**UNITED STATES DISTRICT COURT**
**SOTHERN DISTRICT OF NEW YORK**

CITIGROUP GLOBAL MARKETS INC.,

Plaintiff,

v.

ABDULLAH MAHMOUD ABBAR, GHAZI
ABDULLAH ABBAR, AJIAL
LEVERAGED FEEDER HOLDINGS
LIMITED, AMATRA LEVERAGED
FEEDER HOLDINGS, LIMITED,
AMAVEST HOLDINGS LIMITED, and
GAMA INVESTMENT HOLDINGS
LIMITED,

Defendants.

JUDGE STANTON

Case No. 11 CV-6993

COMPLAINT



## NATURE OF THE ACTION

1.      This action seeks to enjoin a FINRA arbitration (the "FINRA Arbitration")
commenced against Citigroup's United States broker-dealer, Citibank Global Markets Inc.
("CGMI"), by two Saudi Arabian nationals and foreign investment entities they control
(collectively, the "Claimants" or "Defendants").  The FINRA Arbitration is captioned *Abbar v.
Citigroup Global Markets Inc.*, FINRA No. 11-03212.

2.      Although Claimants sued CGMI, CGMI has no customer agreement with
any Claimant and no Claimant has an account at CGMI.

3.      The Claimants are not customers of CGMI.  Nor is CGMI a counterparty
to the transactions on which Claimants base their claim.

4.      Rather, each of the transactions at issue is between Claimants and various
non-US Citigroup entities located and doing business in the United Kingdom, Switzerland, and
the Cayman Islands.  None of those entities are subject to FINRA arbitration.

5.     Claimants premise their right to arbitration on Rule 12200 of the FINRA Code of Arbitration for Customer Disputes (the "Code"), which provides that a FINRA member must arbitrate a dispute with its "customer" if "the dispute arises in connection with the business activities of the member. . . ."

6.     Claimants' Statement of Claim in the FINRA Arbitration (the "Statement of Claim" or the "SOC")[1] asserts claims with respect to two separate sets of transactions pursuant to which Claimants obtained financing (or leverage) from the non-US Citigroup entities.  Since Claimants were not customers of CGMI for either of those transactions, the claims set forth in Claimants' Statement of Claim filed with FINRA are not arbitrable.

7.     The first transaction at issue involved two leveraged option transactions that provided Claimants with a leveraged exposure to various hedge funds with an attendant increase in Claimants' opportunity for profit and level of risk (the "Options Trades").  All of the various documents memorializing the Options Trades make clear that Claimants were transacting with Citigroup Global Markets Limited ("CGML") (a major Citigroup subsidiary that functions as Citigroup's United Kingdom-based broker-dealer with headquarters in London).  The Options Trades were principal trades with CGML.  CGMI was not a transacting party on the Options Trades.

8.     The second transaction at issue involved a unit trust and related loan made under Cayman Islands law (the "Private Equity Loan").  The SOC does not allege any credible involvement on the part of CGMI personnel.  CGMI was not a party to (or even mentioned in) the credit agreement governing the Private Equity Loan.

9.     In addition to the fact that none of the Claimants were CGMI's customers, none of the the transactions at issue relate to the business activities of CGMI.

---

[1] The Statement of Claim, without its accompanying exhibit, is attached as Exhibit A hereto.

## THE PARTIES

10.     Plaintiff CGMI is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York.  It is a broker-dealer, registered with the United States Securities and Exchange Commission and it is a member of FINRA.

11.     Defendant Ghazi Abdullah Abbar is domiciled in and a citizen of Saudi Arabia.

12.     Defendant Abdullah Abbar is Ghazi Abbar's father.  He is domiciled in and a citizen of Saudi Arabia.

13.     Defendant Ajial Feeder is a corporation organized under the laws of the Cayman Islands with its principal place of business in the Isle of Guernsey, in the Channel Islands.  Ajial Feeder is owned and controlled by an Abbar family trust of which, upon information and belief, Defendant Ghazi Abbar is the sole settlor.

14.     Defendant Amatra Feeder is a corporation organized under the laws of the Isle of Jersey, in the Channel Islands, with its principal place of business in the Isle of Jersey, in the Channel Islands.  Amatra Feeder is owned and controlled by an Abbar family trust of which, upon information and belief, Defendant Abdullah Abbar is the sole settlor.

15.     Defendant Amavest Holdings Limited ("Amavest Fund") is a corporation organized under the laws of the Cayman Islands with its principal place of business in the Isle of Guernsey, in the Channel Islands.

16.     Defendant Gama Investment Holdings Limited ("Gama Fund") is a corporation organized under the laws of the Cayman Islands with its principal place of business in the Isle of Guernsey, in the Channel Islands.

17.     Defendants Gama and Amavest Funds are indirectly owned by the Abbar Family.  Gama and Amavest Funds indirectly owned the entities that borrowed money in the Private Equity Loan.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(c) because the plaintiff is a citizen of a State, defendants are all citizens or subjects of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.     The Court also has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the underlying statement of claim seeks relief under the federal securities laws.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(d), as the defendants have sought to arbitrate a dispute within this district.

## FACTUAL BACKGROUND

### I.  Defendants Seek to Hold Citigroup Responsible for their Investment Losses

21.     Claimant Ghazi Abbar is a sophisticated foreign investor with extensive experience managing large and complex investments on his behalf of his family.

22.     Ghazi Abbar has been investing his family's assets in hedge funds and private equity investments for almost 25 years.

23.     For several years prior to the transactions at issue, Ghazi Abbar achieved an annualized average return of approximately 15%.

24.     Ghazi Abbar was able to generate these returns by using substantial leverage.

25.     By 2005, Ghazi Abbar was managing at least $350 million on behalf of himself and his family.

26.     Ghazi Abbar had leveraged his family's investments with a revolving line of credit provided by Deutsche Bank ("DB"), well before moving his relationship to Citibank (Switzerland) S.A., a Swiss Bank.

27.     When Mohanned "Ned" Noor—who had been Ghazi Abbar's primary contact at DB—moved to the Citibank (Switzerland) S.A., Ghazi Abbar sought a larger leveraged exposure from this bank in the hopes that he would further enhance his family's returns.

28.     Ghazi Abbar and the investment vehicles he controlled were advised by professionals independent of any Citigroup-affiliated entity, both before and after the transactions at issue.

29.     In 2008, as the global economic crisis unfolded, the value of the assets held by the investment vehicles at issue declined significantly.

30.     Notices were served on the Claimants offering them the ability to preserve their positions by contributing additional funds.

31.     They declined to do so, and the Options Trades were ultimately terminated in November 2008.

32.     Citibank (Switzerland) S.A., along with Citibank N.A. (Geneva Branch) (together, the "Swiss Banks"), which later became a party to the credit agreement governing the Private Equity Loan, are now exercising their rights under the Private Equity Loan documents.

33.     The SOC inappropriately seeks to hold CGMI responsible for Ghazi Abbar's investment decisions.

## II. <u>Defendants Were Not Customers of CGMI in the Options Trades</u>

34.     The purpose of the Options Trades was to provide the Abbars with leverage to increase their hedge fund exposure (and, as a result, their potential returns).

35.     Prior to the consummation of the Options Trades, Claimants held approximately $210 million in hedge fund investments in two funds: Ajial Holdings, Limited ("<u>Ajial Reference</u>") and Amatra Investments, Limited ("<u>Amatra Reference</u>") (together, the "<u>Reference Funds</u>").

36.     To consummate the Options Trades, the Abbars created two new entities (Claimants Amatra Leveraged Feeder Holdings Limited and Ajial Leveraged Feeder Holdings Limited) (the "<u>Feeder Funds</u>")), which, in turn, entered into the Options Trades with CGML.

37.     Under the terms of the Options Trades, the Abbars, via the Feeder Funds, would receive any upside investment return on the Reference Funds.

38.     The contracts at issue make clear that it was CGML (not CGMI) that entered into the Options Trades with the Feeder Funds controlled by the Abbars.

39.     The Options Trades were each governed by a 71-page confirmation contract between each of the Feeder Funds and CGML (the "<u>Confirmations</u>").

40.     Samir Mathur, a CGMI employee, acting pursuant to a power of attorney for CGML, signed the Confirmations on behalf of CGML. This formal power of attorney allowed him to "execute and deliver any deed, documents . . . contracts or agreements for and on behalf of CGML" in connection with "the Ajial and Amatra transactions dated on or about 9 and 10 May 2006."

41.     The transactional documents make clear that CGML not only acted as the counterparty, but CGML structured the Options Trades as well.

42.     CGML and the Feeder Funds entered into a letter agreement addressing the "Structuring Services" that CGML performed in connection with the Options Trades (the "Letter Agreements").

43.     Those Letter Agreements confirmed the engagement of CGML by the Feeder Funds to "assist with the structuring of the Options Trades and the Related Transactions."

44.     Those documents also acknowledged that CGML "and its affiliates . . . may have other roles in the Transaction including . . . as shareholder of" the Reference Funds and "irrevocably" agreed to exclusive jurisdiction of the English courts over any disputes related to the structuring of the Options Trades.

## III. Defendants Were Not Customers of CGMI in the Private Equity Loan

45.     The SOC also contains allegations related to the Private Equity Loan.

46.     The Private Equity Loan was structured as a loan to three separate investment vehicles that formerly held the Abbar family's private equity assets—Langton Ltd. (a Cayman corporation), Vintage Investments, Ltd. (a Jersey corporation), and later, Meltem Ltd. (a Cayman corporation) (the "PE Vehicles").

47.     As part of the transaction, the Abbars transferred control of the PE Vehicles to a Lender Protected Unit Trust ("LPUT"), established by Cititrust (Cayman) Limited under Cayman law.

48.     The LPUT was owned by defendants Amavest and Gama Funds.

49.     Ghazi and Abdullah Abbar were the beneficiaries of trusts that owned Gama and Amavest Funds.

50.     The Swiss Banks were parties to the governing credit agreement (the "Credit Agreement"), as was Cititrust (Cayman) Limited.

51.     CGMI was not a party to the Credit Agreement.

52.     CGMI employees had no involvement in the transaction.

53.     CGMI is not even mentioned in the Credit Agreement or any of the related transaction documents.

## FIRST CLAIM FOR RELIEF
### (DECLARATORY JUDGMENT AS TO NON-ARBITRABILITY—28 U.S.C. § 2201)

54.     CGMI repeats and realleges the allegations of paragraphs 1 to 53 of the Complaint above, as if fully set forth here.

55.     An actual, present, and justiciable controversy has arisen between the parties as to whether any of the defendants are customers of CGMI within the meaning of Rule 12200 of the Code.

56.     Furthermore, an actual, present, and justiciable controversy has arisen between the parties as to whether the dispute alleged in the SOC arises in connection with the business activities of CGMI.

57.     Furthermore, an actual, present, and justiciable controversy has arisen between the parties with respect to whether the defendants are precluded from pursuing the FINRA Arbitration due to the forum selection clauses contained in the defendants' agreements with CGML, and the Swiss Banks.

58.     CGMI seeks a declaration that the defendants are not customers of CGMI, that the dispute alleged in the SOC does not arise in connection with the business activities of CGMI, and that the defendants are precluded from pursuing the FINRA Arbitration due to the forum selection clauses contained in the defendants' agreements with CGML and the Swiss Banks.

## SECOND CLAIM FOR RELIEF
### (INJUNCTION)

59.     CGMI repeats and realleges the allegations of paragraphs 1 to 58 of the Complaint above, as if fully set forth here.

60.     For the reasons set forth above, CGMI seeks a temporary, preliminary, and permanent injunction enjoining any FINRA Arbitration against CGMI by any of the Claimants or entities they control in connection with the conduct alleged in the Statement of Claim.

## PRAYER FOR RELIEF

WHEREFORE, CGMI is entitled to judgment as against defendants:

(i)     temporarily, preliminarily, and permanently enjoining defendants from proceeding in any way with the FINRA Arbitration; and

(ii)    declaring that defendants' dispute with CGMI is not arbitratble;

(iii)   awarding CGMI all attorney's fees and other costs associated with this action; and

(iv)    awarding any other and further relief that the Court deems just and proper.

MILBANK TWEED HADLEY & McCLOY LLP

By: _____

Scott A. Edelman (SE 5247)
(sedelman@milbank.com)
Daniel M. Perry (DP 6966)
(dperry@milbank.com)
Jed M. Schwartz (JS 6184)
(jschwartz@milbank.com)

1 Chase Manhattan Plaza
New York, New York 10005-1413
Phone: (212) 530-5000
Fax: (212) 530-5219

*Attorneys for Plaintiff Citigroup Global Markets Inc.*

EXHIBIT A

FINRA DISPUTE RESOLUTION, INC.

-------------------------------------------------------------x

In the Matter of the Arbitration Between:

ABDULLAH MAHMOUD ABBAR, GHAZI
ABDULLAH ABBAR, AJIAL LEVERAGED
FEEDER HOLDINGS LIMITED, AMATRA
LEVERAGED FEEDER HOLDINGS LIMITED,
AMAVEST HOLDINGS LIMITED, GAMA
INVESTMENT HOLDINGS LIMITED,

                        Claimants,

        -against-

CITIGROUP GLOBAL MARKETS INC.,

                 Respondent.

-------------------------------------------------------------x

**FINRA-DR Arbitration No.**

**STATEMENT OF CLAIM**

Claimants Ghazi Abdullah Abbar ("Ghazi Abbar"), Abdullah Mahmoud Abbar ("Abdullah Abbar" and collectively, with Ghazi Abbar, the "Abbars"), Ajial Leveraged Feeder Holdings Limited ("Ajial Feeder"), Amatra Leveraged Feeder Holdings Limited ("Amatra Feeder"), Amavest Holdings Limited ("Amavest") and Gama Investment Holdings Limited ("Gama"), (collectively, the "Claimants"), by their attorneys, Rich & Intelisano, LLP, as and for their statement of claim against Respondent Citigroup Global Markets Inc. ("CGMI" or "Respondent"), state as follows:

<u>INTRODUCTION</u>

In 2006 and 2007, the Abbars entrusted approximately $350 million of their family wealth, earned over two generations of hard work, to Citigroup, Inc. The Abbars placed their confidence, reliance and trust in various Citigroup entities to live up to their assurances and representations regarding the safekeeping of the Abbar family's wealth and the suitability of the investment recommendations made by these Citigroup entities

and their agents and employees.  Respondent CGMI and its registered representatives engaged in misconduct with respect to the structuring, monitoring and handling of the Abbars' investments at Citigroup.

Due to a pattern of gross misconduct by CGMI and its employees and affiliates, from late 2005 to present, the considerable family wealth which the Abbars entrusted to Citigroup has been virtually wiped out.  CGMI and its affiliates engaged in reckless and deceitful conduct by engineering financial structures that were completely unsuitable for the Abbars, and were structured to maximize the benefit and profits to CGMI and the other Citigroup entities, to the detriment of their clients, the Abbars.  In this regard, through the actions of CGMI and its affiliates, the Abbars' entire portfolio of hedge fund and private equity investments were placed into complex structures wherein CGMI and its affiliates effectively controlled the Abbars' funds.

Moreover, upon information and belief, the structures recommended and implemented by CGMI and its affiliates had never before been utilized by Citigroup for non-institutional family investors like the Abbars, but, upon information and belief, were utilized because they offered the most financial benefit to CGMI and its employees and affiliates.  Once the structures were in place, CGMI and its affiliates mismanaged them to the detriment of the Abbars and for the benefit of CGMI and its affiliates.  In this regard, upon information and belief, the Abbars' financial advisor at Citigroup, Mohanned Noor ("Noor"), CGMI and the other Citigroup entities were incentivized to always maintain full utilization of loan facilities, maximum leverage, and the highest amounts of assets under management possible, which was completely contrary to the Abbars' expressed

interests, in particular in 2008 when Ghazi Abbar advised Noor that he wanted to exercise more caution and prudence in light of the looming massive financial crisis.

CGMI and its affiliates were well aware that the Abbars were relying on CGMI and its affiliates, and had no other professional financial expertise at the time the structures for their hedge fund and private equity investments were put in place, and that they lacked the infrastructure needed to monitor and conduct proper risk management and independent accounting relating to the structures Citigroup recommended and implemented. CGMI should be held accountable for taking advantage of its position of trust and acting in a deceitful and reckless manner which caused extensive damage to its clients, the Abbar Family, while at the same time CGMI and its affiliates have enriched themselves by tens of millions of dollars.

The misconduct of CGMI and its affiliates and employees caused the Claimants losses of approximately $383 million and has destroyed Ghazi Abbar's long-standing relationships with leading hedge fund and private equity managers, which can never be rebuilt. The misconduct has also severely damaged the Abbar family's internal relationships, since the family, through Ghazi Abbar as the person in control of the family's finances, was dependent on CGMI's and the other Citigroup entities' advice and recommendations.

## THE PARTIES

Claimant Abdullah Abbar is a citizen of Saudi Arabia and resides at Al - Abbar Villa, Hi Rowdah, 112 Al Nahda Street, P.O. Box 1045, Jeddah, Saudi Arabia, 21431. He is the patriarch of the Abbar family, and is a self-made businessman who has spent his entire career, over 50 years, building businesses in the areas of food products importing,

travel and tourism, oil transportation and investments, electrical and mechanical distribution, real estate, engineering contracting and other businesses.

Claimant Ghazi Abbar is a citizen of Saudi Arabia and resides at Al - Abbar Villa, Hi Rowdah, 112 Al Nahda Street, P.O. Box 1045, Jeddah, Saudi Arabia, 21431. He is the son of Abdullah Abbar. He was educated in the United States at Boston University and Harvard. Ghazi Abbar handled the investments of the Abbar family, including the family's relationship with Respondent CGMI and its affiliates and related entities. The Abbar family investments involved in this case were held in various personal investment companies ("PICs") that are also Claimants herein, as described below.

Ajial Feeder is a Cayman Islands limited liability company owned and controlled by an Abbar Family trust, the settlor of which is Ghazi Abbar.

Amatra Feeder is an Isle of Jersey limited liability company owned and controlled by an Abbar Family trust, the settlor of which is Abdullah Abbar.

Amavest is a Cayman Islands limited liability company owned and controlled by an Abbar Family trust, the settlor of which is Abdullah Abbar.

Gama is a Cayman Islands limited liability company owned and controlled by an Abbar Family trust, the settlor of which is Ghazi Abbar.

Upon information and belief, Respondent CGMI is a broker-dealer and a member of FINRA. CGMI's principal place of business is 390–388 Greenwich Street, New York, NY 10013-2396. Pursuant to the rules and regulations of FINRA, Respondent is required to submit the instant controversy to arbitration. This claim involves a dispute between the Abbars and their PICs, who are customers, and CGMI, a FINRA member organization, which dispute arose in connection with the business activities of CGMI and

4

its associated persons.  In this regard, the misconduct of CGMI as alleged herein relates to all aspects of the recommendation, implementation and handling of the structures and investments about which Claimants are complaining relating to their hedge fund and private equity investments.  As such, CGMI must arbitrate this dispute pursuant to FINRA Code of Arbitration Procedure Rule 12200 and other applicable rules.

The various Citigroup entities, including CGMI, Citi Private Bank ("CPB"), Citigroup Global Markets Ltd. ("CGML"), Citi Global Wealth Management and Citi Global Wealth Management International (collectively "CGWM") and Citigroup Global Wealth Structuring ("CGWS") which collectively handled the Abbars' investments are collectively referred to herein as the "Citi Entities" or "Citi" or "Citigroup".  Upon information and belief, all of the representatives of the various Citi Entities involved with Claimants' investments were directly or indirectly answerable to CGMI's FINRA-registered representatives in New York.[1]

## BACKGROUND FACTS

### The Abbar Family's Wealth and Investment Experience

The Abbar family's monies at issue in this arbitration represent two generations of life savings accumulated through the hard work of Abdullah Abbar and his son, Ghazi

---

[1] The Abbar family was courted by top officers of various Citi Entities, including CGMI, to maintain or expand business with Citigroup.  Indeed, Ghazi Abbar met at various times and places around the world with the following top Citigroup officials, all of whom were at relevant times FINRA-registered representatives of CGMI: Vikram Pandit, CEO of Citigroup, Inc. in New York, Sallie Krawcheck ("Krawcheck"), CEO of Citi Global Wealth Management, in New York, India and Saudi Arabia, John Havens, CEO of Citigroup's Institutional Client Group twice in New York, Michael Corbat, successor to Krawcheck as CEO of Citi Global Wealth Management in London, Damian Kozlowski, CEO of Citigroup Private Bank in New York, Raymond C. Nolte, CEO of Citigroup's Hedge Fund Management Group in New York, John Barber, a Managing Director for Citi Private Equity in New York and Susan Wilson-Perez, Managing Director, head of Citi Alternative Investments in New York.  In addition, Ghazi Abbar met with Deepak Sharma, head of CGWM International, Shantanu Rastogi, Head of Investments, CGWM International, and Catherine Weir, CEO, CGWM EMEA, all of whom reported directly or indirectly to CGMI FINRA-registered CGWM personnel in New York.  Many of these persons are potential witnesses in the case.

Abbar. Adbullah Abbar overcame a childhood of illness and a lack of education. He started with modest means and became a successful businessman. His business endeavors in a wide range of industries described above, created a nest egg for his family, including his son, Ghazi Abbar, who has worked with Abdullah Abbar in these business endeavors. Abdullah Abbar and Ghazi Abbar intended that these monies would be maintained and invested for the eventual use of their children and other family members (collectively, the "Abbar Family").

During the 1980s and 1990s, as the Abbar Family's wealth grew, their financial advisors at Bankers Trust (later acquired by Deutsche Bank) helped the family set up trust structures designed to hold the family's assets for the eventual benefit of the Abbar Family members, who were the beneficiaries under the trusts.

By 2005, the Abbar Family's assets totaled approximately $350 million, most of which monies were maintained at Deutsche Bank under the trust arrangements described above.[2] By this time Ghazi Abbar was the primary contact with Deutsche Bank and was authorized by his father to manage the trusts on behalf of the family. The Abbar Family's monies were invested in several different types of investment vehicles, including a large percentage of the assets invested in hedge funds, and the rest invested in private equity, venture capital, real estate trusts, public equities and bonds, and private bond issues.

---

[2] The Abbar Family had a relationship with Citigroup since the 1990s and maintained small accounts there, but the majority of their wealth in 2005 was entrusted to Deutsche Bank.

The Abbar Family's investments in private equity and hedge funds were extensive and of very high quality.[3]  Ghazi Abbar had begun investing portions of the Abbar Family's assets in hedge funds and private equity in approximately 1987, at a time when such class of investments were far less common than they are today.  As such, Ghazi Abbar was lucky enough to develop close relationships with some of the world's most highly respected hedge fund and private equity managers, such as Julian Robertson of Tiger Management and later, the "Tiger Cubs" – hedge funds run by managers who formerly worked under Julian Robertson; Louis Bacon of Moore Capital; Monroe Trout, Jr., of Trout Trading Management Co., Ltd (later called Tewksbury Capital); Paul Tudor Jones; and Steven Cohen of SAC.  Ghazi Abbar's introductions to these and other managers were always based on existing relationships.  For example, Paul Tudor Jones recommended and referred Ghazi Abbar to Louis Bacon, who in turn later referred him to Monroe Trout.  Ghazi Abbar thereby relied on professional managers and developed a well diversified hedge fund and private equity portfolio.  Ghazi Abbar met with many of these managers on a yearly basis or more frequently, and the Abbars were well regarded by the best managers in the hedge fund and private equity worlds.  As such, Ghazi Abbar was able to participate in exclusive offerings on behalf of the Abbar Family by virtue of his long-standing and successful relationships with these managers.

Additionally, with respect to certain of the Abbar Family's private equity investments, because Ghazi Abbar had first invested in them years earlier, they were mature investments, needing no additional capital contributions.  These private equity

---

[3] The term "private equity" generally includes equity investments in companies which are not listed on a public exchange.  Private equity investments, which are often structured as limited partnerships, may periodically require the limited partners to make capital infusions during the life of the investment.

investments held by the Abbar Family were therefore extremely valuable because they did not require further infusions of cash to maintain them. The continued maturation of these private equity investments in the Abbars' portfolio made their already first-rate portfolio even more valuable with the passage of time.

## Noor Recommends Leverage for the Abbars' Hedge Fund Investments

Noor, who in 2005 was the Deutsche Bank representative assigned to the Abbar Family, recommended to Ghazi Abbar that the family leverage the portion of its assets invested in hedge funds, which by that time accounted for approximately 70% of the Abbar Family's total assets. Ghazi Abbar agreed to moderately leverage certain hedge fund investments at Deutsche Bank, on an *ad hoc* basis, but not for the overall portfolio. The family also needed liquidity at this time to meet capital calls in its private equity investments, and requested a simple line of credit, but Deutsche Bank did not handle that type of business for non-institutional clients.

## THE ABBARS MOVE THE BULK OF THEIR WEALTH TO CITI

In late 2005, Noor resigned from Deutsche Bank and became employed at Citi Private Bank Geneva ("CPB"). In an effort to lure the Abbar Family and its substantial wealth over to Citigroup, Noor promised Ghazi Abbar that the world-wide family of Citi Entities could provide the desired private equity lending and financing that the Abbar Family wanted, which Ghazi Abbar had always expressed to Noor as being the family's primary lending need. For many years, the Abbar Family had unsuccessfully tried to set up a suitable line of credit for meeting capital calls in its private equity investments so as not to disrupt its businesses. Noor's and CGMI's promise that the Citi Entities could

solve this problem with an appropriate lending facility was the primary reason Ghazi Abbar agreed to move the family's monies to Citi.

CGMI and Noor actively courted the Abbar Family's business. Noor introduced Ghazi Abbar to CGMI employees from New York regarding the Abbar Family's hedge fund and private equity investments, including Rajiv Sennar ("Sennar"), then vice president at CGMI, Samir Mathur ("Mathur"), a managing director and global head of hybrid derivatives, Paco Ybarra ("Ybarra"), then co-head of Fixed Income, and Vishal Mishra ("Mishra"). According to FINRA BrokerCheck, all four of these individuals were employed by CGMI and registered with FINRA as employees of CGMI during the time period they solicited and transacted business with the Abbars.

Meetings were held both in person and via conference call during late 2005 and early 2006. Noor arranged for CGMI and its affiliates to make presentations to Ghazi Abbar about the possible financing arrangements for the family's hedge fund and private equity investments. CGMI proposed a complex leveraged structure for financing the family's hedge fund investments, typically used only by institutional clients such as large funds of funds.

Unknown to Ghazi Abbar at that time, upon information and belief, if Noor could convince the Abbar Family to move its investments to Citigroup, Noor would be one of CPB's top private bankers and the Abbars would become one of the top ten Citi private clients in the world. CGMI, Noor and other Citi Entities, employees and affiliates stood to earn substantial bonuses if Ghazi Abbar could be convinced to move the Abbar Family's investments to Citi, and in particular if Ghazi Abbar agreed to the leveraged derivative structure for the family's hedge fund investments.

In or about early 2006, the Abbar Family commenced a new relationship with CPB and other Citi Entities, including CGMI, with Noor as the financial advisor. Upon information and belief, Noor was given huge accolades and rewards for bringing in the Abbar Family to Citigroup, including a trip to Hawaii for his family, and he was held up within the Citigroup family as an example of CPB working together with the other Citi Entities, including CGMI.

From the outset of the Abbars' new relationship with the Citi Entities, Noor consistently stated to Ghazi Abbar that "we are all one Citi", making clear that the Citi Entities, including CGMI, CPB, CGML and other Citigroup affiliates, and their representatives, including Noor, were a team that would work together in connection with the Abbar Family investments. Indeed, Vikram Pandit, CEO of Citigroup, Inc., emphasized to Citigroup employees in 2008 the "company's priority to deliver the full benefits of the entire Citi franchise to its clients, extending beyond historic business lines." In addition, upon information and belief, from late 2006 or early 2007 until the present, any non-CGMI Citi personnel who had responsibility with respect to Claimants' investments worked for CGWM, a Citi Entity managed by CGMI FINRA-registered representatives in New York.

## THE HEDGE FUND TRANSACTION

### The Negotiations Leading up to the Hedge Fund Transaction

Despite the fact that Ghazi Abbar advised Noor that his family's primary goal was to arrange for a financing structure for the family's private equity investments, Noor and CGMI, for various reasons, insisted that Ghazi Abbar turn his attention to the hedge fund portfolio financing first. In effect, CMGI and its affiliates held hostage the private equity

financing the Abbars had been promised, so they could first complete the lucrative hedge fund financing on Citigroup's own terms.

This was an improper arrangement of "tying" and, upon information and belief, violated rules and regulations of the securities industry and Citigroup.  Ghazi Abbar reiterated to Noor and CGMI that he preferred to maintain a simple loan structure for the Abbar Family's hedge fund investments, but Noor and CGMI pressed for a more complex arrangement.  Upon information and belief, CGMI and its employees and agents, including Noor, would earn massive bonuses for bringing in "new money" from the Abbars pursuant to the transaction proposed by Noor and CGMI.

During late 2005 and early 2006, Noor introduced Ghazi Abbar to Mathur, Sennar, Ybarra, Mishra and other employees of CGMI, primarily via conference calls to CGMI in New York, in connection with the Abbar Family's hedge fund portfolio. CGMI, through these FINRA-registered employees, engaged in direct solicitation of Ghazi Abbar, with Noor also acting as an interface between CGMI and the Abbars.  After substantial discussion and negotiation between CGMI and Ghazi Abbar over several months, CGMI proposed a structured, leveraged arrangement for the Abbar Family's hedge fund financing.  Prior to this time, including at Deutsche Bank, the Abbars had only used simple lines of credit to provide leverage for select hedge fund investments, on an as-needed basis.  CGMI, by itself and through Noor, advised the Abbars to set up the Abbar Family's hedge fund assets as a complex "leveraged option swap" transaction between the Abbar Family and CGMI.  CGMI conducted the negotiations, structured the deal, and conducted its own analysis of the family's existing hedge fund portfolio.  The CGMI employees primarily responsible for the hedge fund transaction were Mathur and

11

Sennar, who from New York dealt directly and extensively with Ghazi Abbar. Upon information and belief, Richard Burns, then global head of equity derivatives of CGMI and employed and registered at FINRA with CGMI, was the business manager responsible for the transaction.

Although CGMI conducted the negotiations and other work to structure and implement the deal, and was originally intended to be the counterparty to the swap transaction, at the eleventh hour, CGMI and the Citi Entities proposed that CGML, their London-based Citi affiliate, instead be the counterparty to the transaction, rather than CGMI. Upon information and belief, this was contractual "window dressing" since CGML in London was essentially a sales organization, while the substantive work involved in evaluating and operating the structure had been and was to be done by CGMI in New York. Moreover, upon information and belief, Citi substituted counterparties to attempt to avoid regulatory and other legal obligations under U.S. law. Given no disclosure as to this motivation by Citi, Ghazi Abbar knew of no reason to object to this proposed change because the structure of the deal and the transaction documents would remain the same, so he consented to the change to CGML. The transaction was consummated in May 2006 (the "Hedge Fund Transaction"). In all, approximately $343 million worth of the Abbar Family's hedge fund investment assets were placed into this Citigroup-created structure (the "Hedge Fund Structure"), including $198 million of the family's equity and $145 million in debt.

## The Implementation and Handling of the Hedge Fund Structure

As part of the Hedge Fund Transaction, ownership and control of two Abbar Family investment vehicles which held the family's hedge fund investments, Ajial

12

Holdings, Ltd. ("Ajial Holdings") and Amatra Investments, Ltd. ("Amatra Investments") were conveyed to CGMI and CGML. In connection therewith, two new Abbar Family investment vehicles were created, namely Claimants Ajial Feeder and Amatra Feeder, in their place, to hold the Abbar Family's ownership interest in the Hedge Fund Structure.

At the time the Hedge Fund Structure was being set up, and for many months thereafter, the Abbar Family had no outside financial advisor or professional engaged to monitor and advise them; Ghazi Abbar was the only person in this role and as such was completely dependent on Citi and Noor to provide guidance.  CGMI and its affiliates were well aware that the Abbar Family was a retail client with no "office" that could properly monitor the transactions or engage in complex risk management.  CGMI and/or Noor recommended that Noor help Ghazi Abbar create a family office in mid-2006, around the time of the consummation of the Hedge Fund Transaction.  The Abbar Family thereafter began to create a family office, Radar Capital ("Radar"), but that entity was not fully functioning until summer 2007, well after the structure proposed by Citi had been put into place.  Even when Radar was up and running, it was not a substitute for a true independent risk management, administration and accounting infrastructure.  This arrangement was completely inappropriate for the Abbar Family.[4]

CGMI's pivotal role in the negotiation, structuring and implementation of the hedge fund financing transaction is made clear in a pre-closing "Citigroup Global Hybrids" internal Citi memorandum relating to the hedge fund financing arrangement, dated April 25, 2006 (the "April 25, 2006 Memo").  A copy of the April 25, 2006 Memo

---

[4]  While the Abbar Family was represented in the transaction by the London office of Chadbourne & Parke LLP ("Chadbourne"), they relied on them solely for legal and not financial advice.  The Abbar Family relied on Citi for financial advice in connection with the transaction. Upon information and belief, Chadbourne's London office had no prior experience with the hedge fund and private equity structures at issue.

is attached as Exhibit "A". In this memo, in which Ghazi Abbar and his father Abdullah Abbar are designated as the "client", the proposed structure is described, including the fact that CGMI will be the 100% holder of the voting shares of the formerly Abbar Family-owned Ajial Holdings and Amatra Investment companies which held the family's hedge fund investments. Without CGMI in this role, the structure could not have been set up. Moreover, CGMI, as part of the Citigroup "team" handling the family's investments, was heavily involved in the negotiations and structuring of the hedge fund financing. Upon information and belief, CGMI, as the entity in control of Ajial Holdings and Amatra Investments, had the right to breach Citi's internal investment guidelines in conjunction with its role in the ongoing structure. This fact is confirmed by the April 25, 2006 Memo.

In addition to highlighting CGMI's integral role in the Hedge Fund Transaction, the April 25, 2006 Memo clearly sets forth the fact that the Abbars lacked any semblance of an appropriate infrastructure for risk management, monitoring or operations. The April 25, 2006 Memo notes that a primary difference between the proposed arrangement for the Abbar Family, contrasted with Citi's "previous trades executed by the Hybrids desk", is that the Abbar Family "<u>does not possess the same level of risk and operational infrastructure that is usually seen in a fund of funds that is the typical client of the desk.</u>" (Emphasis added). The Memo later reiterates, "<u>The Client does not maintain the extensive risk, due diligence and operational infrastructure that exists at most of the larger fund of funds.</u>" (Emphasis added). Upon information and belief, the Abbar Family was the first non-institutional client to have this structure implemented at Citi.

14

Citi omitted to disclose this fact to the Abbars prior to effecting the Hedge Fund Transaction.

CGMI, Noor and the other Citi Entities and employees involved in the transaction were well aware of the Abbars' lack of infrastructure before the deal closed, yet recommended and implemented the derivative structure which was completely unsuitable for the Abbar Family. CGMI and the other Citi Entities were eager to consummate the deal because, upon information and belief, they received a "guaranteed upfront fee" of approximately $7 million to $8 million in connection with the Hedge Fund Transaction, as confirmed by the April 25, 2006 Memo at page 9. Moreover, CPB was to receive a referral fee and custody fees and according to the April 25, 2006 memo, Citi expected to be fully hedged at all times.

Upon information and belief, aside from the substantial compensation they would receive, CGMI and the other Citi Entities had another incentive to divert the Abbar Family from utilizing a simple lending arrangement for its hedge fund investing needs, which is what the Abbars wanted. By structuring the Hedge Fund Transaction as they did, Citigroup was able to keep the risk of the transaction off its balance sheet. For this additional reason, the Hedge Fund Transaction was structured by CGMI and the Citi Entities as an off-balance sheet derivative transaction, instead of a standard loan arrangement.

Finally, CGMI and its affiliates were willing to ignore the Abbar Family's lack of required infrastructure because they structured and documented the transaction in such a one-sided way that Citi had little risk itself in the transaction, while reaping substantial bonuses and fees.

Pursuant to the agreements put in place in the Hedge Fund Transaction, CGMI took control of Ajial Holdings and Amatra Investments, the Abbar Family's entities that held their hedge fund investments, while the Abbar Family, through Ajial Feeder and Amatra Feeder, received only the right to the equivalent of the financial performance of the portfolio.   Additionally, CGMI, knowing that the Abbar Family lacked an infrastructure to monitor the structure and the investments, undertook the duty to actively monitor them from its office in New York on behalf of the family, a fact that reinforces that the leveraged option swap structure set up by CGMI was not suitable for the Abbar Family.

Upon information and belief, Deutsche Bank considered the structure recommended by CGMI to the Abbars to be unsuitable for a family, and would not have agreed to engage in such a swap transaction for the family's hedge fund lending, facts which were unknown to Ghazi Abbar at the time CGMI proposed the swap structure. Ghazi Abbar was advised, after the fact, that Deutsche Bank would not have allowed the proposed derivative structure for the Abbars because they were not an institutional investor with the experienced infrastructure necessary to conduct due diligence and monitor such a structure.

Although Ghazi Abbar, with the help of his nascent family office, was involved in making the investment decisions on behalf of his family and was designated as the Investment Manager under the agreements governing the Hedge Fund Transaction, he was reliant upon CGMI and Noor with regard to hedge fund investments and the amount and appropriateness of leverage being used, and followed their advice in fulfilling his role as Investment Manager.   Moreover, CGMI had the responsibility to approve or deny all

of Ghazi Abbar's investment decisions and CGMI had the right to remove him as Investment Manager.

Once the derivative structure was set up, CGMI continued its involvement in the transaction. Ghazi Abbar traveled to New York approximately twice per year to meet with CGMI representatives, including Mathur, Sennar, Mishra and others, as well as the outside hedge fund managers. In addition to the active role of CGMI employees in cultivating the relationship with the Abbar Family, CGMI had a pivotal role in the ongoing management of the Hedge Fund Structure. Pursuant to the agreements governing the Hedge Fund Structure, CGMI was responsible for approving and monitoring investments under certain guidelines. However, upon information and belief, for the first 12 to 18 months after the structure was put in place, CGMI completely shirked its responsibilities by failing to monitor the investments and conduct the required due diligence or risk management.

In addition to CGMI's large role as the financial gatekeeper, Noor provided investment advice on the majority of hedge fund investments. CGMI also recommended hedge funds to the Abbar Family. Throughout the negotiations and subsequent transactions, Noor acted as the hub of communication and responsibility between the Abbars, CGMI, CPB and the other Citi Entities. In addition, instead of having an independent administrator to complete valuations of the hedge fund investments for purposes of mandatory compliance with the investment guidelines, Citi placed Noor in this role, which was completely inappropriate and caused numerous inadequacies and errors. Citi knew or should have known that this placed Noor and CPB in a conflict of interest position vis-à-vis the Abbar Family because they also acted as advisors to the

17

Abbar Family and reaped fees from each investment and loan draw down. Moreover, Noor inappropriately executed subscription documents on behalf of the Claimants, which, upon information and belief, violated Citigroup's policies and procedures.

During 2006 and 2007, Radar, the Abbar Family office, began attempting to ascertain the nature of the new structure and get an accurate picture of the investments in the hedge fund portfolio within the structure. Radar and its chief operating officer, George Bower, together with Ghazi Abbar, despite their best efforts, could not get access to the complete portfolio information for at least one year after Radar's formation due to the extremely complex nature of the structure and the fact that Citi failed to have Radar placed on the appropriate hedge fund mailing lists to directly receive documents and information. Only when the Abbar Family and Radar finally had the information they needed to even begin to monitor the hedge fund investments, which occurred in mid-to-late 2007, could they then begin to assess and monitor the risks in the portfolio. This process of conducting risk analysis started in 2007 and was not fully realized until 2008. The result of this arduous and tedious process was that by the time the Abbar Family had the information necessary to understand the portfolio, monitor the investments, and start monitoring the risks, the subprime crisis was in full swing. The inability of Radar to fully monitor the investments until 2008, coupled with CGMI's complete lack of monitoring as described above, meant that no one was completely and actively looking out for the Abbar Family's interests. By the time Radar had enough information to assess the situation, and CGMI finally began to do its job, it was too late, as will be discussed in detail below.

## The Hedge Fund Investments In 2008

The spring of 2008 was a time of extreme market volatility as the subprime crisis expanded into other mortgages including alt-a loans; and Bear Stearns collapsed. Ghazi Abbar became very concerned about his family's potential over-exposure to hedge fund investments due to the leverage and complexity in the structure. Despite CGMI's obligation to monitor the investments and risk in the Hedge Fund Structure under the governing agreements, CGMI had failed to properly do so. When Radar and Ghazi Abbar were finally able to conduct their own monitoring and risk analysis, Ghazi Abbar realized the seriousness of the situation given the expansion of the mortgage crisis and the overall dire market conditions. He shared his concerns with Noor who advised him that the Abbars should "do nothing", and that his fears were unfounded. In or about late 2006 or early 2007, Noor had become a representative of CGWM, as well as of CPB in Geneva. Upon information and belief, CGWM was managed by CGMI FINRA-registered representatives in New York. Noor specifically advised Ghazi Abbar that CGMI had no concerns about the leverage or the market conditions, that Citi would provide a moratorium if breaches to the investment guidelines occurred in the Hedge Fund Structure, and that Citi would not unilaterally exercise its rights to the detriment of the Abbar Family.

Additionally, when Ghazi Abbar and Radar discovered that there were breaches of the investment guidelines and advised Noor of such, Noor made very clear that both Noor and CGMI were well aware of these breaches and advised Ghazi Abbar not to worry about them because Citi would make any necessary accommodations and work with the Abbars. Each time Ghazi Abbar expressed concerns to Noor about the over-

19

leverage in the structure and suggested that they liquidate certain positions to reduce the leverage, he was ignored or rebuffed by Noor and Citi, and his suggestions were refused. Upon information and belief, CGMI knew of Ghazi Abbar's concerns and Noor's improper advice, yet stood by. Noor repeatedly assured Ghazi Abbar that he, CGMI and CPB would protect the Abbar Family.

Upon information and belief, in early 2008, when CGMI finally awakened to its responsibilities and started to monitor the Abbar Family's hedge fund investments, CGMI began enforcing unreasonable and unjustified "haircuts" on the values of the hedge fund holdings, the result of which increased the margin requirements and subjected the portfolio to unnecessary credit exposure.

Throughout the summer of 2008, Noor repeatedly advised the Abbars not to liquidate any hedge fund positions. Finally, due to the over-leveraged nature of the structure of the Hedge Fund Transaction, which was due to CGMI's and its affiliates' own actions, the structure totally collapsed in late 2008 when the full force of the financial crisis made its impact.

From the fall of 2008 through November 2009, the Abbars proposed numerous good faith plans to salvage the portfolio and also protect Citi's interests. Despite CGMI's and Noor's earlier assurances that Citi would act in the Abbar Family's best interests, would protect the Abbar Family, and act in a commercially reasonable manner, the Citi Entities instead exercised their purported rights under the Hedge Fund Transaction agreements in a bad-faith and otherwise improper manner, resulting in a total loss to the Abbars of their hedge fund investments. CGMI took over the management of the remaining positions in the hedge fund portfolio and put in place a program for redeeming

the entire portfolio. As a result, upon information and belief, Citigroup will unjustly benefit in the amount of approximately $70 million from the redemption of such investments after repayment of the loan and interest thereon.

In addition, CGMI's and the Citi Entities' purported rights exercised pursuant to the agreements governing the Hedge Fund Transaction were based upon valuations, pricing and practices that, upon information and belief, were not appropriate and did not properly support the assertion of the Citi Entities' rights under the agreements.

The total value of the Abbars' original $198 million investment in the Hedge Fund Transaction was wiped out. The Abbar Family is seeking compensatory damages of not less than $198 million and other damages relating to the Hedge Fund Transaction.

## THE PRIVATE EQUITY TRANSACTION

### The Abbars' Expressed Need for Private Equity Financing

As discussed above, the primary reason the Abbar Family agreed to move its monies from Deutsche Bank to Citi with Noor was CGMI's and other Citi Entities' assurance that the Citi Entities would be able to structure and provide a credit facility to pay for capital calls in the Abbar Family's private equity investments. Prior to this time, including at Deutsche Bank, the Abbar Family had not used leverage to fund private equity capital calls. Although the Abbar Family held some private equity investments that were mature and required no additional capital, many of their private equity investments were still subject to capital calls.[5]

---

[5] In this regard, prior to the implementation of the Hedge Fund Transaction at Citi, the Abbar Family had sometimes sold their hedge fund investments in order to fund private equity capital calls. Once the Hedge Fund Structure was in place, however, the Abbars found that they could not easily or quickly liquidate hedge fund holdings due to the complexity of the structure, and thus this source of funding for private equity capital calls was no longer readily available. Neither Noor nor anyone at CGMI or the other Citi Entities ever advised Ghazi Abbar that his family would not be able to readily liquidate hedge fund holdings within the new structure.

Although the Citi Entities were quick to set up the Hedge Fund Transaction (which generated massive bonuses and other compensation for CGMI and the other Citi Entities), obtaining the private equity credit the Abbars needed took much longer. Upon information and belief, in Noor's second year at Citi, he and his team would only receive bonuses on new deals and fresh money he brought in. Accordingly, it was beneficial for Noor to first get the Hedge Fund Transaction in place in the first year of the relationship, ensuring that he would be paid for this transaction, then to focus in the following year on the Abbar Family's private equity needs. This way, he would receive compensation on two separate transactions in successive years.

In late 2005, CGMI had originally proposed both a hedge fund _and_ a private equity financing structure. CGMI notified the Abbars that it would do a private equity deal only if the Hedge Fund Transaction was effectuated, thereby inappropriately "tying" the private equity funding to the Hedge Fund Transaction. Furthermore, upon information and belief, a traditional loan facility would not generate substantial revenue or bonuses for Noor or Citi, thus Citi avoided addressing the Abbars' needs in the private equity arena for many months, for the reason that it would simply not be profitable for the Citi Entities.

**The Citi Entities Implement a Structure for the Abbars' Private Equity Financing**

Upon information and belief, in late 2006, CGMI had a financing structure available for the Abbar Family. However, CGMI and the other Citi entities failed to disclose this to Ghazi Abbar. Upon information and belief, Noor and CPB did not wish to again share Abbar-generated revenue with CGMI and therefore decided to execute the private equity transaction at CPB. In late 2006, CPB and an affiliate, Citi Global Wealth

Structuring ("CGWS"), devised the concept of placing the Abbar Family's private equity investment assets into a specialized, esoteric vehicle under Cayman Law, called a Lender Protected Unit Trust, or "LPUT".  Despite Ghazi Abbar's expressed preference for a simpler loan structure, he was not offered or presented with any type of arrangement other than the LPUT, despite the availability of other alternatives.

The LPUT (the "Private Equity Transaction" or the "Private Equity Structure") was a new structure at Citi and was put in place for the Abbar Family in March 2007. Upon information and belief, the Abbar Family was the first and only non-institutional client to have such a structure set up at Citi.  The credit facility provided for loans of up to $110 million, which amount was determined by reference to the value of the Abbar Family's underlying assets (which were transferred to the LPUT controlled by Citi).  The Abbar Family had approximately $147 million in equity in its private equity investments at this time.

As part of the Private Equity Transaction, ownership and control of two other Abbar Family investment vehicles, Langton Ltd. ("Langton") and Vintage Investments Ltd. ("Vintage"), and eventually a third, Meltem Ltd. ("Meltem"), which held the Abbar Family's private equity investments, were transferred to Citi, and the Abbar Family's interest in the Private Equity Structure became held in two other family investment vehicles, Claimants Amavest and Gama, as holders of units in the LPUT trust that was created by Citi.  The LPUT trust arrangement was an overly complex and elaborate structure that was used, upon information and belief, to benefit the Citi Entities and to the detriment of their clients, the Abbar Family.

23

Upon information and belief, just as in the case of the Hedge Fund Transaction, the LPUT structure was reviewed and/or approved for the Abbar Family by CGMI FINRA-registered representatives of CGWM. In addition, upon information and belief, representatives of CGWS, who helped devise the LPUT, ultimately answered to CGMI FINRA-registered Global Wealth Management personnel. Finally, upon information and belief, CGWM representatives, who were involved in the day-to-day management of the LPUT on behalf of Citi, were also ultimately responsible to CGMI FINRA-registered CGWM personnel in New York. For example, 2008 correspondence evidences that Citi bankers in Europe (including Paul De Sousa) looked to Citi in the U.S., meaning CGMI registered representatives in New York, for approval to amend the terms of the private equity loan facility.

As was the case in the Hedge Fund Transaction, in the context of the Private Equity Transaction, the Abbar Family was completely reliant for investment advice on the recommendations of Noor, CGWM and other Citi Entities, although the Abbars used the same legal counsel as before. Radar, the family office intended to monitor the Abbar Family's investments, started to operate by early 2007, yet played little role in structuring the Private Equity Transaction because it had neither the experience nor staff to do so. There should have been a truly independent infrastructure to monitor risk, conduct accounting and other needed monitoring on behalf of the Abbar Family.

**The Increased Borrowing at the Behest of Citi and the Formation of Meltem**

For the first few months after the Private Equity Transaction was consummated, the Abbar Family drew only about 30% to 50% of the loan facility on average, which was the Abbar Family's preference as this met their usual conservative borrowing needs to

meet capital calls for their private equity investments.  Apparently, however, this amount of borrowing was not beneficial enough to the Citi Entities, including CGWM, because in early 2007, Noor persuaded Ghazi Abbar to use the undrawn amount of the credit facility to invest in certain Citigroup-related private equity investments.  Upon information and belief, CGWM and other Citi Entities and their employees would receive greater compensation the more the loan facility was utilized.  Moreover, upon information and belief, CGWM pressured its sales people to sell Citigroup proprietary products to its clients which generated more revenue than non-Citigroup products.  Noor and CGWM proposed that the Abbars add to the existing credit facility and set up a new entity, Meltem, which would invest in the proposed Citigroup-related investments.  In May 2007, an amendment to the Private Equity Structure was consummated, and Meltem was formed.  The Citigroup-related funds in which Meltem invested included Citi Venture Capital International, ("CVCI")[6] and Court Square.  Upon information and belief, Citigroup is the major partner and controller of CVCI, a London-based private equity manager, and is a major backer of Court Square, a private equity manager.[7]

In or about mid-2008, Ghazi Abbar approached Citi requesting more flexibility in the use of the private equity credit facility.  He met with Krawcheck, then head of CGWM and a managing director and FINRA-registered representative of CGMI in New York, who promised Ghazi Abbar in a June 2008 email that "I will stay engaged on this issue till we reach a mutually acceptable resolution."  This is just one example of many instances of direct communications between Krawcheck and Ghazi Abbar.  Krawcheck

---

[6] CVCI's management included Citigroup FINRA-registered representatives.
[7] Upon information and belief, Citi allowed the Abbar Family to invest in the CVCI and Court Square funds at Citi's employee-discount rates, making these investments already leveraged in a sense, before they even got into the Meltem structure where the leverage was ratcheted up.

became involved in procuring a $10 million line approved for the Abbar Family. Ghazi Abbar had met with Krawcheck several times in the past, including in connection with the Abbar Family's hedge fund investments.

By the end of 2008, the Citigroup-related investments in Meltem were putting severe pressure on the private equity credit facility, due to inordinately large capital calls. Noor had resisted Ghazi Abbar's overtures to sell these investments, which would have threatened his compensation. Instead, Noor promised that if Meltem put too much pressure on the portfolio, he could arrange for an increase in the facility. The aforementioned $10 million facility, which was effectuated in late 2008, temporarily released some of the pressure on Meltem, helping to forestall efforts to sell the Citigroup-related private equity investments, which was really what was needed.

**The Collapse of the Private Equity Structure**

Throughout the fall and winter of 2008, Ghazi Abbar wanted to sell the Citigroup-related positions in Meltem, but he was talked out of it by Noor. In an attempt to increase liquidity and protect the structure from failing, the Abbar Family sold other, non-Citigroup investments and injected approximately $13 million of outside monies into the LPUT structure.

In January 2009, when the situation surrounding the Private Equity Transaction was dire due to the extreme pressure being put on the lines by the Citigroup-related Meltem positions, Ghazi Abbar again proposed to sell them. Noor responded by advising him not to sell because the Meltem positions would be the only thing Noor would make money on that year, and confirmed by text message to Ghazi Abbar the approval of a $50 million sub-facility to meet any shortfall. Ghazi Abbar had no reason to doubt this

promise; CGMI and Krawcheck had previously intervened to set up the $10 million line. Upon information and belief, the communication of an additional $50 million facility was falsely made in order to persuade the Abbar Family not to sell the Citigroup-related positions. The Abbar Family, in reliance on these false promises made in bad faith, did not sell its Meltem positions. The $50 million facility never materialized.

Finally, in November 2009, the Meltem investments exerted too much pressure on the lines, and the LPUT structure was declared "exposed to risk" by Citigroup. Such notice purportedly entitled Citigroup to take control of the structure. Meltem and the Citi-related investments held by Meltem were a major contributing factor in the collapse of the structure. The extreme leverage in the structure, combined with the complexity of the structure, led to its demise. Had Meltem not been formed in order to maximize investments in Citigroup-related private equity investments (so that the Citi Entities could realize maximum profits), the structure would not have been over-stressed, leading to its collapse. The Meltem arrangement, designed to benefit Citigroup from the outset, gave Citi the pretext to eventually declare the structure as "exposed to risk" and to exercise its purported rights under the Private Equity Transaction agreements. Although the then present valuations of the Abbar Family's other more mature private equity investments were down, the long term outlook of this highly regarded portfolio was positive.

## 2009 Negotiations with Citigroup

In April and May 2009, Ghazi Abbar, in an attempt to reach a resolution with Citi relating to the Private Equity Transaction and the Meltem debacle, negotiated an agreement between the Abbar Family and the Citi Entities through Noor and Deepak Sharma of CGWM. Under the agreement, certain assets would be sold to reduce

exposure, and Citi would agree not to take unilateral action with respect to any of its purported rights under the relevant agreements for a period of 12 months. Just after this moratorium was agreed to, however, Noor resigned from CGWM and CPB. Thereafter, Citigroup completely reneged on its agreement, declared the structure "exposed to risk" and exercised its purported rights under the agreements governing the Private Equity Transaction.

After the unilateral declaration of the LPUT as "exposed to risk" by Citi, it was only a matter of time before Citi took over the portfolio in order to sell off the positions into a depressed, illiquid secondary market. The entire private equity portfolio of the Abbar Family, now contained in the LPUT structure controlled by Citi, was taken over by CGMI's New York-based institutional recovery unit in 2009, whose personnel included Trevor Houston and John O'Connell. In the last 18 months, CGMI personnel have been actively dealing with the Abbars with respect to all issues related to the hedge fund and private equity investments.

Upon information and belief, CGMI has begun selling off valuable private equity investments at substantially discounted prices to protect itself, rather than its clients, the Abbar Family. As such, CGMI has benefited at the expense of the Abbar Family. Moreover, upon information and belief, in at least one instance, Citi sold a private equity position into a depressed secondary market instead of waiting for a short period to exit at a substantial multiple.

As described above, CGMI's, CGWM's and the other Citi Entities' own conduct, particularly in connection with Meltem, inappropriately placed their clients at risk of default and caused the risk that eventually materialized. The improper recommendation

and implementation of the Meltem structure greatly contributed to the risks and the ultimate breakdown of the already improper structure. CGMI and the other Citi Entities should not be permitted to reap the advantage of selling off in an untimely manner the Abbar Family's valuable private equity investments at considerable loss to the Abbar Family in order to unfairly "protect" themselves.

Additionally, CGMI's and the other Citi Entities' rights exercised pursuant to the agreements governing the Private Equity Transaction were based upon valuations, pricing and practices that, upon information and belief, were not appropriate and do not support the assertion of the Citi Entities' rights under the agreements.

The Abbar Family's total investment in connection with the Private Equity Transaction was $147 million. The Abbar Family is seeking damages of not less than $147 million in connection with the Private Equity Transaction. As stated above, the Abbar Family is seeking compensatory damages of approximately $198 million in connection with the Hedge Fund Transaction. Moreover, the Abbar Family, during the life of the Hedge Fund and Private Equity Transactions injected an additional $38 million, which has also been lost, thereby creating a total loss of approximately $383 million.

In connection with both the Hedge Fund Transaction and the Private Equity Transaction, CGMI, CGWM and other Citi Entities deliberately structured the complex legal agreements governing the transactions in a way that they could disclaim or exclude legal responsibilities on the part of the Citi Entities, including U.S. regulatory oversight, and to deprive the Abbars of any rights or remedies they may have, to the fullest extent possible. This deliberate one-sided construction of the legal agreements was

fundamentally at odds with the relationship of trust and confidence which the Abbar Family had established with Citi.

## CLAIMS FOR RELIEF

All of the actions and omissions of CGMI as set forth above constitute and give rise to the following claims: breach of fiduciary obligations; misrepresentations and material omissions; common law fraud and fraudulent inducement; unsuitability; failure to supervise; breach of the implied covenant of good faith and fair dealing; negligence, gross negligence and negligent misrepresentation; unjust enrichment; unlawful tying; breach of contract and warranty; promissory estoppel; prima facie tort; respondeat superior; breach of applicable U.S. securities laws, statutes, rules, regulations and standards of conduct; violations of English law, including but not limited to the Financial Services and Markets Act of 2000; and violations of applicable Saudi Arabian and Swiss law. Claimants also request a complete and full accounting.

Throughout the entire period described herein, CGMI and members of the Citi team at various Citi affiliates were agents of one another in dealing with the Abbar Family's investments. In addition, CGMI FINRA-registered representatives had ultimate authority with respect to both the Hedge Fund and Private Equity Transactions. As such, CGMI should be held responsible for the misconduct of all these agents and employees.

## COMPENSATORY AND OTHER DAMAGES

By reason of, as cause of, and in consequence of the misconduct engaged in by Respondent, its employees, agents and representatives including Noor, among others, and misconduct in the handling of Claimants' assets, Claimants have suffered compensatory

damages in an amount to be determined at the hearing of this matter, but not less than $383 million.

Claimants request compensatory damages, rescission and/or other damages; disgorgement of Respondent's compensation; punitive damages in an amount to be determined by the arbitrators; interest at the legal rate; reasonable attorneys' fees; costs, expert and witness fees and administrative expenses; and any other and further relief the arbitration panel finds just and equitable.

## PUNITIVE DAMAGES

The actions of CGMI as set forth in this statement of claim support an award for punitive damages.  By reason of the unconscionable fraudulent acts and willful misconduct of CGMI, engaged in for the purpose of and with the intent of causing Claimants damage by misrepresentation and deceit, and conduct that placed Claimants' assets at extraordinary high risk, which led to the losses of Claimants' assets, and by reason of CGMI's failure to supervise its registered representatives, Noor and other CGWM personnel responsible for Claimants' investments, and personnel responsible for supervision of such investments, and breach of Respondent's fiduciary duties owed to Claimants, Claimants are entitled to recover punitive damages.  As a matter of policy and law under the provisions of the Federal Arbitration Act, which has been deemed applicable to this arbitration by a 1995 decision of the Supreme Court of the United States, Mastrobuono v. Shearson, 115 S.Ct. 1212 (1995), the arbitrators herein have the authority to consider and make an award to Claimants for punitive damages. Respondent's failure to supervise the conduct of its registered representatives and other representatives, including Noor, and Respondent's breach of its fiduciary obligations

owed to Claimants, were perpetrated in such a gross, reckless, wanton and willful manner as to be deserving of the imposition of punitive damages in an amount to be determined by the arbitrators.  The fraud violations asserted above, CGMI's breach of its fiduciary obligations owed to Claimants, and the other violations and failures of CGMI representative stated herein, all constitute gross negligence, material misstatements and omissions and fraud, warranting an award of punitive damages.

Dated: New York, New York
        August 17, 2011

                            Respectfully submitted,

                            RICH & INTELISANO, LLP

                            Attorneys for Claimants

                    By: _____
                            John G. Rich, Esq.
                            Ross B. Intelisano, Esq.
                            Diane Mall Sammarco, Esq.

                            111 Broadway
                            Suite 1303
                            New York, NY 10006
                            (212) 433-1480