**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITIGROUP GLOBAL MARKETS INC., | |
| Plaintiff, | ECF CASE |
| v. | Case No. 11 Civ. 6993(LLS) |
| ABDULLAH MAHMOUD ABBAR, GHAZI ABDULLAH ABBAR, AJIAL LEVERAGED FEEDER HOLDINGS LIMITED, AMATRA LEVERAGED FEEDER HOLDINGS LIMITED, AMAVEST HOLDINGS LIMITED, and GAMA INVESTMENT HOLDINGS LIMITED, | |
| Defendants. | |

## AMENDED JOINT PRETRIAL ORDER

The Parties hereby submit this Amended Joint Pretrial Order.

## I. AGREED FINDINGS OF FACT

### A. Introduction

1.      On August 17, 2011, Defendants Abdullah Mahmound Abbar, Ghazi Abdullah Abbar, Ajial Leveraged Feeder Holdings Limited ("Ajial Feeder"), Amatra Leveraged Feeder Holdings Limited ("Amatra Feeder") Amavest Holdings Limited ("Amavest") and Gama Investment Holdings Limited ("Gama") commenced an arbitration before the Financial Industry Regulatory Authority ("FINRA") against Plaintiff Citigroup Global Markets Inc. ("CGMI").

2.      On October 6, 2011, CGMI commenced this action.  Along with its complaint, CGMI filed a motion, supported by declarations, seeking to preliminarily enjoin Defendants from pursuing their FINRA arbitration.

B. **The Parties**

1. **Plaintiff**

3.      Plaintiff CGMI is a corporation, organized under the laws of the State of New York, with its principal place of business located in New York, New York.

4.      CGMI is an indirect, wholly-owned subsidiary of non-party Citigroup Global Markets Holdings Inc., which is a wholly-owned subsidiary of non-party Citigroup Inc. (õCitigroupö).

5.      CGMI is a broker-dealer, registered with the Securities and Exchange Commission and a member of FINRA.

6.      Non-party Citigroup Global Markets Limited (õCGMLö) is a corporation, organized under the laws of England and Wales, with its principal place of business located in London, England.

7.      CGML is a broker-dealer authorized by the Financial Services Authority of the United Kingdom under the Financial Services and Markets Act 2000.

8.      CGML is an indirect, wholly-owned subsidiary of Citigroup.

2. **Defendants**

a. **Ghazi Abbar**

9.      At all relevant times, Ghazi Abbar was, and is, a Saudi Arabian citizen.

10.     Ghazi Abbar was directly involved in the negotiation of both the Options Transactions and the Private Equity Loan Facility (both defined below).

### b.  **Abdullah Abbar**

11.     Abdullah Abbar is a Saudi Arabian citizen who is domiciled in and resides in Saudi Arabia.

12.     Abdullah Abbar is Ghazi Abbar's father.

### c.  **The Feeder Funds**

13.     Defendant Ajial Feeder is a company incorporated in the Cayman Islands with its principal place of business in the Isle of Guernsey, the Channel Islands.

14.     Ajial Feeder is owned by the JT808 Trust, the settlor of which is Defendant Ghazi Abbar.

15.     Defendant Amatra Feeder (with Ajial Feeder, the "Feeder Funds") is a company incorporated in the Isle of Jersey with its principal place of business in the Isle of Jersey, the Channel Islands.

16.     Amatra Feeder is owned indirectly by the JT647 Trust.  The settlor of the JT647 Trust is Abdullah Abbar.

### d.  **Gama and Amavest**

17.     Defendant Gama is an investment company incorporated in the Cayman Islands with its principal place of business in the Isle of Guernsey, Channel Islands.

18.     Gama is owned by the JT808 Trust.

19.     Defendant Amavest is a company incorporated in the Cayman Islands with its principal place of business in the Isle of Guernsey, Channel Islands.

20.     Amavest is owned by the JT647 Trust.

21.     The JT808 Trust and the JT647 Trust are collectively referred to as the "Trusts".

22.     None of the Defendants are broker-dealers.

## C. <u>Background</u>

23.     During the 1980s and 1990s, the Abbarsø primary banking relationship was with Bankers Trust, which was later acquired by Deutsche Bank.  (TX 588 at 6.)

24.     In 2005, the Abbarsø banker at Deutsche Bank in Switzerland was Mohanned õNedö Noor.

25.     In 2005, the Trusts owned two investment companies called Ajial Holdings Limited (õAjial Limitedö or õAjial Referenceö) and Amatra Investment Limited (õAmatra Limitedö or õAmatra Referenceö).

26.     Ajial Limited and Amatra Limited each owned a portfolio of hedge fund investments, which were held in custody at Deutsche Bank in Switzerland.

27.     Mr. Noor left Deutsche Bank in or around Fall 2005.  He began working for an affiliate of Citigroup in Switzerland on or around January 1, 2006.  He was assigned to a business unit within Citigroup called the Private Bank.

## D. <u>The Relevant Transactions</u>

28.     The statement of claim filed by the Defendants with FINRA includes allegations relating to transactions involving interests in hedge fund and private equity investments.

29.     The first transactions involved financing for the portfolio of hedge funds held by Ajial Limited and Amatra Limited (the õOptions Transactionsö).

30.     A second series of transactions involved financing for a portfolio of private equity investments (the õPrivate Equity Loan Facilityö).

E.  **The Options Transactions**

1.  **Key Documentation Concerning the Options Transactions**

31.     The Options Transactions closed on or about May 9, 2006.

32.     A number of documents were executed in connection with the Options

Transactions (the ÷Closing Documentsö).

33.     Included among the Closing Documents are:

a.      Two substantially identical confirmations between CGML and

each of the Feeder Funds (the ÷Confirmationsö);

b.      Two substantially identical side letters between CGML and certain

Defendants and other non-parties;

c.      Two substantially identical investment advisory agreements, dated

May 9, 2006, between Ajial Limited and Amatra Limited and Ghazi

Abbar (the ÷Investment Advisory Agreementsö);

d.      A document titled ÷Summary of Leverage Option Transaction,ö

dated May 9, 2006, signed by Ghazi Abbar (the ÷Summary of Leverage

Option Transactionö);

e.      A document titled ÷Power of Attorney;ö

f.      A resolution of Amatra Limited dated May 9, 2006, providing,

among other things, that one authorized and issued ordinary share in

Amatra Limited issued to CGMI would be converted into one non-

redeemable ordinary share and the two remaining authorized and issued

ordinary shares into redeemable non-voting shares;

g.      A ÷Management Shares Subscription Letterö dated May 9, 2006,

addressed to the directors of Ajial Limited, relating to CGMIøs acquisition

of the voting shares in Ajial Limited and undertaking to act in accordance with its articles of association; and

h.     A waiver of conflict of interest letter with respect to joint legal representation by Cayman counsel of CGMI, Ajial Feeder, and Ajial Limited.

## 2.   Negotiation of the Options Transactions

### a.   The Hybrids Group

34.     In or around 2005 and 2006, Citigroup managed its businesses along business segments.  One of those business segments was called Corporate and Investment Banking ("CIB").

35.     The Sales & Trading Division of CIB housed multiple desks, including a desk called the "Hybrids Desk."

36.     The Hybrids Desk was also called the Hybrids Group.

37.     The Hybrids Group was a business unit within Citigroup, not a separate legal entity.

38.     The Hybrids Group engaged in transactions with customers of Citigroup domiciled in the United States and various countries around the world.

39.     As of the end of 2006, the Hybrids Group had members in New York, London, Hong Kong and Tokyo.  The members in New York were CGMI employees, the members in London were CGML employees, and the members in Hong Kong and Tokyo were employees of entities located within those countries.

40.     The persons who were members of the Hybrids Group were employees of the Citigroup legal entity located in the country in which they worked.

41.     The persons who were members of the Hybrids Group in New York were FINRA-registered representatives of CGMI.

42.     The Hybrids Group had two types of businesses:

    a.     A multi-asset business, which involved, for example, options on baskets of indices, packaged as notes.

    b.     A "Fund Derivatives" business involving leveraged options, swaps and credit facilities.

43.     James Wathan was an employee of CGML in London and a sales person who worked on the Options Transactions, but he did not work in the Hybrids Group.

44.     As of the end of 2006, the Hybrids Group worked with a "diverse range of clients including high net worth individuals, family offices, institutional investors, fund managers, and funds of hedge funds."

45.     The Hybrids Group had a "client service group" located in New York. The members of the client service group's primary role was to interact with clients, the Hybrids Group's trading team, and the Hybrids Group's operations team, as trades progressed.

46.     The client service group reported to Samir Mathur and Erwin Parviz.

47.     The client service group was involved with the Options Transactions.

48.     Rajiv Sennar was a member of the Hybrids Group in New York and was employed by and a FINRA registered representative of CGMI. Rajiv Sennar was the principal person in New York responsible for structuring the Options Transactions.

49.     One of Mr. Sennar's direct supervisors during the time of the Options Transactions was Erwin Parviz, a CGML employee located in London, England.

50.     Mr. Sennar also reported to Samir Mathur in New York.

51.    Mr. Mathur was also a member of the Hybrids Group in New York and was employed by and a FINRA registered representative of CGMI.

### i.    The Negotiations

52.    Discussions regarding a potential business transaction between Ghazi Abbar and Citigroup began in or around November 2005.

53.    Even before Mr. Noor began working for the Private Bank in early 2006 he began discussions with Mr. Abbar about potential financing from Citigroup.

54.    From in or about November 2005 to May 2006, there were emails, conference calls, and in person meetings between representatives of CGMI, CGML and/or the Private Bank, on the one side, and Ghazi Abbar, on the other.  These contacts with Ghazi Abbar were primarily with, alphabetically, Mohanned Noor of the Private Bank, Rajiv Sennar of CGMI, and James Wathan of CGML.

55.    Ghazi Abbar received two presentations in or around November 2005 with respect to financing solutions for the private equity and hedge fund portfolios.

56.    One presentation was dated November 18, 2005, and was titled "Presentation to GA Investments Co. Private Equity Securitization Structure."

57.    The presentation stated: "We look forward to discussing this opportunity in more detail with you as we explore ways to provide liquidity to your present and future private equity investments."

58.    A disclaimer to the Private Equity Securitization Structure document stated that "[a]ny terms set forth herein are intended for discussion purposes only and are subject to final terms as set forth in separate definitive written agreement."

59.     Another presentation was untitled but addressed financing solutions for a hedge fund portfolio (the "November 2005 Hedge Fund Presentation").

60.     The front page of the November 2005 Hedge Fund Presentation listed the contact information for James Wathan.

61.     The second-to-last page of the November 2005 Hedge Fund Presentation listed the contact information for Samir Mathur and Rajiv K. Sennar in New York and James Wathan in London, and bore a copyright by CGMI, disclaimers by "Citibank, N.A. and its subsidiaries," and trademark and service mark reservations by Citicorp.

62.     The disclaimer also states that the terms set forth in the presentation "are intended for discussion purposes only and are subject to the final expression of the terms as set forth in separate definitive written agreements."

63.     In or about January 2006, Ghazi Abbar received a presentation titled "Hedge Funds + Private Equity" (the "January 2006 Hedge Funds + Private Equity Presentation").  The "January 2006 Hedge Funds + Private Equity" Presentation's cover page lists CGMI, under which is "Fund and Multi-Asset Derivatives," and CGMI's address in New York.  The last page bears a copyright by CGMI, disclaimers by "Citibank, N.A. and its subsidiaries," and trademark and service mark reservations by Citicorp.  That disclaimer states that the terms set forth in the presentation "are intended for discussion purposes only and are subject to the final expression of the terms as set forth in separate definitive written agreements."

64.     The negotiations of the Options Transactions included emails between Rajiv Sennar and Ghazi Abbar, as well as emails between Mohanned Noor, Ghazi Abbar, Rajiv Sennar, and James Wathan.

65.     The negotiations of the Options Transactions included emails in which Mohanned Noor would relay messages between James Wathan or Rajiv Sennar and Ghazi Abbar.

66.     In March 2006, as negotiations progressed, Ghazi Abbar agreed to reimburse Citigroup for the costs of Citigroup's counsel's legal fees if the Options Transactions did not close.

67.     In an April 10, 2006 email from Richard Burns to Erwin Parviz, Mr. Burns stated that he was not "agreeable" to the Options Transactions at that time because of "the lack of formal fund-of funds manager," and because of "the diligence and formal control process around that."  Mr. Burns, however, eventually gave his approval for the transactions.

### b.  The CMAC Approval Process

68.     Within Citigroup, at the time of the Options Transactions, a Capital Markets Approval Committee ("CMAC") reviewed hedge fund financing transactions, such as the Options Transactions, and complicated or new transactions that might raise unique, franchise-type issues.

69.     CMAC consisted of members from CGMI's and CGML's finance, accounting, tax, market risk, credit risk, compliance, and legal units, among others.

70.     The Options Transactions were presented to a joint New York and EMEA (Europe, Middle East, Africa) meeting on or about April 27, 2006.

71.     Prior to the joint CMAC meeting, a memorandum (the "CMAC Memo") was prepared and circulated to CGMI and CGML personnel.

72.     Rajiv Sennar was the principal author of the CMAC Memo.

73.     The CMAC Memo lists Richard Burns as the business manager and Erwin Parviz, Samir Mathur, and Rajiv Sennar as the business sponsors.

74.     The CMAC Committee members or their representatives that reviewed and approved the Options Transactions included the following people who were employed by or registered with CGMI: Ramesh Gupta, Donald Krapp, Jean Louis Lafforgue, Bret Dooley, Craig Seledee, Steven Penny, James McDade, and Laurence Salva.

75.     The CMAC Committee members or their representative that reviewed and approved the Options Transactions also included the following people who were not employees of, or FINRA-registered representatives of, CGMI: David Minarik, Jonathan Asher, Raphael Lebrun, David Arnold, John Davie, Stephen Randall, Paul Reed, and Julie Wan.

76.     Certain CGMI and CGML employees engaged in due diligence of Ghazi Abbar and Abdullah Abbar in April 2006, prior to the execution of the Options Transactions, including (in alphabetical order) Sean Flanagan (CGML), Ramesh Gupta (CGMI), Donald Krapp (CGMI), Jean Louis Lafforgue (CGMI), Samir Mathur (CGMI), Joanne McCourt (CGML), Vishal Mishra (CGMI), Erwin Parviz (CGML), Rajiv Sennar (CGMI), James Wathan (CGML), and Julie Wan (CGML).

### c.   The Confirmations

77.     On February 6, 2006, Rajiv Sennar sent an email to Ghazi Abbar expressing a preference to document the Options Transactions under New York law and suggesting various law firms to Ghazi Abbar.

78.     On February 28, 2006, Rajiv Sennar wrote an email to James Wathan stating that it would be useful to know which attorney in New York Ghazi Abbar planned to use.

79.     Beginning some time in March 2006, Ghazi Abbar was represented by the London office of the law firm of Chadbourne & Parke LLP ("Chadbourne") in connection with the Options Transactions negotiations.

80.     During the negotiation process, Citigroup was represented by the London office of Allen & Overy, LLP ("A&O"), who were the primary Citigroup attorneys who drafted documentation for the Options Transactions.

81.     Jonathan Asher and Rafael Lebrun, CGML employees, and Craig Seledee, a CGMI employee, were the primary internal lawyers involved in reviewing the Options Transactions.  Mr. Seledee's role was to monitor A&O and participate in internal Citigroup approvals.

82.     A draft term sheet for the Options Transactions was circulated on February 26, 2006.  It was on CGMI letterhead.  It indicated that "A Citigroup entity" to be determined would sell the Options Transactions.

83.     Ghazi Abbar first received a draft of the confirmations on March 17, 2006.

84.     The Confirmations were signed on or about May 9, 2006.

85.     The Confirmations are governed by English law and incorporate a non-exclusive forum selection clause in favor of English courts.

### d.  The Summary of Leverage Option Transaction

86.     In connection with the Options Transactions, on or about May 9, 2006, Ghazi Abbar signed the Summary of Leverage Option Transaction.

87.     The Summary of Leverage Option Transaction purported to describe and summarize the Options Transactions.

**e.   The Structuring Services Fee Letters**

88.    On May 11, 2006, CGML and each of the Feeder Funds executed letters (the öStructuring Services Fee Lettersö) to öconfirm[] the engagement, prior to the Trade Date of the Option Transaction of CGML by Counterparty [each Feeder Fund] to provide to Counterparty the following services in connection with the Option Transaction: assist with the structuring of the Option Transaction and the Related Transaction.ö

89.    The Structuring Services Fee Letters define öCGMLö as Citigroup Global Markets Limited and define öCitigroupö as öCGML and its affiliates.ö

90.    The Structuring Services Fee Letters also state:  öCounterparty [each Feeder Fund] and CGML each irrevocably agrees that the Courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this letter agreement and accordingly submit to the exclusive jurisdiction of the English Courts.ö

**f.   The Investment Advisory Agreements**

91.    The Investment Advisory Agreements under which Ghazi Abbar acted as investment advisor to the Reference Funds (Ajial Limited and Amatra Limited) were signed by Ghazi Abbar and the Reference Funds.

92.    CGMI is not a signatory to the Investment Advisory Agreements.

93.    As part of the Options Transactions CGMI acquired the voting shares of the Reference Funds and CGML acquired the economic shares in the Reference Funds.

94.    CGMI was referred to in the Investment Advisory Agreements as the öRelevant Shareholder.ö  The agreements provide CGMI with certain rights, and referenced CGMIøs New York address to the attention of Mr. Mathur.

- 13 -

95.     The Investment Advisory Agreements state that Ghazi Abbar, as Investment Advisor, shall recommend to each Reference Fund ōthe purchase or redemption or sale of Investments in particular [hedge funds] and the terms upon which such purchase or redemption or sale should be effected and the date when such purchase or redemption or sale should be effected.ö

96.     Ghazi Abbar could not bind the Reference Funds, had no voting rights in the Reference Funds, and was required to obey and comply with all orders and directions given to him by or on behalf of the Reference Funds or the Relevant Shareholder.

97.     The Investment Advisory Agreements stated that if Ghazi Abbar became domiciled in or a resident of the United Kingdom, or was performing any material part of his obligations or exercising any material part of his rights (either in person, through an agent, as an employee or in any other capacity) under the agreement or any related document, in the United Kingdom, and the Reference Funds incurred or became liable for any United Kingdom taxes, Ghazi Abbar would indemnify and hold the Reference Funds harmless for such taxes.

98.     The Investment Advisory Agreements provided the Reference Funds with the authority to terminate the Investment Advisory Agreements for any reason upon ten business daysø notice.

99.     The Investment Advisory Agreements state that Ghazi Abbar shall supply, to CGMI on behalf of the Reference Funds, all requisite information in respect to an investment that is the subject of an investment recommendation to enable the Reference Funds to identify and properly assess the risk of the relevant investment, and if approved for the Reference Funds, to cause the proposed investment to be effected.

100.    The Investment Advisory Agreements state that each completed investment recommendation shall be delivered to the Reference Funds, with a copy to the Relevant Shareholder, no later than 15 days prior to the date recommended to the Referenced Funds in the investment recommendation for the Reference Funds to submit appropriate redemption or subscription forms to effect an investment or redemption.

101.    The Investment Advisory Agreements state that the Reference Funds shall decide whether or not the investment recommendation should be acted upon in whole or in part, and the Reference Funds "shall not be obliged to give any explanation for or have any liability in connection with any such decision."

102.    The Investment Advisory Agreements state that if the Reference Funds decide in their sole discretion, but in accordance with the Investment Advisory Agreements, that an investment recommendation "should be acted upon (whether in whole or in part) it shall cause the transaction to be effected by providing appropriate instructions to the" Reference Funds' custodians within five business days of receipt of the investment recommendation.

103.    The Investment Advisory Agreements state that if the Reference Funds decide that an investment recommendation should not be acted upon they shall notify the Investment Advisor Ghazi Abbar of their decision no later than five business days from the time when they received the investment recommendation.

104.    The Investment Advisory Agreements contain English governing law provisions stating that each of the Reference Funds and Ghazi Abbar "irrevocably agrees that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with [those agreements] and accordingly submit to the exclusive jurisdiction of the English courts."

105.    The Investment Advisory Agreements state that CGMI, as the Relevant Shareholder, has the right to bring any suit, action, or proceedings arising out of or in connection with the agreement, against Ghazi Abbar as Investment Advisor or the Reference Funds, in any court of competent jurisdiction.

### 3.    The Closing of the Options Transactions

106.    The signing of the Closing Documents for the Options Transactions took place on May 9, 2006.

107.    The closing dinner for the Options Transactions took place in London on May 9, 2006.

### 4.    Post-Trade Operations of the Options Transactions

108.    As discussed above, Ghazi Abbar was appointed as the investment advisor to the Reference Funds (Ajial Limited and Amatra Limited).

109.    From at least 2006 to 2009, in that role, Ghazi Abbar made specific investment recommendations to the Reference Funds.

### F.   The Private Equity Loan Facility

110.    The Private Equity Loan Facility involved three financing facilities.

111.    The largest of the facilities was a secured loan facility (the ôSecured Loan Facilityö) provided initially by Citibank N.A. (Geneva Branch) in the amount of $100 million that was subsequently increased to a total amount of $135 million.

112.    The Secured Loan Facility was documented, in part, by the following documents:

    a.    A credit agreement dated March 27, 2007.  This credit agreement was amended and restated, with the final version being the Third

Amended and Restated Credit Agreement, dated in December 2008 (collectively, the "Credit Agreement");

b.      A deed of trust dated March 23, 2007 (the "Trust Deed") establishing a Lender Protection Closed-End United Trust ("LPUT");

c.      Two "Individual Guarantor Declarations," one signed by Ghazi Abbar and the other signed by Abdullah Abbar; and

d.      Two "Exculpatory Clauses Notices," one signed by Ghazi Abbar and the other signed by Abdullah Abbar.

113.    The lenders under the Credit Agreement as of December 2008 were non-parties Citibank N.A. (Geneva Branch) and Citibank Switzerland (together, the "Swiss Banks").

114.    The borrowers under the Credit Agreement were three non-party holding companies: Vintage Investments Limited ("Vintage"), Langton Ltd. ("Langton"), and later, Meltem Ltd. ("Meltem").

115.    As part of the Private Equity Loan Facility, legal and beneficial ownership of non-parties Vintage, Langton, and later Meltem, were transferred by Gama and Amavest to non-party Cititrust (Cayman) Limited, as trustee of the LPUT, in exchange for "units" of the LPUT.

116.    Ghazi Abbar and Abdullah Abbar are parties to the Credit Agreement in their capacities as "Individual Guarantors."

G.  **Individual Compensation**

117.    The Hybrids Group had its own profit and loss ("P&L").

118.    The sum of the profits and losses associated with all trades engaged in by the Hybrids Group would generate its P&L.

119.    The Hybrids Group maintained spreadsheets that set forth its P&L.  They were reviewed by certain people in the Hybrids Group on a daily basis.

120.    The Hybrids Group employees do not receive commissions from individual transactions.  Bonuses for Hybrids Group members were based on a number of factors, including Hybrid Group P&L, whether the employee helped to close deals with clients of the Hybrid Group, how hard the employee worked, and how the employee conducted himself or herself with his or her colleagues.

121.    Documents produced in this litigation relating to the bonus of Rajiv Sennar reference the Options Transactions.

122.    The impact of the deals Sennar was associated with and the amount of P&L those deals generated for the Hybrid Group were factors in how Sennar was compensated in 2006.

123.    The largest deal Sennar was involved in during 2006, with respect to the impact on the Hybrid Group's P&L, was the Options Transactions.

**H.    The UK Decision**

124.    In October 2011, in response to the FINRA statement of claim, CGML filed an action against four of the defendants in the instant action (Abdullah Abbar, Ghazi Abbar, Amatra Feeder, and Ajial Feeder) in the High Court of Justice, Queen's Bench Division, Commercial Court of the United Kingdom (the "UK Court") in the matter titled Citigroup Global Markets Limited v. Amatra Leveraged Feeder Holdings Limited, and others (the "UK Action").

125.    On May 18, 2012, the UK Court issued a Judgment (the "UK Judgment") in which it held that it did not have jurisdiction to hear claims brought by CGML seeking a declaration that its affiliates, including CGMI, were not liable to the defendants in that action.

126.    The UK Judgment also provided that the UK Court did not have jurisdiction over the claims CGML brought against Abdullah Abbar.

127.    The UK Judgment further stated that ö[t]here is, of course, a question about whether the defendants are or were CGMIøs customers (within the meaning of the FINRA regime), but that is to be determined by the New York court, and I am not in a position to do so.ö

128.    Finally, the UK Judgment and its accompanying order provided for a case management stay for CGMLøs remaining claims against Ghazi Abbar, Amatra Feeder, and Ajial Feeder, until either (1) the issuance of a final FINRA arbitration award, or (2) a final decision by this Court that the FINRA arbitration may not proceed if that is what this Court decides (including any appeal of that decision).

## II.  PLAINTIFF'S PROPOSED FINDINGS OF FACT

### A.  Introduction

1.      FINRA Rule 12200 requires FINRA members to arbitrate disputes they may have with their "customers."  (Rule 12200, FINRA Code of Arbitration.)

2.      In their FINRA statement of claim (the "Statement of Claim"), Defendants allege that they suffered losses on two financing transactions into which they entered with foreign affiliates of Citigroup.  (TX 588.)

3.      Those two transactions were the Options Transactions and the Private Equity Loan Facility, discussed above.

4.      CGMI was not a party to either of these two financing transactions.  (*See, infra*, § D.)

5.      CGMI did not receive any revenue or profit from the Options Transactions.  (TX 70.)

6.      CGMI did not receive any revenue or profit from the Private Equity Loan Facility.  (Ekert Tr. at 122:8-123:8.)

7.      None of the Citigroup foreign affiliates that are parties to these two financing transactions are members of FINRA.  (*See*, *infra* ¶¶ 8-9.)

8.      CGML, Citigroup's U.K.-based broker-dealer, entered into the Options Transactions.  (TX 272; TX 523; TX 561; TX 572; TX 573; TX 574.)

9.      Citibank N.A. (Geneva Branch) and Citibank (Switzerland) SA ("Citibank Switzerland") entered into the Private Equity Loan Facility.  (TX 294; TX 304; TX 567.)

### 1. **FINRA Arbitration was Never Contemplated as a Forum for Dispute Resolution**

10.     At no time during the negotiation of the Options Transactions did Ghazi Abbar or his counsel request the right to arbitrate claims arising out of the Options Transactions. In fact, at the time the Options Transactions were executed, Ghazi Abbar gave no thought at all to whether he would have a right to arbitrate any potential claims arising thereunder in New York.  (Abbar Tr. at 145:24-146:5.)

11.     None of the written agreements governing the Private Equity Loan Facility provide for the arbitration of any dispute in the United States, let alone FINRA.  (TX 303.)

### B. **The Parties and Other Relevant Entities**

### 1. **CGMI and CGML**

12.     Customers of CGML do not have any right to FINRA arbitration.  (Rule 12200, FINRA Code of Arbitration.)

13.     Citigroup is a multi-national financial institution, with operations worldwide.

14.     Since at least 2006, the Hybrids Group has been a part of the business segment within Citigroup known, depending upon the date, as the Corporate and Investment Bank ("CIB"), the Citi Markets & Banking segment, or the Institutional Clients Group.  (TX 214 at CITI 7344; TX 293 at 7524; TX 330 at CITI 7099.)

15.     CIB, and its successor units, provide corporations, governments, institutions, and investors with financial products and services, including investment banking and advisory services, structured products, and lending.  (*E.g.*, TX 214 at CITI 7382.)

16.     CIB had a Capital Markets and Banking function as well as a Transaction Services function, which included trade services.  (TX 214 at 7344.)

17.     The Hybrids Group, discussed in the Agreed Findings of Fact above, was located within CIB and its successors.

18.     Separate and apart from its broker-dealer businesses, Citigroup provides private banking services to high net worth clients (like the Abbars) through its Private Bank. (TX 214 at CITI 7392.)

19.     During the relevant time period, the Private Bank was located within a business segment of Citigroup called Global Wealth Management ("GWM").

20.     The Private Bank provides personalized wealth management services for high-net-worth individuals, including investment management, investment finance, and traditional banking services.  (*E.g.*, TX 214 at CITI 7392.)

21.     Employees of the Private Bank are not required to be licensed with FINRA or any other broker-dealer.  (TX 214 at CITI 7344; TX 293 at CITI 7524; TX 330 at CITI 7099.)

22.     The chart below, excerpted from Citigroup's 2006 Annual Report, shows the distinction between the business segment housing the Hybrids Group and the business unit housing the Private Bank during the relevant time period:



(TX 214 at CITI 7344.)

23. Private Bank clients who transact business through legal entities in foreign locates, as is the case here, have no right to FINRA arbitrations with respect to their transactions or accounts with the Private Bank. (Rule 12200, FINRA Code of Arbitration.)

24. Clients of the Private Bank are not considered clients of CGMI or CGML absent an express agreement by maintaining an account with CGMI or CGML, as the case may be.

## 2. **The Defendants**

### a. **Ghazi Abbar**

25. Ghazi Abbar is a sophisticated businessman and experienced investor.

26. Ghazi Abbar graduated from Harvard Business School in 1978 with a Masters in Business Administration. (Abbar Tr. at 7:20-8:6.)

27.     Ghazi Abbar operates a business in Saudi Arabia worth at least many tens of millions of dollars.  (Abbar Tr. at 27:15-18.)

28.     Ghazi Abbar understands that large, multi-national companies operate through subsidiaries and affiliates.  (Abbar Tr. at 28:4-17.)  The family business that he supervises is, in fact, a separate legal entity, independent from the other businesses his family operates.  (Abbar. Tr. at 12:11-13:8.)

29.     Ghazi Abbar conducts his own business activities through various trusts and other entities.  (*See, generally* TX 272; TX 273; Abbar Tr. at 111:10-21.)

30.     Ghazi Abbar understands that when he authorizes a particular transaction, he can do so on behalf of himself personally, or on behalf of one or more entities for which he acts or of which he has control.  (Abbar Tr. at 153:17-58:3.)

31.     Ghazi Abbar understands that his counterparty to a given transaction knows whether he is acting personally or on behalf of an entity; and in the latter case, knows the identity of the entity on behalf of which he is acting, by looking at the identity of the party listed in the relevant transaction documents.  (Abbar Tr. at 153:17-58:3.)

32.     As a sophisticated businessman with the foregoing knowledge, Ghazi Abbar understood that the counterparty on his transaction with foreign companies within the Citigroup family was determined by the parties listed on the relevant transaction documents that he signed or instructed others to sign.  (Abbar Tr. at 211:22-212:2.)

33.     In addition to his business activities, Ghazi Abbar has been managing his family's investment activities since 1986 or 1987.  (Abbar Tr. at 18:24-19:6; TX 569.)  These activities included investing in hedge funds and private equity investments for the past 25 years.  (TX 588 at 3, 7.)

34.     Ghazi Abbar has described himself as a "cross between an institutional and private bank person." (TX 329.)  He has stated that he only deals with alternative investments, which include hedge funds and private equity investments.  (TX 329.)

35.     By the time of the transactions in question, Ghazi Abbar had significant past experience managing hedge fund investments, which were held in two funds-of-funds: Amatra Limited and Ajial Limited, also called the Reference Funds.  (Abbar Tr. at 18:24-19:6; TX 569; TX 588 at 3, 7.)

36.     Ghazi Abbar also had experience managing private equity investments, which were held by non-parties Vintage and Langton.  (TX 61 at CITI 5834.)

37.     By 2005, Ghazi Abbar was managing at least $350 million.  (TX 588 at 6.)

38.     Ghazi Abbar maintains a personal and a business presence in London, England.

39.     Ghazi Abbar maintains a 5,000 to 6,000 square foot residence in London, England, to which his wife and children have access.  (Abbar Tr. at 64:20-65:7.)  A trust for which Ghazi Abbar is a beneficiary employs one full-time staff member at this residence. (Abbar Tr. at 21:6-12.)

40.     Ghazi Abbar does not maintain any residence in the U.S.  (Abbar Tr. at 19:7-10.)

41.     During the relevant time period, Ghazi Abbar maintained a private investment office called Radar Capital Limited ("Radar"), which was located in London, England.  (Bower Tr. at 30:11-14.)

42.     Radar was founded in June 2006.  (TX 527 at CITI 11017.)

43.     Radar was a U.K. company, staffed with U.K. personnel, and audited by U.K. auditors.  (Bower Tr. at 52:12-53:25.)

44.     Ghazi Abbar's private investment office, Radar, did not have operations in the U.S.  (Bower Tr. at 108:7-9.)

45.     Neither Ghazi Abbar nor Radar employed any U.S. personnel.  (Bower Tr. at 108:10-12.)

### b.  Abdullah Abbar

46.     Abdullah Abbar is not a party to any of the Closing Documents documenting the Options Transactions.  (TX 272; TX 523; TX 561; TX 572; TX 573; TX 574.)

47.     Abdullah Abbar never visited CGMI's offices in New York.  (Defendants' Interrogatory Resp. No. 1.)

48.     Abdullah Abbar never communicated with any employee or representative of CGMI in connection with the Options Transactions.  (Defendants' Interrogatory Resp. No. 2.)

49.     Abdullah Abbar never communicated with any employee or representative of CGMI in connection with the Private Equity Loan Facility.  (Defendants' Interrogatory Resp. No. 3.)

### c.  The Feeder Funds

50.     Ajial Feeder was formed on or about April 18, 2006.  (TX 579 at CITI 10077.)

51.     The JT808 Trust, which owns Ajial Feeder, is not a party to the FINRA Arbitration.  (TX 588 at 4.)

52.     Amatra Feeder was formed on or about April 28, 2006.  (TX 514 at CITI 9860.)

53. The JT647 Trust, which owns Amatra Feeder, is not a party to the FINRA Arbitration. (TX 588 at 4.)

54. Ghazi Abbar has never held any position with either Feeder Fund. (Abbar Tr. at 79:2-11; 109:20-110:8.)

55. No representative of either Feeder Fund took part in the negotiation of the Options Transactions. (Abbar Tr. at 79:20-25; 103:22-104-10.)

56. Defendant Ajial Feeder opened an account with Citibank Switzerland on April 18, 2006. (TX 281.)

57. Defendant Amatra Feeder opened an account with Citibank Switzerland on April 28, 2006. (TX 282.)

58. Each of these accounts agreements provides for exclusive jurisdiction in Geneva, Switzerland for disputes arising from the account holder's relationship with Citibank Switzerland. (TX 281; TX 282.)

### d. **Gama and Amavest**

59. Defendants Gama and Amavest are foreign investment companies that participated in the Private Equity Loan Facility, but had no involvement in the Options Transactions.

60. The JT808 Trust, which owns Gama, is not a party to the FINRA Arbitration. (TX 588 at 4.)

61. The JT647 Trust, which owns Amavest, is not a party to the FINRA Arbitration. (TX 588 at 4.)

62. Ghazi Abbar is not a director or officer of either Gama or Amavest. (Abbar Tr. at 292:25-18.)

63.     Defendant Gama opened an account with Citibank Switzerland on May 12, 2006.  (TX 201.)

64.     Defendant Amavest opened an account with Citibank Switzerland on March 23, 2007.  (TX 302.)

65.     Each of these accounts agreements provides for exclusive jurisdiction in Geneva, Switzerland for disputes arising from the account holder's relationship with Citibank Switzerland.  (TX 201; TX 302.)

### e.   There is No Privity Between CGMI and the Defendants

66.     No Defendant ever had an account with CGMI.  (Abbar Tr. at 160:17-161:14.)

67.     No Defendant ever signed a customer agreement with CGMI.

68.     No Defendant ever paid CGMI for any product.  (Abbar Tr. 167:16-168:7.)

69.     No Defendant ever paid CGMI for any service.  (Abbar Tr. 167:16-168:7.)

### C.   The Abbars' Relationship with Citigroup's Swiss Banks and Mohanned Noor

70.     In the 1990s, Ghazi and Abdullah Abbar began business dealings with an affiliate of Citigroup.  (Abbar Tr. at 25:25-26:7.)

71.     At that time, Ghazi and Abdullah Abbar dealt with the Private Bank branch located in Geneva, Switzerland.  (Abbar. Tr. at 29:8-13; 30:18-23.)

72.     The Private Bank operates in Switzerland through Citibank Switzerland Citibank N.A. (Geneva Branch) (together, with Citibank Switzerland, the "Swiss Banks").

73.     Ghazi and Abdullah Abbar have maintained accounts with Citibank Switzerland since the 1990s.  (TX 200; TX 202; TX 588 at 6; Abbar Tr. at 25:25-26:7.)

74.   Abdullah Abbar opened his account with Citibank Switzerland on January 19, 1994.  (TX 200.)

75.   Ghazi Abbar opened his account with Citibank Switzerland on October 30, 1996.  (TX 564.)

76.   Each of these account agreements provides for exclusive jurisdiction in Geneva, Switzerland for disputes arising from the account holder's relationship with Citibank Switzerland.  (TX 200 at 13 of 16; TX 564.)

77.   As part of its regular business practice, Citibank Switzerland would send Annual Suitability Confirmation Letters to Ghazi Abbar and Abdullah Abbar.  (*E.g.*, TX 565; Abbar Tr. 137:10-12.)

78.   These suitability letters characterized the Abbars' risk tolerance and investment experience, including experience with leverage.  (TX 565; Abbar Tr. 137:10-12.)

79.   Ghazi Abbar did not suggest any revisions to the suitability letters until September 2009, after the Options Transactions had been terminated, and at approximately the same time he retained counsel to pursue claims against the Private Bank.  (TX 373.)

80.   The suitability letters state, for example, that Ghazi Abbar's risk tolerance was "aggressive" and that he was "willing to assume greater levels of risk in pursuit of greater returns."  (TX 565 at ABBAR 4230.)

81.   The suitability letters also state that Ghazi Abbar was prepared to use leverage, which he understood could involve "higher volatility, variability of returns and loss of principal."  (TX 565 at ABBAR 4230.)

82.     The suitability letters also state that Ghazi Abbar had õextensive experienceö investing in hedge funds and õmedium experienceö investing in derivatives and in using leverage.  (TX 565 at ABBAR 4230.)

83.     The characterizations of Ghazi Abbarøs risk tolerance, use of leverage, and investment experience in the suitability letters were consistent with Ghazi Abbarøs investment history prior to 2006.

84.     As of 2005, the hedge fund investments of the Reference Funds were held at Deutsche Bank.  (TX 221.)  During this time, the Reference Funds borrowed money from Deutsche Bank to provide leverage for those investments.  (TX 221 at CITI 7774; Mathur Tr. at 95:12-96:3; Seledee Tr. at 205:22-206:13.)

85.     When Ghazi Abbarøs contact at Deutsche Bank, Mohanned Noor, moved to the Private Bank, Ghazi Abbar moved the bulk of his and his fatherøs private banking relationship to the Private Bank from Deutsche Bank.  (TX 588 at 8; TX 329.)

86.     Mohanned Noor was involved in both the Options Transactions and the Private Equity Loan Facility.

87.     Ghazi Abbar and his father were viewed as clients of the Private Bank, and there are a number of email communications and documents that refer to Ghazi Abbar as a client of the Private Bank.  (*E.g.*, TX 13; TX 22; TX 30.)

**D.  The Options Transactions**

**1.  The Structure and Function of the Options Transactions**

88.     The Options Transactions are governed by the two Confirmations, which are substantially identical.

89.     As reflected in each of the Confirmations signed on May 9, 2006, CGML was the contracting counterparty to each of the Feeder Funds.  (TX 523 at CITI 2388; TX 561 at CITI 2303; Mathur Tr. at 88:24-89:6.)

90.     CGMI is not listed as a counterparty to the Feeder Funds on the Confirmations.  (TX 523; TX 561.)

91.     The first page of the Confirmations, each of which took the form of a letter agreement, lists CGML as the sender.  (TX 523; TX 561.)

92.     The first page of each Confirmation states that the purpose of the Confirmation "is to set forth the terms and conditions of the Transaction entered into between [each Feeder Fund] and Citigroup Global Markets Limited."  (TX 523 at CITI 2370; TX 561 at CITI 2285.)

93.     Samir Mathur, a CGMI employee, signed each Confirmation on behalf of CGML, and each Confirmation makes clear that he was signing on behalf of CGML.  (TX 523 at CITI 2388; TX 561 at CITI 2303; Mathur 104:19-25.)

94.     Mr. Mathur signed each Confirmation pursuant to a written power of attorney from CGML.  (TX 561; Mathur Tr. 104:19-25; Mathur Decl. ¶ 10, 11.)

95.     CGMI did not sign the Confirmations.  (TX 523; TX 561; Mathur Tr. at 88:24-89:6.)

96.     Prior to the consummation of the Options Transactions, the Reference Funds held approximately $210 million in hedge fund investments.  (TX 588 at 12-13; CITI TX 221.)

97.     The purpose of the Options Transactions was to provide the Reference Funds with leverage to increase their hedge fund exposure (and, as a result, their potential returns).  (TX 588 at 10-11.)

98.     To consummate the Options Transactions, the JT647  and JT808 Trusts (the ōTrustsö), created the Feeder Funds.  (TX 579 at CITI 10093; TX 580 at CITI 9875.)

99.     As part of the Options Transactions, each of the Feeder Funds entered into an option contract with CGML, pursuant to which the value of the Feeder Fundøs option was linked with the value of the underlying set of hedge fund investments held by one of the Reference Funds.  (TX 523; TX 561.)

100.     The option owned by Ajial Feeder was linked with the value of the set of hedge fund investments held by the Reference Fund Ajial Limited.  (TX 523; TX 561.)

101.     The option owned by Amatra Feeder was linked with the value of the set of hedge fund investments held by the Reference Fund Amatra Limited.  (TX 523; TX 561.)

102.     CGML provided the Feeder Funds with money the Feeder Funds used to leverage their investments in the hedge funds owned by the Reference Funds.  In other words, the Feeder Funds received money from CGML and used that money to increase the hedge fund holdings of the Reference Funds.  (TX 523; TX 561.)

103.     Under the terms of the Options Transactions, the Feeder Funds would receive any upside investment return on the Reference Funds, after the Feeder Funds repaid CGML for the leverage it provided to them, plus an accretion amount, which acted similar to interest on a loan.  (TX 523; TX 561.)

104.     CGML was the party at risk in the Options Transactions because it provided the money to the Feeder Funds.  (Mathur Tr. at 158:15-159:6.)  Accordingly, all profit

and loss from the Options Transactions was booked on CGML's books and records. (TX 70; Salva Tr. at 15:2-8; 40:14-41:2.)

106.	To hedge its exposure on the Options Transactions, CGML subscribed for the "participating" shares of the Reference Funds. The participating shares gave CGML the right to all of the economic value of the Reference Funds. (TX 270; TX 271.)

106.	Under this structure, CGML was still exposed to significant "gap risk" on the Options Transactions—*i.e.*, risk that the value of the funds held by the Reference Funds could fall below the amount of leverage extended by CGML to the Reference Funds. (Mathur Tr. at 158:15-159:6.)

107.	As part of the Options Transactions, Ghazi Abbar was appointed investment advisor to each of the Reference Funds pursuant to the two Investment Advisory Agreements (*see* Agreed Findings of Fact § E.2.f.). (TX 521 at CITI 2151; TX 532 at ABBAR 585-87.)

108.	To mitigate against its "gap risk" on the Options Transactions, CGML obtained significant rights of oversight over Ghazi Abbar's investment advisory role. CGML obtained these rights to protect itself against a situation where Ghazi Abbar's investment decisions could result in CGML suffering a loss on the Options Transactions. (Burns Decl. ¶ 12.)

109.	For tax and other reasons, CGML could not also own the "ordinary" voting shares of the Reference Funds. (Seledee Tr. at 72:15-73:10.) Those voting shares, which had to be held by another entity, carried some of the rights of oversight over Ghazi Abbar's investment advisory role. (Seledee Tr. at 128:8-129:7.)

110.    CGMI subscribed for the ordinary shares of the Reference Funds, which carried standard shareholder rights such as the right to elect directors.  CGMI's ownership of the "ordinary" shares of the Reference Fund was intended to mitigate and protect CGML against the economic risks attendant to the Options Transactions.  (Burns Decl. ¶ 12.)

111.    Ghazi Abbar, nevertheless, exercised substantial control in determining how the leverage provided by CGML would be invested by making recommendations to the Reference Funds.  (TX 272 at ABBAR 551-64; TX 532.)

112.    The Investment Advisory Agreements, pursuant to which Ghazi Abbar was appointed as investment advisor of the Reference Funds, set forth a detailed procedure for how Ghazi Abbar was to make these recommendations.  (TX 272 at ABBAR 556; TX 532 at ABBAR 588.)

113.    Under that procedure, once the Reference Funds received an investment recommendation from Ghazi Abbar, the Reference Funds would determine whether or not to act upon the recommendation.  (TX 272 at ABBAR 556; TX 532 at ABBAR 588.)

114.    CGMI, as the holder of the ordinary shares of the Reference Funds, exercised its right to approve or disapprove of an investment for the purpose of protecting CGML's economic position.  (TX 272 at ABBAR 556; TX 532 at ABBAR 588; Mathur Decl. ¶ 20.)  This is because CGML bore the "gap risk" attendant to the Options Transactions.  (TX 272 at 556; TX 532 at ABBAR 588; Mathur Decl. ¶ 20.)

115.    In consideration of the service Ghazi Abbar provided to the Reference Funds, each Investment Advisory Agreement authorized a $50,000 payment to Ghazi Abbar. (TX 272 at ABBAR 556; TX 532 at ABBAR 588.)

116.    A graphical explanation of the Options Transactions and the risk-management hedge is reproduced below:



117.    The Options Transactions had a term of five years.  (TX 523 at CITI 2374; TX 561 at CITI 2289.)

118.    At the end of the term, the Feeder Funds had the right, subject to satisfaction of certain conditions, to receive any appreciation in value of the participating shares of the Reference Funds above an exercise price equal to the amount of leverage CGML had made available under the terms of the Confirmations, plus an additional fee õaccretingö on that amount at LIBOR plus approximately 110 basis points.  (TX 523; TX 561.)

119.    The option could either be cash settled by CGMLøs payment of the difference between the value of the Reference Funds and the exercise price, or physically settled

by CGML's transfer of the participating shares to the Feeder Funds.  (TX 523 at CITI 2375-76; TX 561 at CITI 2290-91.)

120.    In addition to the roles above, CGML was the "Calculation Agent" (a defined term in the Confirmations) under the Options Transactions.  (TX 523 at CITI 2383; TX 561 at CITI 2298.)

121.    As Calculation Agent, CGML had the right to "haircut" the collateral value of the underlying portfolio (*i.e*, reduce the amount of the underlying investments that were used as collateral).  (Mathur Tr. at 76:3-77-19; TX 545.)

122.    CGMI personnel, including John Yu, Samir Mathur, Yontcho Valtchev, and Vishal Mishra, who were involved in performing these "haircuts," were acting on behalf of CGML with respect to the Options Transactions, consistent with the fact that only CGML (and not CGMI) had the right to perform these "haircuts" under the Options Transactions.  (TX 523; TX 561; Seledee Tr. at 161:22-163-17.)

123.    Part of the process for assigning "haircuts" to underlying funds involved performing due diligence on those funds.  (Mathur Tr. at 76:3-14.)  CGMI personnel involved in this due diligence process were acting on behalf of CGML with respect to the Options Transactions.

### 2.   Negotiation of the Options Transactions

#### a.   The Hybrids Group

124.    The Hybrids Group was the management unit within Citigroup that structured the Options Transactions.  (Seledee Tr. at 13.)

125.    The Hybrids Group has booked transactions on behalf of several legal entities, including CGMI, CGML, Citibank, NA, Citibank Canada, and Citigroup Financial Products, Inc.  (Seledee Tr. at 14; Burns Tr. 79-80; TX 14.)

126.     Employees of the Hybrids Group choose the legal entity to enter into a particular transaction depending on the structuring requirements of that specific transaction. (Seledee Tr. at 14.)

127.     The Hybrids Group did not have its own sales force.  (Burns Tr. at 18:13-24.)

### i.  James Wathan

128.     The salesperson who worked on the Options Transactions was James Wathan, a CGML employee located in London.  (Sennar Tr. at 259:7:11; 133:25-134:5.)

129.     Mr. Wathan was the "primary [Corporate and Investment Bank] relationship and sales contact for" the Options Transactions.  (TX 515 at CITI 1484.)

130.     Mr. Wathan was the person who introduced Ghazi Abbar to Rajiv Sennar. (Abbar Tr. at 164:19-24.)

### ii.  Rajiv Sennar

131.     The negotiation of the structure and business terms of the transaction was conducted primarily by Rajiv Sennar in New York for CGML, on the one hand, and Ghazi Abbar for the Trust's and their investment vehicles, on the other hand.  (Sennar Tr. at 136-37; TX 563.)

132.     At the time, Rajiv Sennar was a structurer working in New York employed by CGMI.  Mr. Sennar was approximately 25 years old.  (Sennar Tr. at 281:9-12.)

133.     As a structurer, Mr. Sennar's job was to act as a product specialist who would assist Citigroup's sales force (including CGML salespeople like James Wathan) to provide solutions to clients.  (Burns Tr. at 102:22-103:5; Burns Tr. at 104:18-105:3.)

134.     Mr. Sennar's ultimate supervisor in the Hybrids Group, Richard Burns, viewed Mr. Sennar as acting on behalf of CGML in connection with his work on the transaction. (Burns Tr. at 117:7-119:2; Burns Tr. at 164:16-24.)  In Mr. Burns' view, Mr. Sennar was not

acting on behalf of CGMI in connection with the Options Transactions.  (Burns Tr. at 117:7-119:2; Burns Tr. at 164:16-24.)

### iii.  **Richard Burns**

135.    Samir Mathur was the head trader for the Hybrids Group and Erwin Parviz was the head structurer.  Both directly reported to Richard Burns, who at all relevant times was the head of the Hybrids Group.  (Burns Tr. at 19:22-20:17; 30:2:24; TX 506; TX 507; TX 508.)

136.    As head of the Hybrids Group, Mr. Burns was responsible for the entire business of the group, including Mr. Sennar's work.  (Burns Tr. at 32:6-10.)

137.    At all relevant times, Mr. Burns was a CGML employee located in London.  (Burns Tr. at 54:21-55:9.)

### iv.  **Negotiations**

138.    During the negotiations of the Options Transactions, Mohanned Noor acted as Ghazi Abbar's initial "go between" with employees at Citigroup.  (TX 329; TX 222; TX 218; TX 227.)

139.    Mr. Noor introduced Mr. Abbar to James Wathan, who was a salesperson employed by CGML in London, England.  (TX 518 at CITI 1835; Burns Decl. ¶ 9.)

140.    Mr. Wathan met with Mr. Abbar in London on November 22, 2005, to discuss potential financing arrangements for Mr. Abbar.  (TX 518 at CITI 1835; Sennar Tr. at 258:12-20.)  Mr. Sennar was not present at this meeting.  (TX 518 at CITI 1835; Sennar Tr. at 258:12-20.)

141.    This was the first of several in person meetings that took place during the negotiation of the Options Transactions, all of which took place in London.  (Abbar Tr. at 62:16-19.)

142.    The other meetings occurred on January 13, February 2, February 21, March 30, April 13, and May 9, 2006.  (TX 518; Bower Tr. 58:5-14; Mathur Tr. 55:10-24.)

143.    Section E.2.a.i of the Agreed Finding of Fact discusses a November 2005 Hedge Fund Presentation and a January 2006 Hedge Funds + Private Equity Presentation received by Mr. Abbar.

144.    The November 2005 Hedge Fund Presentation does not mention CGMI and bears a Citibank disclaimer.  (TX 209.)

145.    The last page of the "January 2006 Hedge Funds + Private Equity Presentation," bears a boilerplate copyright by CGMI, disclaimers by "Citibank, N.A. and its subsidiaries," and trademark and service mark reservations by Citicorp.  (TX 4.)

146.    That disclaimer states that the terms set forth in the presentation "are intended for discussion purposes only and are subject to the final expression of the terms as set forth in separate definitive written agreements."  (TX 4.)

147.    In connection with his discussions with Mr. Abbar, James Wathan involved Rajiv Sennar to assist in developing potential structures for transactions that Mr. Wathan was proposing to Mr. Abbar for his consideration.  (Sennar Tr. at 32:16-34:6.)

148.    During the early discussions of the Options Transactions, Mohanned Noor and James Wathan had direct conversations with Ghazi Abbar, and relayed some of those conversations to Rajiv Sennar.  (TX 218; TX 220.)

149.    In early 2006, Mr. Abbar determined to pursue the Options Transactions and the parties began to negotiate formal documents.

150.    As head of the Hybrids Group, Richard Burns would be presented with potential transactions on which members of the Group were working.  (TX 23.)

151.    In 2006, Rajiv Sennar considered Ghazi Abbar to be a client and prospective client of Citigroup.  (Sennar Tr. at 51-52, 54.)  Sennar did not focus on whether he considered Ghazi Abbar to be a client or prospective client of CGMI or CGML.  (Sennar Tr. at 51-52.)

152.    Rajiv Sennar did not open a single account at CGMI during his time with the Hybrids Group.  (Sennar Tr. at 196:3-8.)

153.    Mr. Sennar did not have the authority to create an account relationship on behalf of CGMI without getting approvals from other people within CGMI.  (Sennar Tr. at 280:6-15.)

154.    Mr. Sennar did not have authority to enter into a derivative transaction without getting approvals from his superiors.  (Sennar Tr. at 280:22-281:2.)

### b.   The CMAC Approval Process

155.    The CMAC Memo referenced in Paragraphs 68-76 of the Agreed Findings of Fact, set forth Citigroup's understanding of the Options Transactions, and that CGML would be the party selling the Options Transactions.  (Burns Tr. at 225:18-226:9.)

156.    The CMAC Memo states that CGML would be the "writer of the Leverage Options."  (TX 515 at CITI 1478.)

157.    The CMAC Memo refers to CGML as the "seller" of the Leverage Options.  (TX 515 at CITI 1480.)

158.    The CMAC Memo states that CGML will provide the funding for the Options Transactions.  (TX 515 at CITI 1485.)

159.    The CMAC Memo states that CGML will charge the applicable "spread" or interest rate on the options.  (TX 515 at CITI 1485.)  It also states that the Feeder Funds will pay CGML a premium at the inception of the trade.  (TX 515 at CITI 1485.)

160.     CGMI was listed as "booking entity" on the CMAC memo because it held the voting shares of the Reference Funds.  (Mathur Tr. at 130:23-22.)

161.     The CMAC Memo also states that "Structured Products Sales and Marketing (James Wathan) has been the primary CIB relationship and sales contact for the Client."  (TX 515 at 1484.)

162.     Contrary to Defendants' arguments, CGMI's ownership of the voting shares of the Reference Funds (neither of which is a Defendant) did not create a customer relationship between CGMI and the Defendants. As recognized in the CMAC Memo, "Citigroup's ownership of the [R]eference [F]unds will include the ability to exercise direct control over their investments," and "this control is from purely a risk management perspective and not an investment management perspective."  (TX 515 at CITI 1479.)

163.     The "risk" referred to in the foregoing statement was CGML's economic risk.  (Sennar Tr. at 220:3-7; Sennar Tr. at 221:22-25.)

### c.  The Confirmations

164.     The London office of the law firm Chadbourne & Parke LLP ("Chadbourne") represented Ghazi Abbar and the Feeder Funds in connection with the Options Transactions.  (Serfilippi Tr. at 46:25-47:7)

165.     Chadbourne did not utilize any U.S.-based lawyers on the Options Transactions.  (Serfilippi Tr. at 27:5-7.)

166.     Claude Serfilippi was one of the lawyers who represented Ghazi Abbar in the Options Transactions transaction.  (Serfilippi Tr. at 46:25-47:7)  Mr. Serfilippi was at the time (and still is) the Managing Partner of Chadbourne's London office.  (TX 592; Serfilippi Tr. at 15:7-17.)

167.    Christopher Owen and Denis Petkovic were two other Chadbourne partners who worked on the Options Transactions.  (Serfilippi Tr. at 19:7-20:15.)  They were English solicitors, with significant experience in derivatives, structured products, and ISDA agreements.  (Serfilippi Tr. at 16:8-17:2; 19:7-20:15.)

168.    During the negotiation process, CGML was represented by the London office of the law firm Allen & Overy LLP (õA&Oö).  (Serfilippi Tr. at 26:20-25.)

169.    Contrary to the Defendantsø claim, CGMI was never intended to be the seller of the Options Transactions.  (Burns Tr. at 119:16-120:2.)

170.    The first draft Confirmation Mr. Abbar received, on March 17, 2006, reflected that CGML would be the party to the Options Transactions and it listed CGML as the seller of the option.  (Abbar Tr. at 112:17-113:12; TX 563 at CITI 496, CITI 512.)

171.    No party ever received a draft Confirmation indicating that any entity other than CGML would sell the Options Transactions.  (Serfilippi Tr. at 23:20-24:3.)

172.    No Defendant ever objected to the fact that CGML was the Citigroup entity that was party to the Confirmations.  (Abbar Tr. at 88:9-19.)

173.    At no time, including after receiving a draft Confirmation on March 17, 2006, did Ghazi Abbar or Chadbourne request that CGMI be substituted for CGML or added as an additional party to the Options Transactions.  (Abbar Tr. at 164:5-13; Serfilippi Tr. at 137:23-139:18.)

174.    Defendants argue that using New York as governing law had been discussed prior to March 20, 2006.  But CGML, as well as other Citigroup entities, had previously entered into transactions governed by New York law.  (TX 323.)  And, in any event, on March 20, 2006, Rajiv Sennar explained to Mohanned Noor, Ghazi Abbarøs private banker,

that the Options Transactions would be governed by English law, not New York law.  (TX 519 at CITI 7833.)

175.    Mr. Sennar's stated reason for using English law was because the template for similar options transactions was under English law and preparing a new template under New York law would take additional time, indicating that no similar transaction had been governed by New York law.  (TX 519 at CITI 7833.)

176.    No Defendant ever received a draft of the Confirmation that was governed by New York law.  (Abbar Tr. at 86:20-87:10.)

177.    Ghazi Abbar assumed that when the draft Confirmations referenced English law, he would be dealing with an English entity.  (Abbar Tr. at 209:11-210:2.)

178.    Chadbourne reviewed and extensively commented on the draft Confirmations.  (TX 610.)

179.    No Defendant ever objected to or attempted to negotiate the fact that the Options Transactions were governed by English law.  (Abbar Tr. at 88:20-24.)

180.    The Confirmations further underscore the lack of any "customer relationship" between Defendants and CGMI.  The Confirmations incorporate by reference the 2002 ISDA Equity Derivatives Definitions (the "ISDA Equity Definitions") and the 2002 ISDA Master Agreement ("ISDA Master Agreement").  (TX 523 at CITI 2370; TX 561 at CITI 2285.)

181.    Section 13.1 of the ISDA Equity Definitions is titled: "Non-Reliance." (TX 204 at CITI 15124.)

182.    Pursuant to that section, CGML and the Feeder Funds each represented that they were entering into the Options Transactions "as principal (and not as agent or in any

other capacity)ö and that öneither the other party nor any of its Affiliates or agents are acting as a fiduciary for it.ö  (TX 204 at CITI 15124.)

183.    This is substantially similar to the disclaimer that the Second Circuit relied upon in determining that no customer relationship existed in *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 168 (2d Cir. 2011) (finding no customer relationship when each party to an agreement acknowledged that öthe other party acts only at armøs length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provideö).

### d.  The Disclosure Letter

184.    As part of the Options Transactions, Ghazi Abbar executed a document called öSummary of Leverage Option Transaction.ö  (TX 572.)  This document was also known as a disclosure letter.  (TX 571.)

185.    The Disclosure Letter was drafted by A&O.  (Seledee Tr. at 246:16-24.) A draft of the Disclosure Letter was received by Ghazi Abbar and his counsel on May 3, 2006. (TX 571.)  This draft stated that the öleverage option transactions are to be sold by Citigroup Global Markets Limited.ö  (TX 571 at CITI 3709.)

186.    Ghazi Abbar signed the Disclosure Letter.  (TX 49 at ABBAR 916.)

187.    CGML signed the Disclosure Letter.  (TX 49 at ABBAR 915.)

188.    CGMI did not sign the Disclosure Letter.  (TX 49.)

189.    The Disclosure Letter contains the following representations by Ghazi Abbar under the section titled öUnderstandings concerning your evaluation of the transactionö:

a.      ö(a) You are duly authorized to act in connection with the proposed transactions on behalf of the [Feeder Funds], all legal or beneficial owners of the

[Feeder Funds] and all person who are legal and beneficial owners of the Reference Funds on the date of this letter;ö

b.     ö(b) You have had substantial experience in evaluating the economic risks and merits of transactions similar to the proposed transactions;ö

c.     ö(c) You have obtained independent professional advice (including but not limited to legal, accounting and investment advice) with respect to the proposed transactions and you have not relied on Citigroup [defined as CGML and its affiliates] for advice of any kind as to such matters or as to the tax consequences of the proposed transactions;ö and

d.     ö(d) Based on your experience, the advice of our independent advisors and such other considerations as you deemed relevant, and having regard to the matters summarized in this letter, you have concluded that the proposed leveraged option transactions and associated transactions are appropriate for the [Feeder Funds] and their legal and beneficial owners.ö  (TX 49 at ABBAR 916.)

190.     Chadbourne reviewed and commented on the Disclosure Letter, and provided specific comments on a section titled öUnderstandings concerning your evaluation of the transaction.ö  (TX 608; Serfilippi Tr. at 83:6-84:5; 95:5-96:20.)

191.     In particular, Chadbourne, in an email on which Ghazi Abbar was copied, required that the word ötaxö be stricken from the representation that Ghazi Abbar had received independent professional advice as to certain matters, because ö[h]e has in fact not take[n] tax advice.ö  (TX 608 at CITI 14295; Serfilippi Tr. at 94:5-96:20.)  Chadbourne did not require or request adjustments to the other representations discussed above.

192.     Thus, having specifically focused on the provision and having requested a change to it, Chadbourne did not request any adjustments to Ghazi Abbarøs representations that

he had not relied on CGML or its affiliates for advice of any kind as to professional, legal, accounting, or investment advice.  (TX 608 at CITI 14295; Serfilippi Tr. at 94:5-96:20.)

193.    Ghazi Abbar, along with his counsel at Chadbourne, participated in a conference call with members of Citigroup during which the Disclosure Letter was discussed. (Serfilippi Tr. at 84:11-18; 85:22-87:17; TX 607 at CITI 3708)

194.    Chadbourne understood that the Disclosure Letter accurately summarized the terms of the Options Transactions.  (Serfilippi Tr. at 91:6-10.)

195.    Mr. Serfilippi, of Chadbourne, did not recall anyone from Citigroup suggesting that sections (b) and (c) of the Disclosure Letter (addressing Ghazi Abbar's experience and disclaimer of advice by Citigroup) quoted above were untrue.  (Serfilippi Tr. 94:4-10)

196.    Ghazi Abbar reviewed, negotiated, and executed the Disclosure Letter with the assistance of counsel.  (TX 571; TX 608; Serfilippi Tr. at 83:6-84:5; 95:5-96:20.)

197.    Ghazi Abbar took the Disclosure Letter seriously when he signed it. (Abbar Tr. at 329:1-6; 331:17-20.)

### e.    The Structuring Services Fee Letter

198.    The Structuring Services Fee Letter, discussed in Paragraphs 88 through 90 of the Agreed Findings of Fact, confirmed that CGML was engaged by the Feeder Funds to provide them with structuring services.  (TX 573; TX 574.)

199.    Ghazi Abbar instructed the directors of the Feeder Funds to sign the Structuring Services Fee Letters.  (Abbar Tr. at 230:10-231:6; TX 573 at CITI 4409; TX 574 at CITI 2241.)

200.    Under the terms of the Structuring Services Fee Letters, the Feeder Funds agreed to "pay to CGML . . . structuring fees . . . in all circumstances other than where such

Option Transaction is terminated as a result of an Event of Default in respect of CGML . . . .ö (TX 573 at 4407; TX 574 at CITI 2239.)

201.    The Structuring Services Fee Letters each provide: öThis letter agreement confirms the engagement . . . of CGML by [the Feeder Funds] to provide [the Feeder Funds]ö with structuring services in connection with the Options Transactions and related transactions. (TX 573 at 4407; TX 574 at CITI 2239.)

202.    The Structuring Services Fee Letters state that the Feeder Funds will pay structuring fees to CGML ö[i]n consideration of CGMLøs provision of structuring servicesö to the Feeder Funds.  (TX 573 at 4407; TX 574 at CITI 2239.)

203.    There were no payments made to CGMI for structuring services.  (Abbar Tr. at 167:16-168:7; TX 573; TX 574.)

204.    Chadbourne reviewed and commented on the Structuring Services Fee Letters.  (TX 517; TX 609.)

205.    Notwithstanding the fact that they were aware that U.S.-based Hybrids Group employees had participated in structuring the Options Transactions, Chadbourne chose not to comment on the portion of the Structuring Services Fee Letters that stated CGML was providing structuring services.  (Serfilippi Tr. at 101:4-11; TX 517, TX 609.)

206.    Accordingly, Ghazi Abbar and the Feeder Funds were on notice through the Structuring Services Fee Letters that any structuring services provided by Rajiv Sennar or any other Citigroup employee were provided on behalf of CGML, and that it was CGML, and not CGMI, that the Feeder Funds were paying for those services.  (TX 573; TX 574.)

207.     The Structuring Services Fee Letters define "CGML" as Citigroup Global Markets Limited and "Citigroup" as CGML and its affiliates, collectively.  (TX 573 at 4407; TX 574 at CITI 2239.)

208.     In each Structuring Services Fee Letter, each Feeder Fund acknowledges that:

a.     "(i) CGML is acting as an independent contractor in connection with the Structuring Services and not in any other capacity including as a fiduciary, advisor or agent;"

b.     "(ii) the [Feeder Fund] is not relying on the advice of Citigroup [defined as CGML and its affiliates] for legal, regulatory, financial, tax, accounting or investment matters, but instead [the Feeder Fund] is seeking and will rely on the advice of its own professionals and advisors for such matters;"

c.     "(iii) the [Feeder Fund] will make its own independent analysis and decision regarding the Transaction and the pricing and valuation thereof based on the advice from its own professionals and advisors, without reliance on Citigroup;"

d.     "(iv) the [Feeder Fund] will determine, without reliance upon Citigroup, the economic risks and merits as well as the legal, regulatory, tax and accounting characterizations and consequences of the Transaction and will be capable of assuming such risks;"

e.     "(v) Citigroup has not, and will not, make any recommendations or representations regarding the expected or projected success, performance, result, consequence, benefit or risks (whether legal, regulatory, tax, financial, accounting or otherwise) of the Transaction;"

f.      õ(vi) Citigroup shall have no responsibility to take into consideration the effect of the Transaction on the [Feeder Fund] or its legal or beneficial owners; andö

g.      õ(vii) nothing [in the Structuring Services Fee Letter] shall give rise to any liability or responsibility on the part of Citigroup for the success or anticipated benefits of the Transaction or any transactions contemplated thereby.ö  (TX 573 at 4408; TX 574 at CITI 2240.)

209.    Thus, in the Structuring Services Fee Letters, Defendants represented that they were not relying on CGMI (or any other Citigroup entity) for legal, regulatory, financial, tax, accounting, or investment advice.  (TX 573; TX 574.)

210.    Rather, the Feeder Funds believed that they were relying on Ghazi Abbar for financial and investment matters.  (Abbar Tr. at 237:21-238:3.)

211.    In determining that no customer relationship existed in the *Wachovia* case, the Second Circuit relied upon similar disclaimers that each party was õrelying solely upon its own evaluation ofö the agreement at issue and that it understood the agreement at issue and accompanying risks, and õhas determined they are appropriate for it, and willingly assumes those risks, and . . . [that] it has not relied and will not be relying upon any evaluation or advice . . . for the other party, its affiliates or the representatives or advisors of the other party or its affiliates . . . .ö  *Wachovia*, 661 F.3d at 168.

212.    The Structuring Services Fee Letters are governed by English law and contain a mandatory forum selection clause in favor of English courts.  (TX 573 at 4408; TX 574 at CITI 2240.)

213.    Chadbourne provided specific revisions to drafts of the Structuring Services Fee Letters, but it did not seek to negotiate the acknowledgments discussed above or to strike the mandatory forum selection language.  (TX 517; TX 609.)

**f.    The Investment Advisory Agreements**

214.    The Investment Advisory Agreements state that if Ghazi Abbar became domiciled in or a resident of the U.K., or was õperforming any material part of his obligations or exercising any material part of his rights (either in person, through an agent, as an employee or in any other capacity) under the Agreement or any related document, in the United Kingdom,ö and the Reference Funds incurred or became liable for any United Kingdom taxes, Ghazi Abbar would indemnify and hold the Reference Funds harmless for such taxes. (TX 521 at CITI 2156; TX 532 at ABBAR 589-590.)

215.    This provision arose as a compromise from Mr. Abbarøs unwillingness to covenant that he would õnot be domiciled or resident in the United Kingdom at any time during the terms of the Agreementö and that he would õnot perform any material part of his obligations or exercise any material part of his rights (either in person, through an agent, as an employee or in any other capacity) under this Agreement or any related document, in the United Kingdom.ö (TX 601 at CITI 3727; TX 602 at CITI 14261, 14270.)

216.    The Investment Advisory Agreements do not create a customer relationship between CGMI and Ghazi Abbar.  To the contrary, under these agreements, Ghazi Abbar agreed to provide investment advisory services to the Reference Funds for a fee.  (TX 521 at CITI 2154-55; TX 532 at ABBAR 588.)

217.    The Investment Advisory Agreements do not provide for arbitration of any disputes.  (TX 532; TX 521.)

218.    Under the agreements, CGMI negotiated an exception to the exclusive jurisdiction clause (for the Courts of England) for suits CGMI brought in its capacity as sole shareholder of the Reference Funds.  Under the Investment Advisory Agreements, for such suits CGMI could sue Ghazi Abbar in any competent jurisdiction.  (TX 521 at CITI 2160; TX 532 at ABBAR 593.)

219.    During the process of negotiating this agreement, Ghazi Abbar's lawyers tried to make this right reciprocal.  Specifically, Ghazi Abbar's lawyers sought the right for Ghazi Abbar to be able to sue outside England for claims related to the Investment Advisory Agreements.  Counsel for CGML refused that request, and under the terms of the Investment Advisory Agreements, Ghazi Abbar's only recourse under the agreements is to bring suit in the courts of England. (TX 600 at CITI 14021; TX 521 at CITI 2159; TX 532 at ABBAR 593.)

### 3.    The Option Transactions Could Never Have Been Booked by CGMI

220.    During the relevant time period, every leveraged option transaction similar to the Options Transactions was booked with CGML.  (Burns Tr. at 72:13-73:19; 204:4-205:2.)

221.    By the end of 2005 or early 2006, the Hybrids Group had determined not to use CGMI to book deals like the Options Transactions.  (Sennar Tr. at 95:6-24; 96:24-97:8; 187:7-20.)

222.    Rajiv Sennar could not recall a single trade that he worked on in which CGMI acted as counterparty.  (Sennar Tr. 95:25-96:23; 186:8-13; TX 323; TX 207.)

223.    Indeed, Defendants have not identified a single document that lists CGMI as the booking entity or potential booking entity for the Options Transactions.

224.    According to Mr. Sennar, "there was really no business that we did via CGMI, the fund derivatives, after late 2005, early 2006."  (Sennar Tr. at 192:15-25.)

225.    In addition, CGMI's internal booking systems were incapable of booking the Options Transactions.  During all relevant times, CGMI's internal booking systems could not book derivatives transactions in which the underlying assets were hedge funds.  (Burns Tr. at 228:17-229:6.)

226.    CGMI has been the counterparty for other types of derivatives transactions.  (Burns Tr. at 76:15-77:7.)  But, none of those transactions involved hedge funds as the underlying collateral, as the Options Transactions did.  (Burns Tr. at 119:3-120:20.)

227.    Even if it were possible to book the Options Transactions on CGMI's ledger, doing so would have been prohibitively expensive for the Defendant Feeder Funds because differences in regulatory capital requirements for CGMI and CGML resulted in a substantially higher cost of funding for CGMI than for CGML on trades like the Options Transactions.  (Seledee Tr. at 65:7-17; Burns Tr. at 226:10-228:16; 74:18-75:6.)

228.    This higher cost of funding would have required CGMI to charge a cost of funds (similar to "interest") rate four or five times higher than CGML could charge.  (Burns Tr. at 229:7-230:5; 226:10-228:16; 74:18-75:6.)

229.    Thus, the Feeder Funds benefitted substantially from the lower price for the Options Transactions that CGML could charge.  (Seledee Tr. at 65:7-66:5; Mathur Tr. at 162:12-163:10.)

230.    This was an industry-wide practice.  During the relevant time period CGML's competitors for trades like the Options Transactions were primarily French and Swiss banks, or U.S. banks operating through their European affiliates.  (Burns Tr. at 230:6-16.)

### 4.    The Closing of the Options Transactions

231.    The signing and of the Closing Documents for the Options Transaction took place in London on May 9, 2006.  (Mathur Tr. at 55:10-24; Bower Tr. 58:5-59:2.)

232.    The Options Transactions were booked on CGML's books and records. (TX 35 at 7; Burn Tr. at 217:24-219:5)

233.    For a customer to execute an options trade at either CGMI or CGML, it had to open an account.  (Sennar Tr. at 193:2-9; Burns Tr. at 200:18-201:2.)

234.    James Wathan, a CGML salesperson located in London, facilitated, with the assistance of other CGML employees, the opening of the accounts associated with the Options Transactions.  (TX 509-513; Sennar Tr. at 205:22-206:19.)

235.    Those accounts were located at CGML.  (TX 509-513.)

236.    CGMI, in contrast, had no accounts associated with the Options Transactions.  (Sennar Tr. at 200:11-17; Abbar Tr. at 159:11-16, 160:17-161:14.)

237.    On May 9, 2006, the date the Options Transactions closed, Mr. Wathan received four emails stating that the opening of accounts associated with the Options Transactions had been approved.  Under the heading "Entity," each email stated "CITIGROUP GLOBAL MARKETS LTD," and under the heading "Account Type," each email stated "CUSTOMER-CGML".  (TX 509-513.)

238.    On March 17, 2006, Rajiv Sennar had requested from Ghazi Abbar the "constitutive documents" for the Feeder Funds and stated these were for "our internal account opening procedures."  (TX 563 at CITI 494.)  Documents related to the Reference Funds were collected for various purposes, including the completion of "AML/KYC [Anti-Money Laundering/Know Your Client] compliance related documentation internally."  (TX 595 at CITI 13979.)

239.    These were included in the materials reviewed by CGML as part of its "Client Documentation Checklist," in connection with its anti-money laundering process.  (TX 579; TX 580.)

240.    On or around June 19, 2006, CGML personnel performed anti-money laundering checks on the Feeder Funds in accordance with the requirements of U.K. law and the procedures of CGML, completing a document called the "UK [Anti-Money Laundering] Questionnaire" (the "AML Questionnaire").  (TX 579 at CITI 10081-92; TX 580 at CITI 9864-74)

241.    Chadbourne provided CGML with information necessary to perform these anti-money laundering checks.  (TX 595.)

242.    The AML Questionnaire contains a section titled "Intermediate Customer . . . Evidence to support classification."  (TX 579 at CITI 10082; TX 580 at 9865.)  An "intermediate customer" is defined as "an institution which Citigroup deals with as a customer on an arm's length basis.  Classification as an Intermediate Customer results in the institution receiving some of the protection contained in FSA Rules."  (TX 579 at CITI 10081; TX 580 at 9864.)

243.    The section titled "Intermediate Customer . . . Evidence to support classification" contains three check boxes for the evidence that can support classification as an Intermediate customer.  (TX 579 at CITI 10082; TX 580 at 9865.)  One of those checkboxes states: "For Overseas financial services institutions attach a print out from the relevant regulator/exchange web-site."  (TX 579 at CITI 10082; TX 580 at 9865.)

244.    Each AML Questionnaire attached a print out from the Isle of Jersey Financial Services Commission website listing the trustee of the Feeder Funds among its õRegulated Entities.ö  (TX 579 at CITI 10126-28; TX 580 at CITI 9917-19.)

245.    The AML Questionnaire was signed by CGML employee James Wathan in his capacity as õSalesman/Relationship Manager.ö  (TX 579 at CITI 10083, 10092; TX 580 at CITI 9866, 9874.)

246.    In July 2006, CGML sent each of the Feeder Funds a letter indicating that õin accordance with the rules of the Financial Services Authorityö (a U.K. regulator), CGML had classified each of the Feeder Funds as an õintermediate customer.ö  (TX 579 at CITI 10129; TX 580 at CITI 9920; Abbar Tr. at 282:2-283-2.)  There is no evidence that any representative of the Defendants ever objected to the letter.  Ghazi Abbar testified as a Rule 30(b)(6) witness on behalf of each Feeder Funds and did not dispute that the Feeder Funds received and chose not to dispute its characterization.  (Abbar Tr. at 280:21-283:24.)

247.    CGMI never sent either Feeder Fund any communication stating that CGMI deemed them to be its customers.  (Abbar Tr. at 282:2-283-2.)

248.    Not until the Statement of Claim did any Defendants ever send any communication to CGMI in which it purported or sought to be a CGMI customer, as opposed to a customer of the Private Bank or CGML.

### 5.    Post-Trade Operations of the Options Transactions

249.    After the close of the Options Transactions, CGML provided the leverage (*i.e.*, the funding) for the Options Transactions.  (Mathur Tr. at 162:12-163:10.)

250.    CGMIøs role after the Options Transactions closed was to manage CGMLøs risk.  (Sennar Tr. at 60:18-61:10.)

251.    Ghazi Abbar recommended investments to the Reference Funds.  (TX 265.)

252.    If the investment recommended by Ghazi Abbar in his capacity as investment advisor fit within the prescribed Investment Guidelines, CGMI would approve the transaction, in its capacity as shareholder of the Reference Funds.  (Burns Tr. at 188:23-189:10.)

253.    CGMI's ability to approve or disapprove of investments and to conduct due diligence was important for CGMI to manage CGMI's risk.  (Mathur Tr. at 84:25-86:7.)

254.    Ghazi Abbar also relied upon his personal investment office, Radar. Bower Tr. at 34:14-22; 44:6-24.)  The purpose of Radar was to "support Ghazi Abbar" in making investment decisions.  (Bower Tr. at 83:11-16.)

255.    Risk reports run by the Hybrids Group throughout the life of the Options Transactions listed CGML as the legal entity or legal vehicle associated with the Options Transactions.  (*E.g.*, TX 342 at CITI 10772.)

256.    Employees of the Swiss Banks (Citibank Switzerland and Citibank N.A. (Geneva Branch)) would receive statements from the hedge funds that formed the investments made by the Reference Funds.  (TX 547.)  They would provide those statements to the Reference Funds' administrators, who would then calculate the net asset value ("NAV") for the Reference Funds.  (TX 540; TX 547.)  The administrators would send the NAVs to the Hybrids Group. (Bower Tr. at 140:23-141:9.)

257.    From time to time, CGMI employees performed due diligence on hedge funds held by the Reference Funds, or proposed to be purchased by the Reference Funds.  Such due diligence or analysis was done either on behalf of CGML in its role as Calculation Agent for the purpose of determining whether to haircut investments held by the Reference Fund, or by

CGMI in its capacity as voting shareholders of the Reference Fund for the purpose of determining whether to approve or disapprove the investment recommendations made by Ghazi Abbar in his capacity as investment advisor.  (TX 280; TX 291.)  In both cases, CGMI was acting to manage CGML's risk, and in neither case did such conduct on the part of CGMI employees evidence or create a customer relationship between CGMI and any of the Defendants. (TX 280; TX 291.)

258.    In March 2007, Ghazi Abbar approached Mohanned Noor and James Wathan about modifying the Options Transactions to receive additional leverage from CGML. (TX 59; TX 526; TX 525.)

259.    James Wathan and Mohanned Noor were involved in discussions with Ghazi Abbar regarding this amendment.  (TX 59; TX 526; TX 525.)

260.    The Feeder Funds and CGML agreed to amend the Options Transaction on or around April 25, 2007.  (TX 396.)

261.    That amendment contained an exclusive forum selection clause in which CGML and the Feeder Funds agreed that "English courts have exclusive jurisdiction to settle any dispute arising out of or in connection with this Letter Agreement, the parties submit to the exclusive jurisdiction of the English courts and each party irrevocably waives any objection to the English Court on the ground that the English courts are an inconvenient or inappropriate forum to settle a dispute."  (TX 396.)

E.  **The Private Equity Loan Facility**

1.  **The Structure and Function of the Private Equity Loan Facility**

262.    The Defendants concede in their Statement of Claim that Mohanned Noor and the Swiss Banks decided to execute the Private Equity Loan Facility at the Swiss Banks, and not with CGMI.  (TX 588 at 22.)

263.     As with the hedge fund investments underlying the Options Transactions, the private equity investments were held at all relevant times by separate investment vehicles, non-parties Vintage and Langton (and later, Meltem).  (TX 61 at CITI 5833-4; TX 303 at 3558.)

264.     These private equity investments were the collateral for the Private Equity Loan Facility.  (TX 61 at CITI 5834-37, CITI 5845-49.)

265.     In structuring the Private Equity Loan Facility, the Private Bank recognized that if the collateral was held in investment vehicles controlled by the Abbars, the Abbars could transfer out distributions on the investments, or take other action that would reduce the value of the collateral.  (TX 61 at CITI 5836; TX 301 at ABBAR 3351.)

266.     To prevent this, the Private Bank negotiated the creation of the LPUT (Lender Protected Unit Trust) under Cayman Islands law.  (TX 61 at CITI 5836.)

267.     Vintage and Langton were then transferred to the LPUT, and Gama and Amavest received all of the units in the LPUT.  (TX 61 at CITI 5836.)

268.     Citibank NA (Geneva Branch) then extended a $100 million loan facility to Vintage and Langton in March 2007.  (TX 567.)

269.     Ghazi and Abdullah Abbar acted as individual guarantors for the Private Equity Loan Facility.  (TX 567 at 3476; TX 304.)

270.     The Abbars retained the right to control the underlying private equity investments, each acting as an õInvestment Directorö under the terms of the LPUT.  (TX 301 at ABBAR 3351.)

## 2.  **Negotiation of the Private Equity Loan Facility**

271.     The Private Equity Loan Facility was provided by the Swiss Banks, located in Geneva.  (Abbar Tr. at 196:14-23; TX 567 at 3476.)

272.    CGMI was not a party to any document relating to or governing the Private Equity Loan Facility.  (Abbar Tr. at 197:18-198:15.)

273.    CGMI personnel were not involved in negotiating the Private Equity Loan Facility.  (Sennar Tr. at 279:4-7; Serfilippi Tr. at 132:7-11.)

274.    There is no evidence that anyone involved in the Private Equity Loan Facility was acting on behalf of CGMI.

275.    In November 2005, over one year prior to the consummation of the Private Equity Loan Facility by the Swiss Banks, a person or persons at "Citigroup" prepared a presentation for GA Investments Co., titled "Private Equity Securitization Structure."  (TX 209.) This presentation was not prepared by CGMI.  (TX 209.)

276.    In January 2006, Ghazi Abbar informed CGML that he did not have an "urgency" for liquidity for the private equity portfolio because he was selling some of the $350 million in equity holdings in the Saudi market.  (TX 518 at CITI 1836; Abbar Tr. at 205:20-206:10.)

277.    It was not until on or around October 13, 2006, that Ghazi Abbar and Mohanned Noor began to seriously discuss Ghazi Abbar's "desire to arrange leverage for the private equity portfolio."  (TX 568 at ABBAR 2674.)

278.    In November 2006, Richard Burns discussed with other members of the Hybrids Group Ghazi Abbar's request to provide leverage to the portfolio of private equity investments.  (Burns Tr. at 192:15-94:06.)  Because of the lack of liquidity and long-term nature of this type of investment, Burns recommended that the Hybrids Group not consider providing leverage against the portfolio of private equity investments.  (Burns Tr. at 193:18-194:06; TX 31.)

279.     Ghazi Abbar was advised that CGMI was not interested in providing Ghazi Abbar with financing for his private equity portfolio.  (Abbar Tr. at 195:13-22.)

280.     In email communications, Hybrids Group personnel recognized that the Private Bank wanted to handle what would become the Private Equity Loan Facility internally, without any involvement from personnel on the Hybrids Desk.  (TX 520.)

281.     Although Rajiv Sennar may have had a role in preparing presentations addressing private equity structure in early 2006, he played no role in the Private Equity Loan Facility that closed in March 2007.  (Abbar Tr. at 295:12-14.)

282.     The Private Equity Loan Facility made by the Swiss Banks was heavily negotiated and the Abbars were again represented by the London office of Chadbourne during these negotiations.  (Serfilippi Tr. at 12:13-16, 127:24-128:03.)

283.     Claude Serfilippi, the partner heading the Chadbourne team working on the Private Equity Loan Facility had significant experience structuring and negotiating private equity transactions.  (TX 591; Serfilippi Tr. at 14:9-15:6.)

284.     The Swiss Banks were represented by the London office of Burges Salmon, a U.K. law firm.  (Serfilippi Tr. at 121:8-12.)

285.     None of the written agreements governing the Private Equity Loan Facility provide for the parties to litigate disputes arising thereunder in the U.S.  (Abbar Tr. at 150:9-19.)

286.     None of the written agreements governing the Private Equity Loan Facility provide for the arbitration of any dispute in the U.S.  (TX 303.)

287.     The Private Equity Loan Facility was approved by the following people in 2007: Thomas Schwartz, Patrick Tse, Claude Poppe, Larry Black, Damian Kozlowski, Deepak Sharma.  (Ekert Tr. at 63:11-65:18.)

288.     At the time of the Private Equity Loan Facility approval:

a.  Larry Black was based in London, England.  (Ekert Tr. at 71:4-8.)

b.  Damian Kozlowski was based in New York.

c.  Claude Poppe was based in Geneva, Switzerland.  (Ekert Tr. at 70:19-71:2.)

d.  Tom Schwartz was based in New York.  (Ekert Tr. at 68:22-69:5.)

e.  Deepak Sharma was based in Singapore.  (Ekert Tr. 71:9-72:4)

f.  Patrick Tse was based in New York.  (Ekert Tr. at 69:16-70:3.)

289.     All of these individuals were acting on behalf of the Private Bank and none of them were acting on behalf of CGMI.

290.     Of the individuals listed in Paragraph, 288 only Damian Kozlowski and Patrick Tse were ever registered representatives of CGMI.  Kozlowski, however, did not become a registered representative of CGMI until May 2007, *after* the Private Equity Loan Facility was approved.  Mr. Kozlowski's registration with CGMI ended a few weeks later, in June 2007.

291.     The credit approval memorandum ("PE Approval Memo") for the Private Equity Loan Facility was drafted by Beat Glusstein, a Citibank Switzerland employee, located in Geneva, Switzerland.  (TX 61; TX 808.)

292.     The PE Approval Memo lists the "Control / Approving Unit" and "Extending Unit" as "CPB CH".  (TX 61 at CITI 5833.)  "CPB" stands for Citi Private Bank and "CH" stands for Switzerland.

293.     The PE Approval Memo specifies that one of the Swiss Banks, Citibank N.A. (Geneva Branch), will be the lender.  (TX 61 at CITI 5837.)

294.   The key loan documents for the Private Equity Loan Facility, including the relevant credit agreement, were governed by Cayman law and contained exclusive forum selection clauses in favor of Cayman courts.  (TX 567 at ABBAR 3516.)

295.   Ghazi and Abdullah Abbar each signed an Exculpatory Clauses Notice in connection with the Private Equity Loan Facility that set forth, among other things, that the transaction would be governed by Cayman law and that the exclusive forum for settling disputes would be in the Cayman Islands (subject to a right of arbitration in the International Chamber of Commerce, which is not at issue here).  (TX 294 at ABBAR 241.)

296.   Ghazi and Abdullah Abbar each signed an Individual Guarantor Declaration, addressed to Citibank N.A., (Geneva Branch) as Lender, acknowledging that the credit agreement governing the Private Equity Loan Facility was governed by Cayman Islands law and that the Caymans Islands was the exclusive jurisdiction for settling disputes (subject to the same International Chamber of Commerce arbitration right not at issue here).  (TX 304 at ABBAR 3539, 3542; TX 295 at ABBAR 5547, 5549.)

297.   Defendant have not provided any evidence that any accounts associated with the Private Equity Loan Facility were located at CGMI.

### 3.   Amendments to the Private Equity Loan Facility

298.   Certain Citigroup representatives in New York participated in the approval process for amendments to the Private Equity Loan Facility.

299.   Steven Ekert approved a July 2008 amendment to the Private Equity Loan Facility.  (Ekert Tr. at 93:07-09; TX 66 at CITI 15319-22.)

300.   Steven Ekert, at the time, was the Chief Risk Officer of GWM, the business segment under which the Private Bank (but not CGMI or CGML) was located.  (Ekert

Tr. at 29:23-30:11.)  Mr. Ekert approved the amendment on behalf of the Swiss Banks, the

Citigroup entities that were parties to the loan being amended.

### F.   The Workouts of the Options Transactions and the Private Equity Loan Facility

301.    In or about the Spring of 2008, as a result of conditions in the markets,

issues arose as to certain contractual obligations in the Confirmations, including the loan-to-

value limits.

302.    Samir Mathur was the lead person in the Hybrids Group with respect to

risk-related issues for among other trades, the Options Transactions.  (Mathur Tr. at 119:13-17.)

303.    He, and others from the Hybrids Group, dealt with George Bower and

Mohanned Noor in an effort to resolve these issues.  (Mathur Tr. at 115:24-4.)

304.    Patricia Hogan, Richard Burns, and Erwin Parviz were also involved in

these discussions.  (Mathur Tr. at 117:4-20.)  These individuals were representing the interest of

CGML as the counterparty under the Confirmations.

305.    The work performed by Mr. Mathur, and those who reported to him, was

performed on behalf of CGML, consistent with the fact that it was CGML that would bear any

economic losses associated with the transaction.  (Mathur Tr. at 153:19-154:21.)

306.    During negotiations regarding the workout of the Options Transactions,

Mr. Noor acted as an intermediary between the Defendants and Citigroup.  (Abbar Tr. at 261:6-

262:2.)

307.    On or about October 23 or 24, 2008, George Bower, Samir Mathur, and

Richard Burns communicated about the õpotential of collateralizing certain Private Equity assets

in a possible workout period.ö  (TX 557 at ABBAR 8889.)

308.     On October 24, 2008, CGML sent notices to each of the Feeder Funds, stating that it would forbear from exercising its remedies under the Options Transactions until October 27, 2008.  (TX 557 at ABBAR 8891, 8893.)  The notices were each signed by CGML by Richard Burns, as Managing Director.  (TX 557 at ABBAR 8892, 8894.)

309.     By email dated October 27, 2008, from Mohanned Noor to Richard Burns and Catherin Weir (of the GWM), and copying others, Mr. Noor stated that Ghazi Abbar and Abdullah Abbar had decided not to post additional collateral, including the private equity assets, in connection with the Options Transactions.  (TX 34 at CITI 9772.)

310.     CGML later began exercising its contractual rights to begin liquidating the hedge fund portfolios.  When it did so, a number of CGMI employees and registered representatives and CGML employees were involved, including Samir Mathur, Patricia Hogan, Erwin Parviz, Richard Burns, Ramesh Gupta, Vishal Mishra, Sean Flanagan, John Yu, and Harry Peng. (Mathur Tr. at 133:6-136:23; TX 368.)  All of these individuals were acting on behalf of CGML in connection with the exercise of its contractual rights.  (Mathur Tr. at 154:18-21.)

## 1.  The IRM Group[1]

311.     In or around October 2009, Citigroup's Institutional Recovery Management ("IRM") group became involved in the "workout" of the Options Transactions. (TX 577.)

312.     IRM is a global group within Citigroup that deals with workout situations. (Ekert Tr. at 110:2-9.)

---

[1] The IRM's group's involvement in the workout of the two transactions is not relevant to the issues before the Court, and in any event, relate primarily to settlement discussions between CGML and the Swiss Banks, on the one hand, and their counterparties, on the other hand. Plaintiff's setting forth proposed facts addressing the IRM group's involvement is not intended as a waiver of any objection to testimony or documents related to these subjects, including objections based on Rules 401 and 408 of the Federal Rules of Evidence.

313.    IRM acts on behalf of many different Citigroup affiliates when those various affiliates have troubled loans with counterparties.  IRM does not enter into customer relationships with the counterparties to the loans.  The customer or counterparty relationship remains at whatever Citigroup affiliate initially entered into the transaction.

314.    In seeking to workout a loan, IRM acts on behalf of the Citigroup affiliate that initially entered into the transaction.  Accordingly, IRM was acting on behalf of CGML in connection with its involvement with the Options Transactions as to which CGML was the counterparty.

315.    By the time that IRM became involved in working out the Options Transactions, the Private Equity Loan Facility, too, had come under stress.

316.    In 2009, Steven Ekert, the Chief Risk Officer of Citigroup GWM (the business segment within which the Private Bank was located), was involved in a decision to have IRM become the single point of contact for working out solutions to the Options Transactions and the Private Equity Loan Facility.  (Ekert Tr. at 107:9-108:23.)

317.    Prior to that decision, the Private Bank had been handling the workout of the Private Equity Loan Facility itself.  (Ekert Tr. at 107:9-108:10; Ekert Tr. at 120:22-121:12.)

318.    Trevor Houston was appointed the single point of contact by the head of IRM.  (Ekert Tr. at 111:4-7, 111:11-23.)

319.    In handling the workout of the Options Transactions and the Private Equity Loan Facility, Houston was not representing CGMI's interest.  Rather, he was representing the interest of the Citigroup entities that were counterparties to the Options Transactions and the Private Equity Loan Facility, which were CGML and the Swiss Banks, respectively.

320.    Trevor Houston reported to John Dorans.  (Ekert Tr. at 112:17-19.)

321.    John OøConnell worked with Trevor Houston.  (Ekert Tr. at 111:8-10.)

322.    During the workout of the Private Equity Loan Facility by the IRM group, Mr. Ekert, received updates from the members of the IRM group.  (Ekert Tr. at 119:6-120:6.)

323.    Throughout the workout process, the Private Equity Loan Facility was still õfor the account ofö the Private Bank.  Any losses would have been taken by the Private Bank and any recoveries (to the extent permitted under the Private Equity Loan Facility documents) would have gone to the Private Bank.  (Ekert Tr. at 122:8-123:8.)

324.    Similarly, although IRM was involved in working out the Options Transactions, all losses associated with the Options Transactions were booked at CGML, including a loss in 2009.  (TX 70; Salva Tr. at 63:10-64:20.)

325.    The Private Bank did not compensate IRM for its work on the Private Equity Loan Facility.  (Ekert Tr. at 122:25-123:8.)

**G.  CGMI Did Not Receive Revenue From any Defendant**

326.    CGMI did not receive any revenue or profit from the Options Transactions.  (TX 70; Salva Tr. at 61:15-64:20.)

327.    There is no evidence that CGMI received any compensation, revenue, or profit from the Private Equity Loan Facility.

328.    Neither of the Feeder Funds ever made any payments to CGMI in connection with the Options Transactions.  (Abbar Tr. at 167:23-168:7.)

329.    Neither Ghazi Abbar nor Abdullah Abbar ever made any payments to any entityô  including CGMIô  in connection with the Options Transactions.  (Abbar Tr. at 167:16-22.)

330.    There is no evidence that either Gama or Amavest ever made any payments to CGMI.

331.    Over the period of 2006 through 2009, CGML incurred a loss of approximately $200,000 in connection with the Options Transactions.  (TX 70; Salva Tr. at 61:15-64:20.)

332.    In 2010 and 2011, after the hedge funds that were the collateral for the Options Transactions were owned by CGML, and therefore at CGML's risk, CGML recognized gains of approximately $30.8 million. (TX 70; Salva Tr. at 61:15-64:20.)

333.    Approximately 80% of the revenue for the Option Transactions was attributable to CGML and 20% to the Swiss Banks. (TX 30.)  None was attributable to CGMI. (TX 70; Salva Tr. at 61:15-64:20.)

### H.  Individual Compensation

334.    Bonuses for Hybrids Group members were based on a number of factors, including: Hybrid Group P&L, whether the employee helped to close deals with clients of the Hybrids Group, how hard the employee worked, and how the employee conducted themselves with their colleagues.  (Mathur Tr. at 43:6-44:12; Sennar Tr. at 102:19-104:25; TX 21 at CITI 12140; Burns Tr. at 108:3-109:4.)

335.    Revenue from the Private Equity Loan Facility was not considered in setting the compensation for CGMI employees.

### I.  Inter-Company Compensation

336.    CGMI and CGML were both party to two inter-company or "transfer pricing" agreements in force during the course of the Options Transactions.  (TX 16; TX 17; TX 45; Seledee Tr. at 92:6-93:7.)

337.    The first agreement, called the Citigroup Corporate and Investment Bank Global Master Service Contract (the "Master Services Contract"), was effective from 2001 through 2007.  (TX 16; TX 17; Seledee Tr. at 141:5-14.)  CGMI and CGML are party to Appendix A to the Master Services Contract.  (TX 17.)

338.    Appendix A contains a section titled "Trading Management Services." (TX 17 at 4.)

339.    The second agreement, referred to as the Intra-Citi Service Agreement ("ICSA"), became effective as of January 1, 2008.  (TX 45 at CITI 15260; Seledee Tr. at 141:5-14.)

340.    The ICSA was signed by CGMI and CGML.  (TX 45 at CITI 15260.)

341.    Both agreements provide a mechanism for a Citigroup entity, acting as service provider to be compensated for services is provides to its customer, which is another Citigroup entity.  (TX 16; TX 17; TX 45.)

342.    The compensation, also called "transfer pricing" is implicated when one Citigroup entity books a transaction and another Citigroup affiliate provides services to the booking entity.  (Salva Tr. at 16:7-16; Seledee Tr. at 98:3-11.)

343.    In the case of the Options Transactions, CGML was the customer and CGMI was the service provider.  (Seledee Tr. at 104:1-15.)

344.    The transfer pricing policies are designed to compensate the service provider for the services is has provided to the booking entity.  (Salva Tr. at 16:7-16.)

345.    The transfer pricing agreements applied to the Options Transactions. (Seledee Tr. at 90:10-91:23.)

346.    The policies are based on arm's-length principles designed to compensate affiliates entities as if a third-party service provider were providing the particular service at issue. (Salva Tr. at 82:14-83:1.)

347.    The transfer pricing policies covered both structuring and trading services. (Salva Tr. at 37:18-39:6; 79:25-82:13; 89:16-90:11.)

348.    Traders could be based anywhere in the world, and provide services to any other part of the world.  (Mathur Tr. at 49:19-50:13.)

349.    The traders from the Hybrids Group knew they were providing services to whichever entity was the legal booking entity.  (Mathur Tr. at 50:14-21.)

350.    Transfer pricing calculations are performed annually, taking into account the year's worth of relevant data.  (Salva Tr. 83:3-19.)

351.    Due to an error, during 2006 through 2008, the Options Transactions were never included in pricing adjustments between CGMI and CGML under the Intercompany Service Agreements (TX 16; TX 17; Salva Tr. at 40:14-42:25, 85:15-86:7.)

352.    After this omission was discovered in or about 2009, no adjustments were made to credit CGMI for any services CGMI provided to CGML under the intercompany service agreements because Citigroup determined that any amount involved would not be material on an aggregate basis because the P&L on the Options Transactions between 2006 and 2009 was "flat." (Salva Tr. at 48:6-59:20, 77:13-78:17.)

**J.    The Conduct Complained of in the Statement of Claim Is Focused on Mr. Noor and the Swiss Banks**

353.    Mohanned Noor was involved in both the Options Transactions and Private Equity Loan Facility.  (TX 588 at 10, 22.)

354.    Mr. Noor was the key contact for the Abbars within Citigroup.  (TX 329.) As the private banker assigned to handle their business, Mr. Noor was, in the words of the Defendants, öthe hub of communication and responsibility between the Abbars, CGMI, CPB and the other Citi Entities.ö  (TX 588 at 17.)

355.    Counsel for Defendants stated, in a pre-trial conference, that it would be övery crucial for us to knowö to what Mr. Noor would testify.  (Nov. 22, 2011 Court Tr. at 10:8-11:22.)

356.    Mr. Noor is the individual whose conduct is discussed more than any other individual in the Defendantsø Statement of Claim before FINRA.  (Abbar Tr. at 128:12-129:9.)

357.    The Plaintiff respectfully refers the Court to the Statement of Claim for an complete and accurate description of the statements made therein, all of which are admissions that bind every Defendant.

358.    The fact that the Statement of Claim focuses on Mr. Noor and the Private Bank is consistent with Ghazi Abbarøs previous statements in which he indicated that his claims were primarily focused on the Private Bank, as discussed immediately below.

359.    On or around November 17, 2009, Ghazi Abbar sent a letter to Trevor Houston stating: öThe basis of our legal case against Citigroup is based on negligence and the assumed role of Private Bank in advising, structuring and managing my familyøs investment program.ö  (TX 578 at ABBAR 5175.)

360.    On or around November 19, 2009, Ghazi Abbar sent a letter to Deepak Sharma, Chairman of the Private Bank, located in Singapore.  (TX 577.)  In the letter, Mr. Abbar stated that öunless we can find a resolution I will be instructing my lawyers to pursue Citi Private Bank forö the losses associated with the Options Transactions.  (TX 577 at ABBAR 5178.)  The

letter continues:  "I have no choice but to hold Citi Private Bank accountable for these losses."
(TX 577 at ABBAR 5178.)  Mr. Abbar's letter also states that his "primary complaint are against
the Private Bank for negligent advice and mismanagement."  (TX 577 at ABBAR 5179.)

361.    In contrast, Ghazi Abbar does not believe that Rajiv Sennar acted
improperly in a way that harmed Mr. Abbar.  (Abbar Tr. at 54:19-24.)

362.    Ghazi Abbar has also committed to Rajiv Sennar that he has no intention
of suing him.  (Abbar Tr. at 55:15-56-14.)

363.    This admission that Defendants have no claim against the primary New
York-based employee involved in the Options Transactions, coupled with the fact that the
primary thrust of their Statement of Claim addresses the conduct of Noor, a Citibank Switzerland
employee, underscores the fact that Defendants' claims are, in substance, claims against foreign
Citigroup entities arising under foreign law.

III.   **DEFENDANTS' PROPOSED FINDINGS OF FACT**

**Defendants' Proposed Summary Findings of Fact without Evidentiary Detail**

1.      By Statement of Claim dated August 17, 2011, Defendants commenced an arbitration against CGMI before the Financial Industry Regulatory Authority ("FINRA") styled *Abbar et al. v. Citigroup Global Markets Inc.*, FINRA Dispute Resolution No. 11-03212 (the "Arbitration").  See Defendants' Counterclaim ¶ 1; Plaintiff's Answer to Counterclaim ¶ 1.

2.      The FINRA Code of Arbitration Procedure is a written agreement for arbitration that is divided into "Customer" and "Industry" Codes.  None of the Defendants is a member of the securities industry (that is, a "broker" or a "dealer") and Defendants have accepted CGMI's standing offer to arbitrate by filing a Statement of Claim and Uniform Submission Agreement under the FINRA "Customer" Code (the "Customer Code").  Each of the Defendants is a "customer" within the meaning of Rule 12100(i) of the FINRA Customer Code. (See TX 814 and ¶ 12 below).

3.      Defendants' Statement of Claim alleges a dispute that has arisen in connection with the business activities and dealings of CGMI, its employees, agents, registered representatives and other "associated persons," as that term is defined by Rule 12100(a) and Rule 12100(r) of the FINRA Customer Code.  (See TX 588).

4.      There are no agreements signed by any of the Defendants and CGMI that preclude, or even address, Defendants' right to file a FINRA arbitration against CGMI.

5.      There are no agreements signed by any of the Defendants and Plaintiff CGMI that provide for an exclusive, or any, forum for resolution of claims by any of the Defendants against Plaintiff CGMI.

6.      As a member of FINRA, CGMI is prohibited by FINRA Rules from circumventing the rights of its customers to pursue their claims in arbitration at FINRA, as set forth in FINRA Rule 2268(d) (formerly NASD Conduct Rule 3110(f)), which states, in relevant part, "no predispute arbitration agreement shall include any condition that (1) limits or contradicts the rules of any self-regulatory organization; (2) limits the ability of a party to file any claim in arbitration."

7.      CGMI has failed and refused to arbitrate with Defendants.  See Plaintiff's Complaint and Motion for a Preliminary Injunction.

8.      The business relationship between Defendants and CGMI alleged in detail in the Statement of Claim began in or about November 2005 and continued without interruption through at least the end of 2011.  See, e.g., ¶¶ 94-116, 127-164, 179-191, 249-302, 303-358 and 380-386 below.

9.      From November 2005 through at least the end of 2011, CGMI offered to provide and did provide investment products, goods and services to Defendants. See, e.g., ¶¶ 94-116, 127-164, 179-191, 249-302, 303-358 and 380-386 below.

10.      From November 2005 through at least the end of 2011, Defendants purchased or undertook to purchase investment products, goods and services from CGMI.  See, e.g., ¶¶ 94-116, 127-164, 179-191, 249-302, 303-358 and 380-386 below.

11.      From November 2005 through at least the end of 2011, CGMI recommended investment-related transactions to Defendants, negotiated the terms of investment-related transactions with Defendants and executed investment-related transactions with and on behalf of Defendants.  See, e.g., ¶¶ 94-116, 127-164, 179-191, 249-302, 303-358 and 380-386 below.

12.     Defendants accepted and relied upon the advice and recommendations of CGMI with respect to the investment-related transactions that CGMI offered, recommended, negotiated and executed.  See, e.g., ¶¶ 94-116, 123, 127-133, 155-161, 249-303, 318-320 and 325-332 below.

13.     Defendants were induced to enter into the Options Transactions by CGMI's undertaking to provide or make available financing with respect to the private equity portfolio of Defendants Ghazi Abbar and Abdullah Abbar.  See, e.g., ¶¶ 94-116, 303 below.

14.     CGMI and its employees, agents, registered representatives and other associated persons offered and recommended the Options Transactions to Defendants and negotiated the terms of the Options Transactions directly with Defendants.  See ¶¶ 94-164 below.

15.     CGMI was a party to the Options Transactions by virtue of CGMI's overall participation in the Options Transactions, execution of certain closing documents and ownership and control of the Reference Funds.  See ¶¶ 179-203 below.

16.     For various business, regulatory and tax reasons, CGMI was required to act in its own capacity with respect to the Options Transactions and could not act as an agent of, delegate of, for the benefit of, or on behalf of CGML.  See ¶¶ 186-198 below.

17.     CGMI did act in its own capacity with respect to the Options Transactions and not as an agent of, delegate of, for the benefit of, or on behalf of CGML.  See ¶¶ 226-239, 253-302 below.

18.     The Private Equity Loan Facility and initial proposals related thereto were recommended to Defendants by employees, agents, registered representatives and associated persons of CGMI.  See ¶¶ 96-115, 306-316, 353-358 below.

19.     The Private Equity Loan Facility was negotiated with Defendants by agents and associated persons of CGMI.  The amendments to the Private Equity Loan Facility were recommended, negotiated and approved by CGMI and its employees, agents, registered representatives and other associated persons.  See ¶¶ 306-316, 317-332 below.

20.     CGMI and its employees, agents, registered representatives and other associated persons were involved in the termination and winding up of the Options Transactions and Private Equity Loan Facility and other related transactions at issue in the Arbitration.  See ¶¶ 333-358 below.

21.     No CGMI employee or FINRA-registered representative explicitly communicated to Ghazi Abbar that any goods or services he or she was providing to Defendants were for the benefit of CGML.

22.     CGMI directly or indirectly controlled Mohanned Noor with respect to the transactions at issue in the Arbitration.  Mohanned Noor is an agent and associated person of CGMI.  See, e.g., ¶¶ 94-140, 210-214 below.

23.     CGMI and its employees, agents, registered representatives and other associated persons were compensated directly or indirectly by Defendants in connection with the investment-related transactions that it offered, recommended, negotiated and executed and in connection with the investment products, goods and services that Defendants purchased and undertook to purchase from CGMI.  See ¶¶ 359-375 below.

**Defendants' Proposed Findings of Fact with Evidentiary Detail**

**The Plaintiff and Its Affiliates**

24.     Plaintiff Citigroup Global Markets Inc. ("CGMI") is a "member" of FINRA within the meaning of Rule 12100(o) of the FINRA Code of Arbitration Procedure for

Customer Disputes (the FINRA "Customer Code") and as provided by Section 15 of the Exchange Act, 15 U.S.C. § 78o.  (Def's. Answer ¶ 10; CGMI Reply ¶ 30).  CGMI is also registered with FINRA under other names, including "Smith Barney."  (TX 774).

      25.    CGMI reports certain financial results to the SEC on Form X-17A-5. According to CGMI's Forms X-17A-5 for the years 2005 and 2006, CGMI is "engaged in the securities industry in the United States and has operations in various foreign countries whose currencies are freely convertible into U.S. dollars."  A substantially similar disclosure was made by CGMI in its Forms X-17A-5 for the years 2007 and 2008.  (TX 767; TX 768; TX 769; TX 770, CGMI Forms X-17A-5 for 2005-2008; see also TX 7 at CITI 8640).

      26.    Non-party Citigroup is a corporation organized under the laws of the State of Delaware with its principal executive offices at 399 Park Avenue, New York, New York, 10043.  Citigroup is a bank holding company under the laws of the United States with operations worldwide.  (TX 214 at CITI 7344; TX 293 at CITI 7524; TX 330 at CITI 7098).

      27.    Between 2006 and 2008, inclusive, Citigroup managed its business along the following segments and product lines, the heads of which are set forth below and are depicted in greater detail in Citigroup's Annual Reports at the pages indicated:

a)     For 2006 (TX 214 at CITI 7344):

1)     Global Consumer Group

2)     Corporate and Investment Banking (CIB)

3)     Global Wealth Management (GWM)

4)     Alternative Investments

5)     Corporate/Other

b)     For 2007 (TX 293 at CITI 7524):

1)    Global Consumer Group

2)    Citi Markets and Banking (CMB)

3)    Global Wealth Management (GWM)

4)    Citi Alternative Investments (CAI)

5)    Corporate/Other

c)    For 2008 (TX 330 at CITI 7099):

1)    Global Cards

2)    Consumer Banking

3)    Institutional Clients Group (ICG)

4)    Global Wealth Management (GWM)

5)    Corporate/Other

28.    The õsegments and productsö stated in paragraph 27 above, including the õbusinessesö listed under each segment and product, correspond to line items in certain tables contained in Citigroupøs Annual Reports and do not represent the financial results for any particular legal entity, including CGMI or non-party Citigroup Global Markets Limited (õCGMLö).  (Compare TX 214 at CITI 7344 with TX 214 at CITI 7358-59 and CITI 7362-99 (2006); TX 293 at CITI 7524 with TX 293 at CITI 7541-44 and CITI 7545-59 (2007); TX 330 at CITI 7099 with TX 330 at CITI 7121-24 and CITI 7125-34 (2008)).

29.    In Citigroupøs Annual Reports for 2006 through 2008, the financial results for CGMI and for CGML were reported under at least two different line items corresponding to segments stated in paragraph 27 above, namely: 1) CIB, CMB or ICG; and 2) GWM.  (TX 214 at CITI 7358-59 (2006); TX 293 at CITI 7541-44 (2007); TX 330 at CITI 7121-24 (2008)).

30. Citigroup's Annual Reports for 2006 through 2008 do not indicate under which "segment" or "business" the financial results for the Global Hybrids Group ("Hybrids Group" or "Hybrids Desk") are reported.

31. In its Annual Reports for 2006 through 2008, Citigroup listed the "Private Bank" business ("Private Bank") in the same segment as the "Smith Barney" business, namely, GWM.  (See TX 214 at CITI 7344 (2006); TX 293 at CITI 7524 (2007); TX 330 at CITI 7099 (2008)).

32. Private Bank is not a bank and is not a separate legal entity.

33. Citigroup describes Private Bank as follows:  "Citi Private Bank is a business of Citigroup Inc. ("Citigroup"), which provides its clients access to a broad array of products and services available through bank and non-bank affiliates of Citigroup."  (TX 816 at ABBAR 204; TX 777; TX 778 at ABBAR 12327, 12329).

**The Defendants**

34. None of the Defendants is a "broker" or a "dealer" within the meaning of Rule 12100(i) of the FINRA Customer Code.

**A.     Abdullah Abbar and Ghazi Abbar**

35. Defendant Abdullah Abbar is the patriarch of the Abbar family and is now retired.  Over the course of a long business career, Abdullah Abbar built and operated businesses in areas such as food products importing, travel and tourism, oil transportation and investments, electrical and mechanical distribution, real estate, engineering and contracting.  (TX 588 at 3-4).

36. Defendant Ghazi Abbar is domiciled in and resides in Saudi Arabia.  (TX 588 at 4).

37.     Ghazi Abbar supervises managers who operate businesses in Saudi Arabia.  (Abbar Tr. at 13-14, 27). Ghazi Abbar began making investments on behalf of his family in 1986 or 1987.  (Abbar Tr. at 18-19; TX 518 a CITI 1836). Since that time Ghazi Abbar has been investing on behalf of his family in hedge funds and private equity investments.  (TX 588 at 4 and 7).

38.     At all relevant times, the investments of Abdullah Abbar and Ghazi Abbar (collectively, "the Abbars") were handled by Ghazi Abbar, including the Abbars' relationship with plaintiff CGMI and its affiliates and related entities.  (TX 588 at 4; Abbar Tr. at 18-19).

39.     In connection with the transactions at issue in the Arbitration, Ghazi Abbar acted for and on behalf of his father, Abdullah Abbar, pursuant to written powers of attorney and had authority to make business and investment decisions on behalf of Abdullah Abbar.  (See TX 515 at CITI 1484; TX 790-95).

40.     Ghazi Abbar was directly involved in negotiations of both the Options Transactions and the Private Equity Loan Facility, and all subsequent related transactions thereunder, during the Abbars' relationship with Citigroup from late 2005 until at least 2011, on behalf of himself, his father and the other Defendants. (See e.g. Abbar Tr. at 86-87; Abbar. Tr. at 112-113; Abbar Tr. at 209-210; TX 519; TX 563; TX 571; TX 286; TX 790-793).

41.     At all relevant times, plaintiff CGMI was on notice that Ghazi Abbar had full authority to make decisions on behalf of Abdullah Abbar and that Ghazi Abbar "runs the show." (TX 228 at CITI 477; TX 515 at CITI 1484).

42.     Ghazi Abbar visited CGMI's offices in New York and communicated numerous times with CGMI employees in New York with respect to the Options Transactions

and the Private Equity Loan Facilities on behalf of himself and his father.  (See, e.g., TX 308; TX 30; TX 64; TX 231; TX 241).

43.     Non-party Radar Capital Ltd. ("Radar") is a family office in London, England, opened by Ghazi Abbar after execution of the Options Transactions documents to help him oversee the Abbars' investments.  (Bower Tr. at 29-31).  Radar was created on or about July 1, 2006, but was not fully operational for many months thereafter.  (Bower Tr. at 50).

B.     **The Defendant Feeder Funds**

44.     Before the Abbars transferred their ownership interest in their hedge fund investments to Citigroup as part of the Options Transactions, the Abbars were the beneficial owners of the hedge funds through two personal investment companies named Ajial Holdings Limited ("Ajial Limited" or "Ajial Reference") and Amatra Investment Limited ("Amatra Limited" or "Amatra Reference"), ("collectively "the Reference Funds").  (TX 515 at 1481-82; TX 579 at CITI 10088; TX 580 at CITI 9871).

45.     Prior to the closing of the Options Transactions, Abdullah Abbar was the beneficial owner of Amatra Limited through a personal trust known as the "JT647 Trust" of which he was the Settlor and Ghazi Abbar was Protector. (TX 580 at CITI 9871; TX 781 at CITI 3449-50; Abbar Tr. at 111).

46.     Prior to the closing of the Options Transactions, Ghazi Abbar was the beneficial owner of Ajial Limited through a personal trust known as the "JT808 Trust" of which he was the Settlor and Protector. (Abbar Tr. at 111; TX 579 at CITI 10088; TX 780 at CITI 3420-21 and CITI 3441-42; TX 515 at CITI 1478 and CITI 1481-82).

47.     The Abbars contributed the money which was used to purchase the hedge funds held in Ajial Limited and Amatra Limited.

48.     As more fully described below, as part of the Options Transactions, the ownership of Ajial Limited and Amatra Limited were transferred to CGMI and CGML and the Abbars purportedly received an indirect interest in the performance of the hedge funds through their beneficial ownership of the Feeder Funds (as defined below).  (TX 515 at CITI 1482-83).

49.     Defendant Ajial Leveraged Feeder Holdings Limited (õAjial Feederö) was incorporated in the Cayman Islands on or about April 18, 2006, as a company with limited liability. (TX 579 at CITI 10093). Ajial Feeder has its principal place of business in the Isle of Guernsey, the Channel Islands.  (Complaint ¶ 13 and TX 252 [Abbar 3151]).

50.     The beneficial owner of Ajial Feeder at the time of the closing of the Options Transactions was defendant Ghazi Abbar through the JT808 Trust. (TX 579 at CITI 10088; TX 780 at CITI 3441-42; TX 298 at CITI 5832-34; TX 515 at CITI 1482-83).

51.     Defendant Amatra Leveraged Feeder Holdings Limited (õAmatra Feederö) was incorporated in the Isle of Jersey on April 28, 2006, as a private company with limited liability. (TX 580 at CITI 009875).  Amatra Feeder has its principal place of business in the Isle of Jersey, the Channel Islands.  (TX 580 at CITI 9875-76**;** TX 588 at 4; TX 307 at CITI 10069-10070).

52.     The beneficial owner of Amatra Feeder at the time of the closing of the Options Transactions was defendant Abdullah Abbar through the JT647 Trust and Defendant Amavest Holdings Limited (õAmavestö). (TX 580 at CITI 9871; TX 782 at CITI 3449-50; TX 781; TX 298 at CITI 5833-34; TX 307 at CITI 10073; TX 515 at CITI 1482-83; TX 781 at CITI 9921).

53.     At the time of the closing of the Options Transactions, Ghazi Abbar controlled Ajial Feeder and Amatra Feeder (together, the õFeeder Fundsö) as Protector of the JT808 Trust and the JT647 Trust.  (Abbar Tr. at 111).

54.     The Feeder Funds did not exist prior to April 2006 and came into existence at the recommendation of Citigroup and as the result of the structuring of the Options Transactions.  (Abbar Tr. at 77-78).

### C.     Defendants GAMA and Amavest

55.     Defendant GAMA Investment Holdings Limited (õGAMAö) is incorporated in the Cayman Islands as a company with limited liability.  GAMA has its principal place of business in the Isle of Guernsey, Channel Islands.  (TX 588 at 4).  The beneficial owner of GAMA is Ghazi Abbar.  (TX 298 at CITI 5726-31, Abbar Tr. at 187, 293).

56.     Defendant Amavest is incorporated in the Cayman Islands as a company with limited liability.  Amavest has its principal place of business in the Isle of Guernsey, Channel Islands.  (TX 588 at 4).  The beneficial owner of Amavest is Abdullah Abbar.  (TX 298 at CITI 5726-31; Abbar Tr. at 187).

57.     Ghazi Abbar controls GAMA and Amavest.  (TX 298 at CITI 5726-31, CITI 5736).

### The Abbars' Investments Prior to Citigroup

58.     By 2005, the investment assets of the Abbars totaled approximately $350 million, which consisted primarily of high quality hedge funds and private equity investments that had been accumulated over a number of years. (TX 588 at 6).

59.     As explained above, prior to 2006, the Abbars' hedge fund investments were held in Amatra Limited and Ajial Limited (which are separate and distinct legal entities from the similarly named Feeder Funds). (Abbar Tr. at 18-19; TX 518; TX 588 at 3, 7).

60.     The Abbars' private equity investments were held in two companies known as Vintage Investments Limited ("Vintage") and Langton Limited ("Langton"). (TX 61 at CITI 5834).

61.     Prior to the transactions at issue in the Arbitration, Amatra Limited, Ajial Limited, Vintage and Langton were beneficially owned by the Abbars through their private trusts. (TX 298 at 5726-31; TX 515 at CITI 1478, CITI 1481-82).

62.     The hedge fund investments held by Amatra Limited and Ajial Limited secured a revolving line of credit issued by Deutsche Bank. (Abbar Tr. at 39-40, 47).

63.     The private equity investments held by Vintage and Langton were not financed by Deutsche Bank or any other financial institution. (Abbar Tr. at 47).

### The Hybrids Group (also known as the Hybrids Desk)

64.     The Hybrids Desk was a business that used CGMI and CGML as legal entities in transactions executed by the Hybrids Desk. (Seledee Tr. at 14).

65.     It made no difference to the Hybrids Desk which Citigroup entity was used as a counterparty on a transaction, as long as it was profitable to Citigroup and the transaction was approved by Citigroup control functions. (Sennar Tr. at 97-98, 102).

66.     Hybrids Desk trades were "booked" in various Citi entities, depending on the structuring requirements of that specific deal. (Sennar Tr. at 28).

67.     The Hybrids Desk used CGML, CGMI, and Citibank NA at various times as booking entities on the trades. (Sennar Tr. at 27-28; TX 14 at CITI 7786).

68.     The Hybrids Desk contained CGMI and CGML employees.  (TX 506; Sennar Tr. at 22.)

69.     The persons who were members of the Hybrids Desk in New York were employees and of CGMI.  (Mathur Declaration ¶ 4).

70.     The Hybrids Desk traders reviewed and managed the risk of the trades done by the Hybrids Desk.  (Sennar Tr. at 26-28).

71.     The Hybrids Group included professionals dedicated to, among other things, õfull client service, fund due diligence, quantitative analysis, sales and marketing.ö (TX 388 at CITI 169).

72.     As of 2007, the Hybrids Group stated that it has a õClient-oriented approach,ö which included a õstrong focus on after-sales service and client satisfaction with dedicated client service teams, regular client updates, cashflow and balance sheet reporting and transaction valuation, adjustment, monitoring and reporting.ö  (TX 388 at CITI 171).

73.     The Client Services Group was a separate group within the Hybrids Desk located in New York which provided services for the Abbars and the Feeder Funds including changes to the portfolio, subscribing or redeeming out of funds, and generating periodic reports and sending them out to Ghazi Abbar.  (Mathur Tr. at 79-81).

74.     From 2006 to 2008, John Yu and Zahra Khademi, New York-based CGMI employees and registered representatives, were in the Client Services Group.  (Mathur Tr. at 81-82).

75.     From 2006 through 2010, John Yu was the Hybrid Groupøs Client Service representative who had the most contact with the Abbars. (See, e.g. TX 383; Mathur Tr. at 136-37; see, e.g., TX 276; TX 310; TX 311; TX 314).

76.     The following FINRA registered representatives and employees of CGMI played a role in dealing with Ghazi Abbar and/or his representatives with CGMI from 2005 through 2011: Rajiv Sennar, Samir Mathur, Patricia Hogan, Adam Albin, Zhenyu Peng, Vishal Mishra, Leah Linn Burnett, Zahra S. Khademi, John Yu, Yontcho Valtchev, Richard Burns, Sallie Krawcheck, Vikram Pandit, Chuck Prince, Raymond Nolte, John Barber, John Havens, Damian Kozlowski, Susan Wilson-Perez, Michael Corbat, Ramesh Gupta, Jean Louis Lafforgue, Donald Krapp, Steven Penny, John J. Conway, Bret Dooley, James McDade, Steven R. Victorin, Patrick Tse, and Trevor Houston. During the same period, CGMI employees Craig Seledee and John O¢Connell also dealt with Ghazi Abbar and/or his representatives.  (TX 815).

### A.     Rajiv Sennar

77.     Rajiv Sennar was a CGMI employee and FINRA registered representative who was on the õMarketing & Structuringö side of the funds derivatives business of the Hybrids Desk in New York.  (Sennar Tr. at 17-18).

78.     Mr. Sennar was hired by CGMI to build up the New York desk of the Hybrids Group. (Sennar Tr. at 17-18; 20-22).

79.     Rajiv Sennar was the principal person working for CGMI in New York who was responsible for the negotiation, development, structure and business terms of the Options Transactions with Ghazi Abbar.  (Sennar Tr. at 56-58; 136-137).

80.     Mr. Sennar provided his business card to Ghazi Abbar which indicated that Mr. Sennar was employed by CGMI.  (TX 5).

81.     Rajiv Sennar had previous experience with fund derivatives transactions at Zurich Capital and BNP before coming to Citigroup. (Sennar Tr. at 31-32).

82.     Rajiv Sennar was an employee of CGMI, and he had no reason to believe he was acting on behalf of any other entity other than CGMI in dealing with Ghazi Abbar. (Sennar Tr. at 48; Abbar Tr. at 57).

83.     No one told Rajiv Sennar that he was working for any other entity other than CGMI.  (Sennar Tr. at 48; Abbar Tr. at 57).

## B.     Samir Mathur

84.     At the time of the Options Transactions with Ghazi Abbar, Rajiv Sennar reported to Ervin Parviz in London and locally reported to Samir Mathur (a CGMI employee and a FINRA registered representative of CGMI) in New York. (Sennar Tr. at 180).

85.     From a supervisory and U.S. regulatory perspective, Samir Mathur, as the U.S. person on the Hybrids Desk in New York, had overall responsibility for people on the Hybrids Desk.  (Burns Tr. at 112-113).

86.     Ghazi Abbar and George Bower viewed Rajiv Sennar as reporting to Mathur.  (Abbar Tr. at 166; TX 553).

## C.     Richard Burns

87.     At all relevant times, Richard Burns (the head of the Hybrids Group) was located in London, England, and was a FINRA registered representative of CGMI.  (Burns Tr. at 53-54; TX 506; TX 507; TX 508).

88.     The FINRA BrokerCheck Report for Mr. Burns states he is registered with and employed by CGMI.  (TX 11).

89.     Richard Burns supervised Samir Mathur, and, indirectly, Rajiv Sennar. (Burns Tr. at 51-53, TX 508 at Abbar 10693).

90.     Mr. Burns was required by Citigroup policy to have a FINRA Series 24 supervisory license in order to supervise U.S. persons.  (Burns Tr. at 51-52; TX 11).

**CGMI Senior Management In Charge of the Hybrids Group**

91.     Burns reported to Joseph Elmlinger (Global Head of Equity Derivatives) and Steve Jones (Global Head of Fixed Income Derivatives), both New York-based employees and FINRA registered representatives of CGMI. (Burns Tr. at 23-24).

92.     Joseph Elmlinger and Steve Jones were ultimately responsible for all of the transactions executed by the Hybrids Group, including the Options Transactions.  (Burns Tr. at 24-25).

93.     Joseph Elmlinger reported to James Forese (Global Head of Equities), a New York-based employee and FINRA registered representative of CGMI. (Burns Tr. at 25-26).

**CGMI's Role In Marketing Hedge Fund and Private Equity Products To Ghazi Abbar in 2005**

94.     In late 2005, Rajiv Sennar and James Wathan, an employee of CGML who was not part of the Hybrids Group, met Ned Noor, who introduced them to Ghazi Abbar.  (Sennar Tr. at 32-36; TX 2).

95.     Ned Noor had been Ghazi Abbar's banker at Deutsche Bank and became employed by Citigroup in January 2006.  (Abbar Tr. at 40-43; Sennar Tr. at 32-34; TX 799 at CITI 455).

96.     In late 2005, Ned Noor told Rajiv Sennar that Ghazi Abbar had a hedge fund portfolio at Deutsche Bank and a private equity portfolio.  (Sennar Tr. at 33-38).

97.     In late 2005, Ned Noor asked Rajiv Sennar and James Wathan to assist him in convincing Ghazi Abbar to move his hedge fund and private equity business over to Citigroup.  (Sennar Tr. at 38-41).

98.     In late 2005, Ned Noor came to Ghazi Abbar and suggested that he move his hedge fund investments to Citigroup.  (Abbar Tr. at 45-46).

99.     Thereafter, there were emails and discussions in late 2005 between Ghazi Abbar, Rajiv Sennar, James Wathan and Ned Noor regarding Citigroup's attempt to move Ghazi Abbar's business from Deutsche Bank to Citigroup.  (TX 2 at ABBAR 1074; Sennar Tr. 39-41).

100.    Ned Noor asked Ghazi Abbar if he wanted more leverage on his hedge fund portfolio from Citi and Ghazi Abbar told him õno,ö but that he might be interested in doing some leverage on his private equity portfolio.  (Abbar Tr. at 46-48).

101.    Ghazi Abbar's interest at the time was to have a line of credit to manage the mismatching of the cash flows in his private equity portfolio.  (Abbar Tr. at 46-47).

102.    Ned Noor went away and came back and proposed to Ghazi Abbar a private equity lending solution.  (Abbar Tr. at 48-49).

103.    In November 2005, Rajiv Sennar, James Wathan, and Samir Mathur had a conference call with Ghazi Abbar in which Ghazi Abbar was told he would receive a proposal to extend a loan for Ghazi Abbar's private equity portfolio. Ned Noor was not on the November 2005 call. (TX 2).

104.    The Citigroup Hybrids Desk and sales force often generated sales presentations which were made to potential clients.  (Burns Tr. at 64; TX 12).

105.    Rajiv Sennar pitched the Hybrids Desk products to Ghazi Abbar regarding the leveraging of his portfolios of hedge funds and private equity funds.  (Sennar Tr. at 52-53).

106.    Citigroup representatives provided Ghazi Abbar with two presentations in November 2005 with respect to funding solutions for his private equity and his hedge fund portfolios: the first was a presentation entitled "Private Equity Securitization Structure" dated November 18, 2005 (the "November 18 Private Equity Presentation") (TX 209); the second was an untitled presentation from "Citigroup Global Markets" to "Citigroup Private Bank" dated "as of November 2005" (the "November 2005 Hedge Fund Presentation") (TX 3).

107.    The November 2005 Hedge Fund Presentation was prepared by Rajiv Sennar and James Wathan in order to pitch to Ghazi Abbar three or four ideas they had about moving his business over to Citigroup from Deutsche Bank. (Sennar Tr. at 42; TX 3).

108.    The November 18, 2005 Private Equity Presentation offered to provide a secured loan or collateral fund obligation to the Abbars, and to "explore ways to provide liquidity for your present and future private equity investments."  (TX 209 at ABBAR 3934).

109.    In December 2005, prior to starting to work at Citigroup, Ned Noor proposed to Ghazi Abbar that Citigroup would do the private equity transaction so long as Ghazi Abbar brought his hedge fund business to Citigroup as well.  (TX 379).

**CGMI's Role In Marketing Hedge Fund and Private Equity Products To Ghazi Abbar in Early 2006**

110.    In or about January 2006, Rajiv Sennar prepared 75% to 80% of a presentation (with James Wathan's assistance) made to Ghazi Abbar dated January 2006 entitled "Hedge Funds + Private Equity" (the "January 2006 Hedge Funds + Private Equity Presentation").  This presentation outlined their proposal for the creation of investment structures at Citi for the Abbars' hedge fund and private equity portfolios. (Sennar Tr. at 42-45; TX 4; See also TX 226).

111.    The January 2006 Hedge Funds + Private Equity Presentation was a natural progression of Rajiv Sennarøs and James Wathanøs marketing efforts to Ghazi Abbar. (Sennar Tr. at 45).

112.    The January 2006 Hedge Funds + Private Equity Presentation was prepared by CGMI. (TX 4 at CITI 445 and CITI 450).

113.    By email dated January 27, 2006, Rajiv Sennar advised Ghazi Abbar that he was õputting together a proposal for your reviewö. The email was signed õRajiv K. Sennar/Citigroup Global Markets, Incö.  (TX 226).

114.    Ghazi Abbar was persuaded by various Citigroup people to engage in a hedge fund transaction with Citi and did so because he needed to do the private equity transactions.  (Abbar Tr. at 173-175).

115.    Ned Noor told Ghazi Abbar that when Ghazi Abbar got the hedge fund transaction done, the private equity transaction would get done.  (Abbar Tr. at 175-176).

116.    In January 2006, Citi determined not to offer Ghazi Abbar a private equity structure at that time. (TX 218).

## New York-Based CGMI Employees Refer to and Treat Ghazi Abbar as a CGMI Client

117.    There are numerous email communications between CGMI, CGML, and Private Bank employees, including Rajiv Sennar, and Ghazi Abbar that refer to Ghazi Abbar as a client.  (See, e.g., TX 6; TX 32).

118.    There is an email in which Rajiv Sennar tells Richard Burns that Ghazi Abbar had been a õvery loyal client.ö  (TX 32).

119.   In 2006, the Hybrids Group created a pitchbook in which Ghazi Abbar is referred to as an example of a ŏClientŏ of the Hybrids Group who executed an option on a portfolio of funds with the Hybrids Group.  (TX 388 at CITI 177-178).

120.   Ghazi Abbar was referred to as a ŏclientŏ by Rajiv Sennar many times in emails to other CIB employees, including CGMI employees and FINRA registered representatives. (See, e.g., TX 290; TX 297).

121.   Rajiv Sennar considered that he and Ghazi Abbar had a bank representative/prospective client relationship, which later developed into a client relationship. (Sennar Tr. at 50-51, 54).

122.   Rajiv Sennar considered Ghazi Abbar to be a prospective client of both CGMI and CGML.  (Sennar Tr. at 51-52).

123.   Rajiv Sennar viewed himself as providing a product to Ghazi Abbar and guiding him through the process of completing the Options Transactions.  (Sennar Tr. at 55-59).

124.   There are numerous email communications between Rajiv Sennar and other CGMI employees Ghazi Abbar describing Ghazi Abbar as a client.  (See, e.g., TX 6; TX 363).

125.   Anybody that required an investment solution or investment idea, including Ghazi Abbar, would be considered a potential customer of the Hybrids Desk.  (Burns Tr. at 131).

126.   Ghazi Abbar communicated to Ned Noor that he wanted to be dealing with Citigroup New York in connection with transactions with Citigroup because that is where in his view the best services were.  (Abbar Tr. at 60-62).

## The Negotiations of the Options Transactions

127.    Ghazi Abbar commenced direct discussions with Rajiv Sennar toward completion of  structured leveraged options transactions with respect to his hedge fund portfolio. (Sennar Tr. at 40-41, 46-47).

128.    The topics of discussion between Rajiv Sennar and Ghazi Abbar included Rajiv Sennar providing Ghazi Abbar with ideas on how he could move his portfolio to Citi. They also discussed specific structures that could be provided.  (Sennar Tr. at 40-41, 46-47, 56-58).

129.    The negotiations included numerous direct telephone discussions and emails between Rajiv Sennar and Ghazi Abbar, as well as discussions and emails in which Ned Noor acted as õgo betweenö between Ghazi Abbar and Rajiv Sennar of CGMI.  (E.g., Sennar Tr. at 46-48, 87-88; TX 218; TX 220).

130.    The deal team for the Abbar Options Transactions consisted of Rajiv Sennar, James Wathan and Ned Noor.  (TX 30).

131.    Rajiv Sennar had an in-person meeting with Ghazi Abbar in early 2006 during the negotiations regarding the hedge fund and private equity transactions.  (Sennar Tr. at 45-46).

132.    The negotiation of the structure and business terms of the Options Transactions were conducted primarily by Rajiv Sennar in New York for Citigroup, on the one hand, and Ghazi Abbar, for himself, his father and his investment vehicles, on the other.  (Sennar Tr. at 136-137; See, e.g., TX 231).

133.    In connection with the completion of the Options Transactions, numerous representatives of CGMI in New York participated by phone in conferences with Ghazi Abbar and his counsel overseas. (See, e.g., TX 244; TX 800; TX 247).

134.    James Wathan told Rajiv Sennar that Ghazi Abbar planned to use his U.S. legal attorney for the Options Transactions and stated that the deal should be booked under New York State law.  (TX 227).

135.    Richard Burns assumed that if there were going to be a New York law provision in the agreements then CGMI would be the counterparty.  (Burns Tr. at 78).

136.    Rajiv Sennar wrote it would be useful to know which attorney in New York Ghazi Abbar planned to use.  (TX 228).

137.    Ghazi Abbar retained Chadbourne & Parke, a New York based law firm, to represent him on the legal aspects of the transaction because he anticipated that U.S. law would apply. (TX 229; Abbar Tr. at 85-87).

138.    Rajiv Sennar told Ned Noor for the first time on March 20, 2006, that the Options Transactions would be under English law and not New York law.  (TX 519).

139.    Rajiv Sennar informed Ned Noor on March 20, 2006, that the template for the Options Transactions was under English law and preparing a new template under New York law was going to take time so they decided to stick with English law.  (TX 519).

140.    Rajiv Sennar and Ned Noor had previously told Ghazi Abbar that English law was more complicated than New York law.  (TX 519).

141.    The Hybrids Desk had used CGMI as the counterparty in transactions similar to the Options Transactions before.  (Sennar Tr. at 95-96).

142.     The Hybrids Group had previously done more than ten transactions in more vanilla derivative multi-assets options with agreements containing New York law provisions and CGMI as the counterparty.  (Burns Tr. at 76-77).

143.     In 2005 and 2006, the Hybrids Group executed transactions in which the legal booking entity was various Citigroup entities, not just CGML. (Burns Tr. at 79).

144.     Citibank, NA, Citibank Canada, Citigroup Financial Products, Inc., CGML, and CGMI were legal entities that the Hybrids Desk booked transactions for 2005 and 2006 and were the Citi counterparties on the transactions.  (Burns Tr. at 79-80; TX 14).

145.     The London offices of Chadbourne & Parke handled the transaction for the convenience of Ghazi Abbar.  (Abbar Tr. at 85-87).

146.     Chadbourne & Parke was only the legal documentation advisor on the Options Transactions and was not acting as financial or investment advisor on the Options Transactions.  (TX 48 at CITI 7988).

147.     Chadbourne & Parke did not focus on the precise Citigroup legal entity, including the identity of the counterparty, which was involved in the Options Transactions. (Serfilippi Tr. at 33, 108-109).

148.     Chadbourne & Parke did not make an assessment of whether the Options Transactions were suitable investments for Abbar. It was retained to document the transaction and to give effect to what other people agreed to. (Serfilippi Tr. at 90-91).

149.     Rajiv Sennar's understanding was that Ghazi Abbar received financial advice from Ned Noor.  (Sennar Tr. at 99-100).

150.     Chadbourne & Parke believed that CGMI was "very much involved" in, and structured, the Options Transactions. (Serfilippi Tr. at 106).

151.    A term sheet for the transaction, dated February 23, 2006, on the letterhead of CGMI, listed an unspecified Citigroup entity as counterparty.  (TX 40 at ABBAR 4865).

152.    The initial term sheet received by Chadbourne & Parke for the Options Transactions in March 2006 indicated to them that CGMI was going to be the counterparty to the transaction. (Serfilippi Tr. at 34).

153.    Citigroup obtained Ghazi Abbar's agreement that if the Options Transactions did not close, Ghazi Abbar would have to reimburse Citigroup for its legal charges. (TX 229).

154.    By the time the Options Transactions were close to signing, Citi had decided internally and unilaterally to use CGML for such types of transactions. (Sennar Tr. at 94-96).

155.    Ghazi Abbar's understanding of the Options Transactions was that he was involved with Citigroup in New York.  (Abbar Tr. at 96-97).

156.    Ghazi Abbar understood that the Options Transactions were being driven by and led by Citigroup people in New York.  (Abbar Tr. at 140-141).

157.    Ghazi Abbar primarily dealt with CGMI employees in New York in connection with the formation and operation of the Options Transactions.  (Abbar Tr. at 164-165).

158.    Ghazi Abbar had no previous experience with the type of Options Transactions that were effectuated by Citigroup in 2006.  (See TX 515 at CITI 1479 and CITI 1484-1485; Abbar Tr. at 227).

159.    Ghazi Abbar did not have an independent outside financial advisor.  (See CITI 1484-85; Sennar Tr. at 99-100; Abbar Tr. at 228).

160.    Ghazi Abbar had received and relied on various Citigroup representatives for financial advice on various aspects of the transaction including Ned Noor and Rajiv Sennar. (Abbar Tr. at 228-29, 232-33).

161.    Rajiv Sennar recommended to Ghazi Abbar the structure of the Options Transactions.  (TX 26; Abbar Tr. at 219-21; Sennar Tr. at 56-58).

162.    Ghazi Abbar believed that the nature of the Options Transactions with Citigroup did not require a traditional securities account at CGMI.  (Abbar Tr. at 161).

163.    On May 3, 2006, six days before the closing of the Options Transactions, Rajiv Sennar advised Ghazi Abbar, in connection with moving the hedge fund portfolio to Citigroup, to break the loans he had at Deutsche Bank if Deutsche Bank would pay the positive mark to market profit on the positions.  (TX 570).

164.    In May 2006, Rajiv Sennar contacted Claude Serfilippi of Chadbourne & Parke to attempt to interest Serfilippi in introducing new customers to the Hybrids Desk. (TX 524).

**CMAC Approval**

165.    The Options Transactions were approved by the Capital Markets Approval Committee ("CMAC") which met to consider and approve the Options Transactions on April 27, 2006 at CGMI's offices in New York. (TX 559).

166.    A CMAC Memo generated in connection with the approval of the Options Transactions referred to the Abbars as being not like a typical fund of funds client the Hybrids Desk was used to dealing with.  The Abbars did not maintain the extensive risk, due diligence

- 96 -

and operational infrastructure that exists at most of the larger fund of funds.  (TX 515 at CITI 1484-85).

167.    According to the CMAC Memo, the Client (Ghazi Abbar) was a high net worth individual with no risk and operational structure that was commonly found in institutional fund of funds managers that were typically the Hybrids Desk's clients.  (TX 515 at CITI 1492).

168.    At the time of the Options Transactions, Ghazi Abbar did not have a family office. (TX 515 at CITI 1484).

169.    Citigroup recommended to Ghazi Abbar that he create a family office and Ned Noor eventually helped Ghazi Abbar set up a family office.  (TX 515 at CITI 1484).

170.    Craig Seledee, a CGMI employee, (and others) was principally involved in reviewing the Options Transactions on behalf of the CGMI legal department and was closely involved with the structuring of the transactions.  (TX 515 at CITI 1493).

171.    The CMAC Committee members or their representatives who reviewed and approved the Options Transactions included the following employees and FINRA registered representatives of CGMI: Ramesh Gupta, Donald Krapp, Jean Louis Lafforgue, Bret Dooley, Craig Seledee, Tony Tuths, Steve Penny, Jim McDade, John Conway, and Larry Salva.  (TX 515 at CITI 1495).

172.    Both before and after the preparation of the CMAC Memo, there were many discussions among CGMI employees regarding the appropriateness of the Options Transactions for Ghazi Abbar. (Seledee Tr. at 170-171).

173.    Rajiv Sennar believed the truthfulness of the following statement in the CMAC Memo, which reads ö CGMI will have complete control on the reference funds and its

assets (hedge funds and cash) and hence will be able to mitigate any fraud risk.ö  (TX 515 at CITI 1478; Sennar Tr. at 216).

176.    Rajiv Sennar mentioned in the CMAC meeting that Ghazi Abbar intended to use some of the leverage provided in the Options Transactions to meet capital calls in his private equity investments.  (TX 256).

175.    The Options Transactions with the Abbars was the first time that the Hybrids Desk had done that type of transaction with a high net worth individual.  (Sennar Tr. at 105).

176.    The Options Transactions were õvery complex and first of its kind with Citigroup Investment Bankö and were considered a landmark deal and model for others to follow.  (Sennar Tr. at 105; TX 389).

177.    Prior to the Options Transactions, Citigroup had no mandate to do that type of business with a private investor.  (TX 22 at CITI 10360).

178.    The Options Transactions were also the first õbasketö of hedge fund trades done by the Hybrids Desk.  (TX 23 at CITI 622).

**The Final Structure of the Options Transactions**

179.    The final structure of the Options Transactions proposed by Citigroup, and agreed upon by Ghazi Abbar, involved the creation of two new corporate entities to be owned by the Abbars, Ajial Feeder and Amatra Feeder.  These entities would purportedly hold the Abbars interest in the performance of the underlying hedge funds owned by Ajial Limited and Amatra Limited (the Reference Funds).  (TX 515 at CITI 1478; TX 46).

180.    The final structure of the Options Transactions proposed by Rajiv Sennar of CGMI, and agreed upon by Ghazi Abbar, transferred the voting shares and hence control of the Reference Funds to CGMI. (TX 47; TX 515).

181.    Such control was required because Ghazi Abbar did not have the same level of risk, due diligence and operational infrastructure as a typical client of the Hybrids Desk. (TX 515 at CITI 1478-79, 1483-85).

182.    The creation of the Ajial Feeder and Amatra Feeder as part of the structure was Citigroup's idea, not that of the Abbars.  (See TX 46; TX 47).

183.    Richard Burns was initially against doing the trade because of the "lack of formal fund-of funds manager," and the lack of "diligence and formal control process around that." (TX 23 at CITI 622).

184.    According to the CMAC Memo, the "Legal Booking Entities" for the Options Transactions were CGML and CGMI.  (TX 515 at CITI 1478).

185.    CGML and CGMI were the booking entities at Citi and also parties to the Options Transactions.  (Burns Tr. at 157-158).

186.    For various business, tax, legal and regulatory reasons, the economic share ownership of the Reference Funds had to be separated from the voting control share ownership. (Sennar Tr. at 70-79).

187.    Citigroup needed a Citigroup entity other than CGML to acquire the voting shares.  (Mathur Tr. at 89).

188.    Accordingly, as part of the transaction, CGMI acquired "for its own benefit" the shares of the Reference Funds which carried voting control of the entities.  (Sennar Tr. at 61-66; TX 7 at CITI 8621).

189.    Such voting shares were booked at CGMI.  (Mathur Tr. at 131-132).

190.    CGML acquired the participating shares representing the economic interest in the Reference Funds.  (Sennar Tr. at 61-65).

191.    In connection with the Options Transactions, Rajiv Sennar sent to the Reference Funds the financial statements, certificate of incorporation, and SEC registration statement for CGMI as well as CGML financial statements.  (TX 7).

## CGMI Was Acting on Its Own Behalf and Not on Behalf of CGML

192.    It was contemplated by Citigroup that CGMI would have an independent role in controlling the Reference Funds, in its own capacity, and not acting simply on behalf of CGML.  (TX 8; Sennar Tr. at 82-85).

193.    Rachel Short of CGML Compliance wrote that õwe need to make sure that there really are people in the US in CGMI who can make these decisions [exercising rights], and that it is not just CGML delegating via CGMIö.  (TX 8 at CITI 1473).

194.    Critically, CGMI was acting in an independent capacity when it managed the risk of the Reference Funds.  This is material because õotherwise CGMI, is actually CGML, and that destroys the nature of the transaction.ö  (Sennar Tr. at 222).

195.    CGMI handled the functions of controlling the Reference Funds from a risk management aspect independently of CGML.  CGMI also had the independent rights to veto any investment in the Reference Funds and cause the Reference Funds to redeem from an underlying investment.  (Burns Tr. at 158; TX 515 at 1478).

196.    In order for there to be no adverse tax consequences, CGMI had to act independently with respect to exercising the voting shares of the Reference Funds, and presumably was performing as originally described.  (Burns Tr. at 153-154).

197.    The Reference Funds were controlled by CGMI through the ownership of voting rights and there was no agreement between CGMI and CGML for CGMI to act according to the requirements of CGML.  (TX 296).

198.    CGMI made independent investment decisions based on the overall risk of the transaction to Citigroup, without taking instructions from CGML. (Seledee Tr. at 137).

199.    Citigroup contemplated that CGMI would add staff to perform due diligence for CGMI to support its role in the Options Transactions because the Reference Funds needed to have the infrastructure of a fund of funds. (See TX 515 at 1479; TX 819; TX 820; TX 821).

200.    George Bower was hired on July 1, 2006 to start a family office called Radar Capital, Ltd. (õRadarö) for Ghazi Abbar.  (Bower Tr. at 29-31).  Radar was not fully operational until for many months.  (Bower Tr. at 50; Abbar Tr. at 250).

201.    George Bower, of Radar, did not become involved with the Options Transactions until after they were consummated.  (Sennar Tr. at 89).

**The Closing Documents for the Options Transactions**

202.    Nothing in the Closing Documents for the Options Transactions or any other agreement with any of the Defendants waived any rights to commence a FINRA arbitration against CGMI.

203.    Nothing in the Closing Documents for the Options Transactions or any other agreement with any of the Defendants states that any goods or services provided by CGMI or any of its employees or FINRA-registered representatives were being provided on behalf of CGML.

204.    On May 9, 2009, many documents were executed to effectuate the consummation of the Options Transactions, including two Confirmations executed by Ajial Feeder and Amatra Feeder (the Feeder Funds) and CGML, which incorporated by reference the 2002 International Swaps and Derivatives Association (ōISDAö) Master Agreement and Equity Derivatives Definitions.  All of these documents were collectively referred to as the ōBibleö.  (TX 523).  They are referred to in the Agreed Findings of Fact as the ōClosing Documentsö.

**The Confirmations**

205.    On May 9, 2006, Samir Mathur, a CGMI employee, purportedly signed the Confirmations of the Options Transactions on behalf of CGML, pursuant to a Power of Attorney which was purportedly made on May 10, 2006.  The power of attorney expired on May 30, 2006. (TX 18; TX 523 at CITI 2388; TX 561 at CITI 2303).

206.    As reflected in each of the Confirmations dated May 9, 2006, as to the signatories to the Confirmations, the Feeders were defined as the ōCounterpartyö and CGML was defined as ōCitigroupö).  (TX 523 at CITI 2370; TX 561 at CITI 2285; Mathur Tr. at 88-89).

207.    In each of the Confirmations, under the section entitled ōContact Details,ö the Hybrids Derivative Desk was listed next to ōSellerøs Telephone Number and Telex and/or Facsimile Number and Contact Details for purpose of Giving Noticeö with the address ō390 Greenwich Street, 4th Floor, New York, NY, 10013ö which is CGMIøs address in New York, ōAttn: Head of Hybrid Derivatives Trading,ö and listing CGMIøs telephone and fax numbers.  (TX 523 at CITI 2388; TX 561 at CITI 2303).

208.    The first page of the Confirmations lists CGML as the addressor, but with the telephone and fax numbers of the Hybrids Desk in CGMIøs offices in New York.  (TX 523; TX 561).

209. Ghazi Abbar and Abdullah Abbar did not personally sign the Confirmations or the Structuring Services Fee Letter (discussed below).  (TX 523 at CITI 2389; TX 515 at CITI 2304; TX 573: TX 574).

**The Calculation Agent**

210. Although the Confirmations stated that CGML would be the Calculation Agent (see TX 523 at CITI 2383; TX 561 at CITI 2298), in practice this function was performed by Ned Noor's group at the Private Bank which supplied valuations received from the hedge funds to the administrators of the Reference Funds, who would calculate NAVs and send them to CGMI.  (TX 547, TX 553, TX 540).

211. CGMI retained Ned Noor's group at the Private Bank as the Calculation Agent to provide information to CGMI so that CGMI could fulfill its role in the Options Transactions.  As such, Ned Noor was acting as an agent for CGMI.  (See TX 553).

212. CGMI relied on information from Ned Noor's group at the Private Bank in connection with its due diligence, risk management and reporting function.  (See, e.g., TX 545).

213. The Private Bank was not equipped to serve as Calculation Agent, or to properly provide information to CGMI or Ghazi Abbar and Radar, which was acknowledged by CGMI and Radar Capital.  (See TX 529; TX 530; TX 533; TX 537; TX 539; TX 541; TX 549; TX 553; TX 557).

214. The valuation information provided by Ned Noor's group at the Private Bank was occasionally inaccurate.  (TX 537; TX 552; TX 553; TX 557).

**The Investment Advisory Agreement**

215. The Closing Documents included an Investment Advisory Agreement signed by Ghazi Abbar and the Trustee of the Reference Funds only, pursuant to which Ghazi

Abbar was appointed as Investment Advisor to the Reference Funds, which were now owned and controlled by Citigroup.  (TX 521; TX 269).

216.    Craig Seledee, CGMI's in-house counsel on the Options Transaction, confirmed that Ghazi Abbar did not have any authority to buy or sell any hedge funds in the Options Transactions. (Seledee Tr. at 128).

217.    CGMI is not a signatory to the Confirmations, the Investment Advisory Agreement, or the Structuring Services Fee Letters, the primary documents relied upon by CGMI, which contain provisions for English choice of law and jurisdiction of the English Courts. (TX 269; TX 523; TX 521; TX 561; TX 573; TX 574).

**Summary of Leverage Option Transaction**

218.    On May 3, 2006, six days before the closing of the Options Transactions, Rajiv Sennar forwarded an "almost final" draft of the Summary of Leverage Option Transaction to Ghazi Abbar and his lawyer, to be discussed on a conference call the next day.  (TX 571).

219.    Ghazi Abbar personally signed the Summary of Leverage Option Transaction on May 9, 2006. (TX 49 at ABBAR 916).

220.    Samir Mathur signed the Summary on May 9, 2006, purportedly on behalf of CGML. (TX 49 at ABBAR 915).

221.    The power of attorney purportedly providing Mr. Mathur the authority to sign on behalf of CGMI was made one day later, on May 10, 2006. (TX 18).

222.    The Summary of Leverage Option Transaction had been drafted by Allen & Overy and presented by Rajiv Sennar to Ghazi Abbar and his counsel.  (TX 571).

223.    The Summary of Leverage Option Transaction also memorialized certain "understandings."  (TX 49 at Abbar 916).

224.    Such understandings included that Ghazi Abbar had substantial experience evaluating the economic risks and merits of transactions similar to the proposed transaction, had obtained independent professional investment advice, and had not relied on Citigroup for any advice. (TX 49 at ABBAR 916).

225.    These understandings were not accurate as described above, as CGMI knew or should have known.  (See TX 515 at CITI 1479, CITI 1484-1485; Abbar Tr. at 227-229, 232-233; Sennar Tr. at 99-100; Abbar Tr. at 228.)

### CGMI's Legal Role In the Options Transactions

226.    CGMI's role after the closing of the Options Transactions was one of risk management and monitoring the investment activities of the underlying Reference Funds. (Sennar Tr. at 60-61).

227.    CGML was not given voting control of the Reference Funds because if it had such rights, there would be certain legal and other risks.  (Sennar Tr. at 71-72).

228.    The control held by CGMI was important in order for Citigroup to manage its risk.  (Mathur Tr. at 84-86; TX 22 at CITI 10359).

229.    The control held by CGMI in the transaction gave it the power to refuse to follow investment recommendations by Ghazi Abbar.  (Sennar Tr. at 61-65, 85-86; TX 515 at CITI 1487).

230.    CGMI had the right to terminate Ghazi Abbar as Investment Manager. (TX 515 at CITI 1487).

231.    The control held by CGMI in the transaction gave it the right to "haircut" the underlying portfolio (i.e., reduce the value of the portfolio).  (Sennar Tr. at 61-63; Mathur Tr. at 76-77; TX 545).

232.    CGMI could force the Reference Funds to buy an investment of its choice without regard to the views of Ghazi Abbar.  (TX 9 at CITI 2502; Sennar Tr. at 85-87).

233.    CGMI also could, and did on occasion, force the Reference Funds to redeem any investment it chose without regard to the views of Ghazi Abbar. (See, e.g., TX 369).

234.    CGMI's power to force the Reference Funds to redeem investments was referenced in the CMAC Memo.  (TX 515 at CITI 1486).

235.    The Closing Timeline for the Options Transactions included a reference to an agreement, which was never executed, for the purchase of ordinary shares between CGMI and the current shareholder.  (TX 24 at CITI 1223).

236.    CGMI signed two documents in connection with acquiring shares of Ajial Limited and Amatra Limited that were part of the Closing Documents.  (TX 44; TX 43).

237.    CGMI signed a joint shareholder resolution for Amatra Limited providing for the issuance of its voting shares to CGMI.  (TX 44).

238.    CGMI signed a Management Shares Subscription Letter addressed to the directors of Ajial Limited relating to CGMI's acquisition of the voting shares in Ajial Limited and undertaking to act in accordance with Ajial Limited's articles of association.  (TX 43).

239.    CGMI also signed a waiver of conflict of interest letter with respect to joint legal representation by Cayman counsel of both Citigroup and the Abbars.  (TX 42).

**The Structuring Services Fee Letters**

240.    The Options Transactions were structured by Citigroup in such a way that Citigroup had a guaranteed upfront fee of approximately $7 to $8 million.  (TX 515 at CITI 1486).

241.    On May 11, 2006, shortly before the closing of the Options Transactions, Citigroup presented Ghazi Abbar and the Feeder Funds with Structuring Services Fee Letter which allowed Citigroup to take upfront profit on the Options Transactions and stated that "CGML" performed structuring services.  (Mathur Tr. at 100-101; TX 25; TX 573).

242.    The letters were drafted in order for CGML to collect a structuring fee, the letters provided that CGML performed some structuring services.  (Sennar Tr. at 247-248).

243.    The Structuring Services Fee Letters were designed to get the client to agree to a certain lock-in period of the transaction so that Citigroup could recognize some up-front P&L.  (Burns Tr. at 163-164).

244.    The Structuring Services Fee Letters were signed by the Feeder Funds and CGML only and are not part of the Bible (Closing Documents).  (TX 25; TX 573).

245.    The English choice of law and exclusive jurisdiction provisions of the Structuring Services Fee Letters applied to the Feeder Funds and CGML only.  (TX 25; TX 573).

246.    In the Structuring Services Fee Letters' exclusive English jurisdiction clause, the term "CGML" was used even though Citigroup was defined in another part of the letter to include "affiliates" of CGML, such as CGMI.  (TX 25; TX 573).

247.    Rajiv Sennar, who was working at CGMI and not CGML, described the Structuring Services Fee Letters to Ghazi Abbar as "a formality" and as basically saying the same thing as the Confirmations. (TX 26).

248.    Rajiv Sennar advised Ghazi Abbar to sign the Structuring Services Fee Letters.  (TX 26).

**Advice by CGMI in Spring 2006**

249.     In March 2006, Ned Noor asked Rajiv Sennar to recommend some hedge funds he knew for Ghazi Abbar, and Sennar provided Noor with names of appropriate funds. (TX 586).

250.     Ned Noor helped advise Ghazi Abbar with respect to the hedge funds to be invested in the structure prior to the closing of the Options Transactions.  (TX 587).

251.     Rajiv Sennar and other CGMI registered representatives in New York provided suggestions or advice with respect to the valuations of assets Ghazi Abbar held at Deutsche Bank which would have to be transferred to the Citigroup structure, as indicated in various emails.  (See, e.g., TX 234; TX 241).

252.     Ned Noor also provided advice to Ghazi Abbar on various matters in connection with the Options Transactions being offered to Ghazi Abbar, as evidenced by emails. (See, e.g., TX 255; TX 333; TX 362; TX 364).

**The CGMI Client Service Group Services the Abbars**

253.     As of the end of 2006, the Hybrids Group included professionals dedicated to õfull client serviceö. (TX 388 at CITI 169).

254.     From 2006 through 2010, John Yu (a member of the Client Service Group) and Ghazi Abbar and/or George Bower communicated directly via email over 490 times. (See, e.g., TX 310; TX 311; TX 320; TX 361).

255.     George Bower met with John Yu in person in New York at least three times. (Bower Tr. at 171, 226-230; TX 358).

256.     Starting as early as for May 2007, CGMI provided Ghazi Abbar and/or George Bower with reports for the Reference Funds called Leveraged Swap Statements (õCGMI

Monthly Statementsö) showing among other things: equity value, leverage, underlying performance numbers, portfolio changes, haircuts, spread, accrued interest and leverage ratio. (See, e.g., TX 314).

257.   John Yu generated the CGMI Monthly Statements and provided them to Ghazi Abbar and/or George Bower on a monthly basis via email.  (See, e.g., TX 314).

258.   Rajiv Sennar was copied on the CGMI Monthly Statement emails. (See, e.g., TX 314).

259.   CGML did not generate, produce or provide any monthly statements to Ghazi Abbar related to the Options Transactions.

260.   On behalf of CGMI, John Yu approved investment recommendations made by Ghazi Abbar.  (See, e.g., TX 310; TX 316; TX 317).

261.   No CGML or Private Bank employee approved investment recommendations made by Ghazi Abbar.

262.   On behalf of CGMI, John Yu calculated haircuts on certain hedge funds which lowered the equity eligible to support the leverage in the Options Transactions.  (See, e.g., TX 318).

263.   No CGML or Private Bank employee calculated haircuts related to the Options Transactions.

264.   In March 2008, John Yu calculated Statements of Net Assets, Pre-Paid Expenses, Liabilities, Share Capital, Daily Mark-to-Market Analysis Sheets, Trial Balance Reports, Realized Gains/Losses Ledgers, and Fund Portfolio Analyses, for the Reference Funds and provided them to Ghazi Abbar and George Bower.  (TX 334).

265.    Zahra Khademi was often copied on emails related to the Options Transactions.  (See, e.g., TX 563; TX 276).

266.    In October 2007, Rajiv Sennar reiterated to George Bower that the Hybrids Group had a client service team in New York which managed all the transactions on the Hybrid Group's books. It dealt with client requests and was responsible for making sure that the client has a good service experience for the life of the transaction.  (TX 325).

267.    In October 2007, Rajiv Sennar set up a meeting with George Bower and the client service team so that the team could make sure the service that George Bower and Ghazi Abbar were receiving was good, to explain what the client service team was all about, and for George Bower to meet another CGMI client service person, Florina Klingbaum.  (TX 325).

268.    In October 2007, George Bower met with Florina Klingbaum in CGMI's office in New York.  (TX 325).

269.    In April 2008, John Yu recommended that Radar have an investment advisory role or become reporting agent for the Reference Funds.  (TX 337; TX 341).

270.    In May 2008, Yu, on behalf of CGMI, suggested to George Bower that the Reference Funds de-lever.  (TX 344).

271.    In June 2008, when John Yu, the Abbars' main daily Client Services Group contact, was out of the office, Florina Klingbaum provided George Bower with calculations of the strike prices and interest amounts of the Reference Funds.  (TX 357).

### Post-Closing Services Provided by Sennar and CGMI's New York Hybrids Desk

272.    Rajiv Sennar was the person who Ghazi Abbar and his agent, George Bower, needed to deal with if they had any particular questions about the Options Transactions.

Rajiv Sennar would be maintaining contact to make sure everything was working as it should be working.  (Bower Tr. at 60).

273.    After the Options Transactions closed, Rajiv Sennar and Ghazi Abbar discussed what was going on with Ghazi Abbarøs investments and the hedge fund market.  (Sennar Tr. at 91-92).

274.    In these discussions, Rajiv Sennar would pass on õintelligenceö that he heard from the market, which he did for many clients.  (Sennar Tr. at 91-92).

275.    In the first few months after the transaction closed, Rajiv Sennar was involved in discussions with Ghazi Abbar to help him understand what he could and could not do, and the process to follow for subscribing to a fund.  (Sennar Tr. at 106-107; TX 527).

276.    Rajiv Sennar continued to provide services to the Abbars after the consummation of the Options Transactions and engaged in direct email communications with Ghazi Abbar and George Bower regularly.  (See, e.g., Sennar Tr. at 89-91; TX 543, TX 544, TX 546, TX 702).

277.    In April 2006, Ned Noor provided a list of hedge funds to Ghazi Abbar that õwe would like to investö in May and June and copied Rajiv Sennar on the email.  (TX 587).

278.    The Hybrids Desk was responsible for monitoring the Investment Guidelines of the Options Transactions and reacting to any possible breaches.  (TX 515 at CITI 1487).

279.    In performing their jobs on the Options Transactions, the CGMI traders on the Hybrids Desk in New York considered both their õclientö Ghazi Abbarøs õinterestö and protecting Citigroupøs interest.  (TX 545).

280.    Following consummation of the Options Transactions, CGMI, through its employees and registered representatives in New York, exercised the following functions:

a)    Reviewed and approved all investment recommendations made by Ghazi Abbar for the Reference Funds (See Sennar Tr. at 107-108);

b)    Reviewed and approved all investment redemptions. (See, e.g., TX 817; TX 326; TX 317; TX 361).

c)    Reviewed and approved all notational adjustments required under the Confirmations (See Sennar Tr. at 107-108; Mathur Tr. at 78-79);

d)    Determined any õhaircutö to valuations of the hedge funds in the portfolio (Mathur Tr. at 115; TX 545; TX 547; TX 553);

e)    Conducted due diligence on underlying hedge funds; (Bower Tr. at 118-125; TX 291);

f)    Starting in 2008, exercised its power to cause the Reference Funds to redeem various hedge funds, without the consent of Ghazi Abbar (Bower Tr. at 113, 115-16); and,

g)    Provided monthly strike reports from John Yu which included the opening and closing balances of the portfolio, valuation, and use of leverage (Bower Tr. at 104; Mathur Tr. at 115; see e.g., TX 801).

281.    Requests for reviews and approvals of investment recommendations were addressed by the Feeder Funds to CGMI employees in New York, and the reviews and approvals thereof were sent by CGMI employees in New York to the Feeder Funds. (TX 309). The due diligence with respect to the investment recommendations made by Ghazi Abbar was performed by CGMI employees and registered representatives in New York.

282.     CGMI employees involved in the valuation process of the hedge funds in the Options Transactions, included Patricia Hogan, John Yu, Samir Mathur and Vishal Mishra. (Seledee Tr. at 161-163).

283.     The traders on the Hybrids Desk in New York adjusted the hedge fund portfolio valuations on occasion based upon input by Radar.  (TX 547, 552).

284.     Ghazi Abbar and Radar relied on the due diligence and reporting by the Hybrids Desk traders and customer service in making investment recommendations.  (TX 553).

285.     The Hybrids Desk in New York knew that Ghazi Abbar and Radar were relying on information reported to them by the Hybrids Desk and on due diligence performed by the desk. (See, e.g. TX 553).

286.     The Hybrids Desk in New York did not itself have adequate due diligence and reporting capabilities for many months after the Options Transactions closed.  (TX 545; TX 547; TX 552; TX 557; TX 553; Abbar Tr. at 298-300).

287.     After the execution of the Options Transactions, Ghazi Abbar and/or his representatives met in New York with Rajiv Sennar four or five times.  (See Sennar Tr. at 89-91; TX 543).

288.     In August 2006, Adam Albin, a CGMI employee in New York and FINRA registered representative and the head of due diligence for the Hybrids Group, wanted to contact the hedge fund managers within the Options Transactions and referred to Ghazi Abbar as the client.  (TX 280; TX 506).

289.     In August 2006, Adam Albin requested to look at the legal documents of the Options Transactions to show "Citi's 'ownership'" of Ajial Limited and Amatra Limited. (TX 279).

290.    In December 2006, Paul Fraynt, a New York-based CGMI employee and FINRA registered representative on the due diligence team for the Hybrids Group in New York, analyzed a hedge fund in one of the Reference Funds for due diligence purposes.  (TX 291).

291.    In March and April 2007, Rajiv Sennar, Yontcho Valtchev, Vishal Mishra, and Samir Mathur, all New York based employees and representatives of CGMI, were involved in discussions with Ghazi Abbar about modifying various aspects of the Options Transactions.  (TX 526; TX 59; TX 575).

292.    George Bower met with Rajiv Sennar, John Yu and Paul Fraynt in June 2007 in New York to discuss the mutual issues related to the Options Transactions.  (Bower Tr. at 171-172; TX 309).

293.    On July 3, 2007, George Bower sent an email to Rajiv Sennar and James Wathan about starting a discussion with them about the ōnext generationö of the Options Transactions.  (TX 544).

294.    The Options Transactions were amended on or about April 20, 2007.  (See TX 305; TX 306).

295.    In December 2007, Yontcho Valtchev, a New York-based CGMI employee and registered representative, prepared haircut breakdown analyses for the Options Transactions which were sent to George Bower.  (See, e.g., TX 327).

296.    George Bower met in New York with CGMI employees four times between 2007 and 2010.  (Bower Tr. at 224-225; TX 550; TX 552).

297.    Samir Mathur had dinner with Ghazi Abbar twice in New York.  (Mathur Tr. at 112-114).

298.    During the time Rajiv Sennar dealt with Ghazi Abbar after the Options Transactions closed, there were numerous telephone calls between CGMI representatives and Ghazi Abbar and his representatives.  (Sennar Tr. at 88-89).

299.    Post-closing of the Options Transactions there were numerous instances of direct e-mail contact between Ghazi Abbar and/or George Bower and CGMI registered representatives and employees assigned to the Hybrids Desk in New York, including Samir Mathur, Rajiv Sennar, John Yu, Yoncho Valchev and Vishal Mishra regarding various servicing issues related to the Options Transactions. (See, e.g., TX 543; TX 545; TX 546; TX 547; TX 550; TX 552; and TX 558).

300.    As of the fall of 2006, CGMI New York accorded $527 million in leverage to the Abbars for their hedge fund portfolio.  (TX 389).

301.    In June 2007, Ghazi Abbar asked Rajiv Sennar and James Forese, the Global Head of Equities and a New York-based CGMI employee, for a $5 million allocation to the Blackstone IPO.  (TX 32).

302.    Citigroup provided Ghazi Abbar with an allocation of the Blackstone IPO because he was a big client of the Hybrids Group and important clients get better treatment. (Burns Tr. at 196-197; TX 32; TX 33).

**Late 2006 Background to the Private Equity Loan Facility**

303.    Before the Options Transactions were executed, Ghazi Abbar had used the liquidity from the hedge funds to meet private equity calls.  The Options Transactions made Ghazi Abbar more illiquid, which he did not anticipate would occur.  Ghazi Abbar discovered that in order to meet the private equity calls, this could lead to potential non-compliance with covenants in the Options Transactions.  (Abbar Tr. at 176).

304.    In November 2006, Richard Burns and Samir Mathur discussed internally with the Hybrids Group that Ghazi Abbar requested a private equity financing transaction. (Burns Tr. at 192-194; TX 31 at CITI 5423).

305.    Richard Burns recommended that the Hybrids Group walk away from the proposed private equity financing transaction. (Burns Tr. at 193-194; See also TX 31 at CITI 5424).

### Execution of the Private Equity Loan Facility in 2007

306.    Overseas Citigroup executive, Deepak Sharma, and Thomas Schwartz, a New York based Citigroup executive, discussed providing loanable value on private equity for the Abbars. (TX 61 at CITI 5831).

307.    New facilities of $103 million required the approval of the Senior Business Management for Global Wealth Management CEO, Damian Kozlowski, along with the Section Risk Manager, Thomas Schwartz. (TX 62 at CITI 9114).

308.    The people that were required to approve the Abbar Private Equity Loan Facility included Thomas Schwartz, Patrick Tse, Claude Poppe, Larry Black, Damian Kozlowski and Deepak Sharma. (Ekert Tr. at 63665).

309.    Thomas Schwartz was Steven Ekert's predecessor as chief risk officer of Global Wealth Management in New York in 2007. (Ekert Tr. at 68-69).

310.    Thomas Schwartz approved the Abbar Private Equity Loan Facility. (TX 62).

311.    Patrick Tse was located in New York in 2007. (Ekert Tr. at 69-70; TX 62).

312.    Damian Kozlowski approved the Abbar Private Equity Loan Facility. (Ekert Tr. at 73; TX 62).

313.    Damien Kozlowski and Patrick Tse were FINRA registered representatives of Citigroup's other U.S. registered broker-dealer, Citicorp Investment Services (CIS), until May 2007 when they became registered with CGMI.  CIS withdrew its FINRA registration in May 2007.  (TX 815).

314.    Deepak Sharma approved the Abbar Private Equity Loan Facility.  (TX 62).

315.    In March 2007, the Abbars entered into a Lender Protected Unit Trust (the Private Equity Loan Facility) which was the first ever transaction wherein Citigroup lent against a basket of private equity investments.  (TX 389 at CITI 6928).

316.    The initial Private Equity Loan Facility was created by transferring the ownership of two Abbar investment companies, Langton Ltd. ("Langton") and Vintage Investments Ltd. ("Vintage") to Cititrust, after which Abdullah Abbar and Ghazi Abbar's interests in their private equity investments were held in two other Abbar entities, defendants Amavest and GAMA.  (TX 298 at 5726-31).  Amavest and GAMA had an interest in the Private Equity Loan Facility by virtue of their subscription for and ownership of the Lender Protection Unit Trust structure.  (TX 298 at 5726-31; TX 303 at ABBAR 3427-44 (Amavest) and ABBAR 3445-3462 (GAMA).

**Ghazi Abbar Asked For Loan To Co-Invest In Private Equity**

317.    Sallie Krawcheck was a New York based Managing Director and FINRA-registered representative of CGMI, as well as the CEO of Citigroup Global Wealth Management.  (TX 343).

318.    In June 2007, Sallie Krawcheck met with Ghazi Abbar in New York to discuss Citigroup loaning him additional money for him to co-invest in private equity alongside Citigroup.  (TX 63).

### Amendments to the Abbars' Private Equity Loan Facility

319.    When Ghazi Abbar needed an amendment of the loan agreement for the Private Equity Loan Facility, he was told that he should õtake it up with Sallie Krawcheckö when he was in New York.  (Abbar Tr. at 169-170).

320.    Ghazi Abbar discussed the amendment of the Private Equity Loan Facility with Sallie Krawcheck in New York.  (Abbar Tr. at 170).

321.    The amendments of the Private Equity Loan Facility for defendants GAMA and Amavest were approved by Citigroup representatives in New York.  (Abbar Tr. at 296-297).

322.    Steven Ekert, a New York-based employee of CGMI, approved the amendment of the Abbar Private Equity Loan Facility in July 2008.  (Ekert Tr. at 91-93; TX 66 at CITI 15319-322).

323.    Raheel Malik, a CGMI FINRA-registered representative, and perhaps Catherine Weir, the head of European Middle East Private Bank operations of Citigroup, also approved the amendment of the Abbar Private Equity Loan Facility in July 2008.  (Ekert Tr. at 95).

**2008 Ghazi Abbar Meetings with Upper Management Regarding Private Equity**

324.     In 2008, Sallie Krawcheck reported to Vikram Pandit, the CEO of Citigroup and a FINRA-registered representative of CGMI based in New York.  (Ekert Tr. at 76).

325.     In May 2008, Ghazi Abbar spent two days in meetings in New York with Citigroup employees including Muwffak Bibi, a Private Bank executive, Sallie Krawcheck, Vikram Pandit, Ray Nolte, the head of CAI and a CGMI employee and FINRA-registered representative based in New York, John Havens, a CGMI employee and FINRA-registered representative based in New York, and John Barber, the head of Citigroup Private Equity and a CGMI employee and FINRA-registered representative based in New York.  (TX 64).

326.     In Ghazi Abbar's meeting with Sallie Krawcheck in New York in May 2008, he discussed whether his loan would be sold.  He was told it would not be sold.  (TX 64).

327.     Ghazi Abbar asked Sallie Krawcheck whether the loans supporting his hedge fund and private equity portfolios could be extended 3 to 5 years to match the maturities of his other investments.  (TX 64).

328.     In Ghazi Abbar's meeting with Vikram Pandit, he asked Mr. Pandit about asset sales and Mr. Pandit explained that asset sales would be consumer and non-strategic assets, not the Abbars' type of loans.  (TX 64).

329.     Ghazi Abbar asked Vikram Pandit when private equity managers would regain their backing through loans given by large banks.  Mr. Pandit indicated that many private equity investors continued to invest with lower leverage/larger equity stakes and that the days of 8 times leverage were gone.  (TX 64).

330.    In mid-2008, the Abbar Private Equity Loan Facility was discussed by Ghazi Abbar, Vikram Pandit and Sallie Krawcheck with a view towards increasing the line of credit to $135 million and to modify the covenant into the Private Equity Loan Facility relating to liquidity.  (TX 66 at CITI 15324).

331.    Ghazi Abbar had dinner with John Barber, a CGMI employee and FINRA registered representative, in May 2008 and John Barber gave Ghazi Abbar a full review of the private equity environment.  (TX 64).

332.    In an email to Ghazi Abbar dated June 5, 2008 regarding the Private Equity Loan Facility, Sallie Krawcheck wrote that she õwill stay engaged on this issue till we reach a mutually acceptable resolution.ö  (TX 65 at CITI 9451).

## 2008-2009 Abbar-CGMI Communications

333.    In June 14, 2007, George Bower met in New York with CGMI employees and FINRA registered representatives Samir Mathur, Patricia Hogan, John Yu, Harry Peng, Paul Fraynt and possibly Adam Albin, to discuss the Options Transactions.  (Bower Tr. at 226-230; TX 552).

334.    In April 2008, Paul Fraynt met with George Bower and other Radar employees to discuss compliance with the Options Transactionsø trade guidelines.  (TX 802).

335.    In connection with a meeting attended by Samir Mathur and Paul Fraynt in April 2008, Samir Mathur suggested that Patricia Hogan, a CGMI employee on the Hybrids Desk, draft a simple agreement for restructuring the Options Transactions to address problems caused by inaccurate information being reported by Mr. Noorø s group at the Private Bank. (TX 552).

336.    In June 2008, George Bower met in New York with John Yu, Adam Albin, Vishal Mishra (a New York-based CGMI employee and registered representative who was a trader in the Hybrids Group), and Samir Mathur, to discuss the investment guidelines, risk and spread of the Options Transactions.  (TX 358; TX 359).

337.    In mid to late 2008, legal notices provided to the Feeder Funds were signed by Richard Burns, the head of the Hybrids Group, and a FINRA registered representative of CGMI, on behalf of CGML. (E.g., TX 366; TX 367).

338.    George Bower met with Samir Mathur two times in 2008.  (Bower Tr. at 225-226).

339.    At the time when difficulties arose with the Options Transactions in late 2008, negotiations with respect to resolving such difficulties included various employees and representatives of CGMI in New York, including Samir Mathur and Patricia Hogan.  (Mathur Tr. at 117-120).

340.    In September-October 2008, Samir Mathur requested from George Bower specific information about the private equity portfolio.  (Bower Tr. at 211).

341.    In October 2008, Samir Mathur, Patricia Hogan and Richard Burns were involved in direct discussions with Ghazi Abbar and George Bower regarding potentially pledging the private equity assets as collateral in an attempt to restructure the Options Transactions.  (TX 34).

342.    In October 2008, a telephone conference including, among others, George Bower, Ghazi Abbar, Samir Mathur, Richard Burns, Patricia Hogan and Ned Noor, took place in which the potential of collateralizing certain Abbar private equity assets in a possible workout period was discussed.  (TX 557).

343.     CGMI suggested it was a possibility that the private equity portfolio would be used as additional collateral on the hedge fund portfolio.  (Bower Tr. at 211).

344.     A number of CGMI employees and registered representatives were involved in Citigroup's decision to remove Ghazi Abbar as Investment Advisor and completely exclude Ghazi Abbar and the Feeder Funds from any role and effectively any interest in the hedge funds owned by the Reference Funds, including Samir Mathur, Patricia Hogan, Ramesh Gupta, Vishal Mishra, and Harry Peng.  (Mathur Tr. at 133-136; TX 368).

345.     On January 29, 2009, the Reference Funds notified Ghazi Abbar that the Investment Advisory Agreement was terminated, and copied CGMI on the notice.  (See, e.g., TX 371).

346.     In August 2009, George Bower had telephone conversations with Samir Mathur and Patricia Hogan to discuss the Options Transactions and the Private Equity Loan Facility.  (Bower Tr. at 245-247; TX 558).

347.     In September 2009, Patricia Hogan of CGMI sent a term sheet outlining a proposed amendment for the Options Transactions.  (TX 374).

348.     In November 2009, CGMI provided Ghazi Abbar with a summary term sheet on CGMI's letterhead and copyrighted by CGMI of a proposed restructuring in which the Options Transactions and Private Equity Loan Facility were to be combined into one transaction. (TX 387).

349.     These negotiations included discussions about the possibility of using the Abbars' private equity portfolio as additional collateral for the Options Transactions.  (Mathur Tr. at 118-119, 121-123).

**CGMI's Institutional Recovery Unit**

350.    Steven Ekert decided that the Institutional Recovery Unit ("IRU") should be the single point of contact for the Options Transactions and Private Equity Loan Facility. (Ekert Tr. at 108, 111).

351.    Trevor Houston, a New York-based CGMI employee and registered representative, was appointed the single point of contact by the head of IRU.  (Ekert Tr. at 111).

352.    John O'Connell, a New York-based CGMI employee and attorney, worked with Trevor Houston. (Ekert Tr. at 111).

353.    In 2009, Trevor Houston brought up the suggestion again of bringing the Options Transactions and Private Equity Loan Facility together.  (Bower Tr. at 211-212).

354.    Mr. Houston and Mr. O'Connell both signed their email correspondence with Ghazi Abbar as Institutional Recovery Management and/or Citigroup Global Markets, Inc. (E.g., TX 376; TX 803).

355.    In November 2009, John O'Connell provided Ghazi Abbar with a proposal for both the Options Transactions and the Private Equity Loan Facility. Mr. O'Connell signed his email "Citigroup Global Markets, Inc." (TX 376).

356.    Ghazi Abbar and George Bower exchanged various emails with Trevor Houston and John O'Connell from January 2010 through at least November 2010 regarding working out the Options Transactions and Private Equity Loan Facility.  (E.g., TX 578; TX 377; TX 804).

357.    These negotiations included certain proposals made by CGMI's IRU, including a proposal whereby unspecified Citigroup entities would take an equity ownership interest or invest alongside Ghazi Abbar or his investment entities.  (TX 375).

358.    No one in the IRU group, including Trevor Houston and John O¢Connell, communicated to Ghazi Abbar or George Bower that the IRU group was working on behalf of CGML, and not CGMI.

## CGMI Compensation and Bonuses Arising from the Options Trades

359.    The Hybrids Group recorded on its own books P&L for the Options Transactions, which initially consisted of upfront structuring fees in the amount of $9.4 million to $10 million.  (TX 20 at CITI 4417; Sennar Tr. at 100-102; Burns Tr. at 144; see also TX 35).

360.    The revenues and structuring fee from the Abbars¢ Options Transactions as reflected on the books and records of CGML from 2006 through 2011 were $30,560,781.  (TX 70; Salva Tr. at 61-63).

361.    The Options Transactions were considered to be highly profitable to the Hybrids Desk and contributed meaningfully to its P&L.  (Sennar Tr. at 105; Mathur Tr. at 75-76).

362.    At the Citigroup business unit level, 80% of the revenue for the Options Transactions was attributable to CIB and 20% to the Private Bank.  (TX 30).

363.    Such Hybrid Group P&L was used in connection with awarding bonuses to CGMI employees assigned to the Hybrid Group, as was success in helping to close deals with clients of the Hybrid Group.  (Mathur Tr. at 43; TX 20 at CITI 4417; Sennar Tr. at 102-104; TX 21 at CITI 12140).

364.    Various CGMI employees and FINRA registered representatives, including Rajiv Sennar and Samir Mathur, received substantial bonuses for 2006.  (See Sennar Tr. at 102; TX 27; TX 29).

365.    Documents produced by CGMI relating to the bonus of Rajiv Sennar reference the substantial role by Rajiv Sennar in closing the Options Transactions.  (Sennar Tr. 102; TX 28; TX 20 at CITI 4417; TX 21 at CITI 12140).

366.    The most important deal Sennar closed in 2006 with respect to the impact on the Hybrid Group's P&L was the Abbar transaction and that played a role in Sennar's year-end compensation.  (Burns Tr. at 116-117).

**Intercompany Service Agreements**

367.    The Citigroup witnesses examined on the Intercompany Service Agreements (TX 16, TX 17 and TX 45) could not recall seeing them prior to preparation for their depositions.  (Mathur Tr. at 50-51, 146-148, 163-164; 25 at 19-21, 28-29, 39-40; Salva Tr. at 20-21, 28-29; Burns Tr. at 89).

368.    Burns had never seen an Intercompany Service Agreement prior to his deposition and did not recall ever seeing Exhibits 16 or 17.  (Burns Tr. at 88-90; TX 16; TX 17).

369.    There is no oral or written evidence that the Intercompany Service Agreements of Exhibits 16, 17 and 45 were used in the Options Transactions.

370.    The Intercompany Service Agreements (TX 16, TX 17 and TX 45) are not referred to in any of the closing documents of the Options Transactions.

371.    The Options Transactions were never included in pricing adjustments between CGMI and CGML under the Intercompany Service Agreements (TX 16 and TX 17), although other trades between CGMI and CGML were included.  (Salva Tr. at 35-38, 49-50).

372.    After this omission was discovered in or about 2009, no adjustments were made to credit CGMI for any services CGMI purportedly provided to CGML under the Intercompany Service Agreements because Citigroup determined that any amount involved

would be õnot material on an aggregate basisö because the P&L on the Options Transactions between 2006 and 2009 was õflatö.  (Salva Tr. at 48-49, 58-59, 77-78).

373.    CGML earned over $30 million in 2010 and 2011 in net revenue from the Options Transactions.  (TX 70; Salva Tr. at 58-63).

374.    CGMI has failed and refused to produce records showing what amounts, if any, were credited to CGMI in 2010 and 2011 as part of any pricing adjustments during those years.

375.    However, CGMI has represented that in 2010 it received approximately $1.3 million in trading management services fees from CGML. (TX 806).

**"One Citi"**

376.    In 2006 and 2007, there was a large number of different Citigroup legal entities, business activities, regions and jurisdictions. Senior management tried bringing those businesses together õunder the umbrella and the auspices of letøs work together as One Citi, solving client problems, working in partnership across different activities, to make sure people understood that they were working as one ultimate organization, rather than a series of independent organizations.ö  (Burns Tr. at 202-203).

377.    People in the markets thought about growing their business generically and did not ever think in business terms around their business through the legal entity side. (Burns Tr. at 203).

378.    Some Citigroup employees did not focus on the legal entity for whom they worked and that it did not matter.  (See, e.g., Mathur Tr. at 17-19, 23-24, 74).

379.    Ekert saw himself as being employed by Citigroup, the larger entity, and did not focus on which specific company was his employer. (Ekert Tr. at 32-33).

**The Abbars' Relationship with Swiss Banks**

380.    Ghazi Abbar and Abdullah Abbar opened bank accounts in Citibank Switzerland in their personal names in 1994 and 1996 with the following account numbers: ER004037622-0002/343494 and ER004037622-0001/340935 ("the Abbars' Personal Citibank Switzerland Bank Accounts").  (TX 200; TX 202; Schwartz Decl. TX B).

381.    Ghazi Abbar signed for himself and his father the following documents to open the Abbars Personal Citibank Switzerland Accounts: "Account Application for Private Persons", "Agreement Governing Fiduciary Placements", "Signature Card", "Declaration of Pledge, Security Assignment and Margin Agreement",  and "Authorization to accept instructions." (TX 200; TX 202; Schwartz Decl. TX B).

382.    The Options Transactions are not reflected on any statements of the Abbars' Personal Citibank Switzerland Bank Accounts.

383.    In September 2006, approximately four months after the Options Transactions were executed, the Trustees of the Feeder Funds opened bank accounts at Citibank Switzerland ("the Feeder Funds Citibank Switzerland Bank Accounts"). (Amatra TX 386; Ajial TX 281).

384.    The Options Transactions are not reflected on statements for the Feeder Funds Citibank Switzerland Bank Accounts.

385.    Citibank Switzerland sent Ghazi Abbar and Abdullah Abbar Annual Suitability Confirmation Letters specifically for the Abbars Personal Citibank Switzerland Bank Accounts and they do not apply to the Options Transactions or any transactions therein.  (TX 565).

386.     There is no evidence that the Feeder Funds received Annual Suitability Confirmation Letters from Citibank Switzerland.

**CGML's Limited Role in the Options Transactions**

387.     There is no evidence that Ghazi Abbar and Abdullah Abbar executed any account applications, customer agreements or any other account opening documentation with CGML.

388.     There are no account numbers for any account at CGML related to Ghazi Abbar and Abdullah Abbar.

389.     There is no evidence that the Feeder Funds executed any account applications, customer agreements or any other account opening documentation with CGML.

390.     There are no account numbers for any account at CGML related to the Feeder Funds.

391.     CGML's Anti-Money Laundering õAMLö approval for the Feeder Funds occurred on June 19, 2006, over one month after the Options Transactions closed.  (TX 579-580).

392.     The AML Client Document Checklist for the Feeder Funds do not provide information under the heading õIntermediate Customer í   Evidence to Support Classificationö.  (TX 579 at CITI 10082; TX 580 at CITI 9865).

393.     õIntermediate Customerö is defined in the Client Document Checklist as õan institution which Citigroup deals with as a customer on an armøs length basis.ö  (TX 579 at Citi 10081; TX 580 at Citi 9864).

394.    The Feeder Funds were sent notification of their ̈Intermediate Customer ̈ status on July 10, 2006, over two months after the Options Transactions closed.  (TX 579 at CITI 10129; TX 580 at CITI 9920).

395.    CGMI performed due diligence regarding Ghazi Abbar and Abdullah Abbar, which was akin to an AML and ̈know your customer ̈ analysis.  (See TX 239; TX 250; TX 805 at CITI 822-823; TX 254)

396.    There is no evidence of any account statements or monthly statements generated by CGML for any account of Ghazi Abbar, Abdullah Abbar, the Reference Funds or the Feeder Funds.

397.    There is no evidence of any purchase, sale or any other trading activity of hedge funds related to the Options Transactions in any CGML account.

## III.   <u>EXHIBITS THE PARTIES AGREE MAY BE RECEIVED IN EVIDENCE</u>

The Parties respectfully refer the Court to **Schedule 1** attached hereto.

## IV.   <u>EXHIBITS TO WHICH THERE IS A DISPUTE AS TO ADMISSIBILITY</u>

The Plaintiff respectfully refers the Court to **Schedule 2** attached hereto for a list of exhibits it intends to introduce at trial to which the Defendants have objected.

The Defendants respectfully refer the Court to **Schedule 3** attached hereto for a list of exhibits they intend to introduce at trial to which the Plaintiff has objected.

The parties will continue to work to resolve objection to the admissibility of exhibits prior to trial.

## V.   <u>ESTIMATE OF TRIAL TIME</u>

Plaintiff estimates that it will need three trial days for its case-in-chief and one half-day for rebuttal.

Defendants estimate that they will need three trial days for their case defense and one half-day for sur-rebuttal.

Dated: New York, New York
       April 20, 2013

MILBANK TWEED HADLEY & McCLOY LLP

By: _____
       Scott A. Edelman (SE 5247)
       (sedelman@milbank.com)
       Daniel M. Perry (DP 6966)
       (dperry@milbank.com)
       Jed M. Schwartz (JS 6184)
       (jschwartz@milbank.com)

       1 Chase Manhattan Plaza
       New York, New York 10005-1413
       Phone:  (212) 530-5000
       Fax:  (212) 530-5219

       *Attorneys for Plaintiff Citigroup Global Markets Inc.*

RICH, INTELISANO & KATZ, LLP

By: _____
       John G. Rich (JR 1137)
       (john@riklawfirm.com)
       Ross B. Intelisano (RI 6584)
       (ross@riklawfirm.com)
       Daniel E. Katz (DK 7222)
       (daniel@riklawfirm.com)

       915 Broadway, Suite 900
       New York, New York 10010
       Phone:  (212) 684-0300
       Fax:  (212) 417-9380

       *Attorneys for Defendants*

## SCHEDULE 1:

## EXHIBITS THE PARTIES AGREE MAY BE RECEIVED IN EVIDENCE

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 1 | Notice of Subpoena for Videotaped Deposition of Rajiv K. Sennar | 2/23/2012 | | |
| TX 2 | Email from James Wathan to Ghazi Abbar re: Follow-up | 11/29/2005 | ABBAR 1074 | |
| TX 3 | Citigroup Global Markets Presentation to Citigroup Private Bank | Nov. 2005 | CITI 002482 | CITI 002498 |
| TX 4 | Citigroup Corporate & Investment Bank Presentation titled "Hedge Funds + Private Equity" | Jan. 2006 | CITI 000445 | CITI 000450 |
| TX 5 | Copy of Business Cards | Undated | ABBAR 4315 | |
| TX 7 | Email from Rajiv Sennar to Cedric Kveim and others re: Requested Materials, with attachments | 6/20/2006 | CITI 008621 | CITI 008685 |
| TX 8 | Email from Rachel Short to Rajiv Sennar re: Amatra-Ajial CMAC Memo | 4/25/2006 | CITI 001473 | CITI 001475 |
| TX 9 | Email from Rajiv Sennar to Toni Pinkerton and others re: Cevian II Subscription for June 14 | 6/13/2006 | CITI 002502 | CITI 002505 |
| TX 12 | Citigroup Corporate and Investment Bank Presentation titled "Citigroup Fund Derivatives" | Jan. 2007 | CITI 000013 | CITI 0033 |
| TX 13 | Email from Rajiv Sennar to Richard Burns re: Two Trades | 1/27/2006 | CITI 010301 | CITI 010302 |
| TX 15 | Declaration of Richard Burns in Support of Citigroup Global Markets Inc.øs Motion for a Preliminary Injunction | 10/6/2011 | | |
| TX 18 | CGML Power of Attorney in favor of Samir Mathur | 5/10/2006 | | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 22 | Email from Richard Burns to Erwin Parviz re: Ghazi Abbar Transaction | 4/10/2006 | CITI 010359 | CITI 010361 |
| TX 23 | Email from Samir Mathur to Richard Burns and Erwin Parviz re: Ghazi Abbar Transaction | 4/10/2006 | CITI 000622 | CITI 000625 |
| TX 24 | Email from Rajiv Sennar to Samir Mathur and others. re: Amatra-Ajial: Updated Timeline and Documentation List, attaching Amatra-Ajial Trades Timeline- | 4/24/2006 | CITI 001220 | CITI 001224 |
| TX 25 | Structuring Services Letter from CGML to Amatra Leveraged Feeder Holdings Limited | 5/11/2006 | | |
| TX 26 | Email from Rajiv Sennar to Ghazi Abbar re: Early Termination Language, with attachments | 5/3/2006 | ABBAR 34 | ABBAR 38 |
| TX 30 | Email from Rajiv Sennar to Richard Burns re: Ghazi Meeting with Seniors | 5/14/2007 | CITI 004463 | |
| TX 31 | Email from Richard Burns to Golnar Montazem, Erwin Parviz, and Samir Mathur re: Private Equity Finance/pricing | 11/30/2006 | CITI 005423 | CITI 005425 |
| TX 34 | Email from Mohanned Noor to Richard Burns and Catherine Weir re: Forbearance Period | 10/27/2008 | CITI 009772 | CITI 009776 |
| TX 35 | Spreadsheet - Fund of Funds | 6/27/2008 | CITI 012578 - 12771 | |
| TX 36 | Spreadsheet - Fund of Funds | 3/30/2009 | CITI 012773 - 12975 | |
| TX 37 | Spreadsheet - Fund of Funds | 6/29/2009 | CITI 012977 - 13162 | |
| TX 38 | Spreadsheet - Fund of Funds | 9/29/2009 | CITI 013170 - 13377 | |
| TX 39 | Spreadsheet - Fund of Funds | 12/24/2009 | CITI 013384 - 13766 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 40 | Draft Summary of Terms Leveraged Options Trade | 2/23/2006 | ABBAR 4865 | ABBAR 4870 |
| TX 42 | Conflicts of Interest Waiver of Ajial Feeder, Ajial Holdings, and CGMI | 5/9/2006 | ABBAR 853 | ABBAR 856 |
| TX 43 | Subscription Letter for share in Ajial Holdings (CGMI) | 5/9/2006 | ABBAR 761 | |
| TX 44 | Amatra Shareholders' Resolution | 5/9/2006 | ABBAR 664 | ABBAR 666 |
| TX 46 | Email from Rajiv Sennar to Bret Dooley and others re: Call to discuss Amatra-Ajial Trade for Acct, Tax and CGML Regulatory | 4/12/2006 | CITI 000857 | |
| TX 47 | Email from Rajiv Sennar to Bret Dooley and others re: Restructuring of Amatra-Ajial Vehicles | 4/20/2006 | CITI 001074 | CITI 001075 |
| TX 48 | Email from Rajiv Sennar to Ramesh Gupta re: list for memo | 4/25/2006 | CITI 007987 | CITI 007989 |
| TX 49 | Letter regarding Summary of Leverage Option Transaction | 5/9/2006 | ABBAR 911 | ABBAR 916 |
| TX 50 | CGMI Updated Privilege Log | 3/27/2012 | | |
| TX 51 | Declaration of Samir Mathur in Support of Citigroup Global Markets Inc.øs Motion for a Preliminary Injunction | 10/6/2011 | | |
| TX 56 | Letter from CGML to Ajial Leveraged Feeder Holdings Ltd. | 7/24/2009 | ABBAR 2266 | |
| TX 57 | Letter from CGML to Ajial Leveraged Feeder Holdings Ltd. | 8/24/2009 | ABBAR 2264 | |
| TX 58 | Letter from CGML to Amatra Leveraged Feeder Holdings Ltd. | 10/6/2009 | ABBAR 1608 | |
| TX 59 | Email from Yontcho Valtchev to Vishal Mishra and Samir Mathur re: Ghazi Trade Modifications - Round 2 | 4/11/2007 | CITI 009207 | CITI 009209 |
| TX 60 | Notice of Rule 30(b)(6) Deposition of Citigroup Global Markets Inc. | 3/21/2012 | | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 61 | Memorandum from Beat Glusstein to Credit Committee re: Private Equity Financing - CA memo | 2/12/2007 | CITI 005829 | CITI 005854 |
| TX 62 | Email from Jonathan Conner to Akbar Shah re: CA package for prime Saudi client | 2/27/2007 | CITI 009114 | CITI 009117 |
| TX 63 | Email from Deepak Sharma to Sallie Krawcheck with no subject indicated | 6/5/2007 | CITI 012214 | |
| TX 64 | Email from Catherine Weir to Muwaffak Bibi, Sallie Krawcheck, and Deepak Sharma re: Sh Ghazi's NY Visit | 5/17/2008 | CITI 009440 | |
| TX 65 | Email from Sallie Krawcheck to Allison Conca re: New York Visit | 6/5/2008 | CITI 009451 | CITI 009452 |
| TX 66 | Email from Paul Desousa to Vaqar Haider, Raheel Malik, and Mohanned Noor re: G**** A****, with attachments | 7/16/2008 | CITI 015319 | CITI 015344 |
| TX 67 | Email from Ned Noor to Richard Burns and others re Forbearance Period | 10/27/2008 | CITI 009772 | CITI 009776 |
| TX 68 | Plaintiff's Updated Responses and Objections to Defendants' Notice of 30(b)(6) Deposition of CGMI | 4/19/2012 | | |
| TX 70 | Hybrid Desk Revenue Spreadsheet | Undated | CITI 010625 | |
| TX 203 | Memorandum from London Account Control to James Wathan re: Annual Update of KYC for Ajial Leveraged Feeder Holdings Limited | 5/9/2001 | CITI 10292 | CITI 10300 |
| TX 204 | 2002 ISDA Equity Derivatives Definitions | 2002 | CITI 15151 | CITI 15221 |
| TX 205 | 2002 ISDA Master Agreement | 2002 | CITI 15222 | CITI 15257 |
| TX 206 | Email from Noor to Abbar re Private Client Enquiry In Breven Howard | 3/3/2005 | ABBAR 2612 | ABBAR 2613 |
| TX 208 | Email from Noor to Abbar re Re: London visit | 11/2/2005 | ABBAR 4227 | |
| TX 209 | Citigroup presentation to GA Investments Co., Private Equity Securitization Structure | 11/18/2005 | ABBAR 3933 | ABBAR 3941 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 210 | Email from Abbar to Wathan re Re: Private equity follow-up | 11/23/2005 | ABBAR 3903 | |
| TX 211 | Email from Wathan to Abbar re Re: Private equity follow-up | 11/24/2005 | ABBAR 1480 | |
| TX 212 | Email from Wathan to Abbar re RE: Private equity follow-up | 11/25/2005 | ABBAR 1073 | |
| TX 213 | Email from James Wathan to Ghazi Abbar re: Follow-up | 11/29/2005 | ABBAR 1074 | |
| TX 214 | Citigroup's 2006 Annual Report On Form 10- K | 2006 | CITI 007343 | CITI 007522 |
| TX 215 | Email from James Wathan to Mohanned Noor and Rajiv Sennar re: Leverage | 1/4/2006 | CITI 000398 | CITI 000399 |
| TX 216 | Email from Wathan to Sennar re Leverage | 1/4/2006 | CITI 400 | CITI 402 |
| TX 217 | Email from Sennar to Wathan re Leverage | 1/5/2006 | CITI 409 | CITI 411 |
| TX 218 | Email from Noor to Wathan re Leverage | 1/9/2006 | CITI 412 | CITI 415 |
| TX 219 | Email from Carole Langlands to Zac Bush et al, re: RE: Reminder Global Hybrids CMAC Pipeline Meeting | 1/11/2006 | CITI 416 | CITI 443 |
| TX 220 | Email from James Wathan to Mohanned Noor re: Ghazi | 1/13/2006 | CITI 451 | |
| TX 221 | Email from Ghazi Abbar to Mohanned Noor re: Statements of Amatra & Ajial, attaching Hedge Fund and Loan Positions | 1/17/2006 | CITI 007769 | CITI 007774 |
| TX 222 | Email from Noor to Abbar re Leverage | 1/19/2006 | ABBAR 1075 | ABBAR 1076 |
| TX 224 | Email from James Wathan to Mohanned Noor re: Leverage | 1/19/2006 | CITI 7775 | |
| TX 226 | Email from Rajiv Sennar to Mohanned Noor and Ghazi re: RE: Portfolio | 1/30/2006 | CITI 3126 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 227 | Email from Rajiv Sennar to James Wathan re: RE: Updated Termsheet | 2/28/2006 | CITI 473 | CITI 475 |
| TX 228 | Email from Rajiv Sennar to Mohanned Noor and James Wathan re: RE: Updated Termsheet | 2/28/2006 | CITI 476 | CITI 479 |
| TX 229 | Email from Wathan to Sennar re RE: Follow Up 2-29-06 | 3/2/2006 | CITI 483 | CITI 485 |
| TX 230 | Email and attached transaction pipeline material. | 3/13/2006 | CITI 3166 | CITI 3207 |
| TX 231 | Email with attachment from Rajiv Sennar to Ghazi re: Amatra Option Confirmation 3-16-06 | 3/17/2006 | CITI 494 | CITI 562 |
| TX 232 | Email from Noor to Abbar | 3/22/2006 | ABBAR 1089 | |
| TX 233 | Email from Flanagan to Sennar re Pipeline | 3/27/2006 | CITI 3208 | CITI 3235 |
| TX 235 | Email from Rajiv Sennar to Samir Mathur re: FW: Pipeline Attached | 4/3/2006 | CITI 566 | CITI 593 |
| TX 236 | Email from Rajiv Sennar to Burns re: Ghazi Trade Memo, with attachment | 4/3/2006 | CITI 563 | CITI 565 |
| TX 237 | Email and attached transaction pipeline material. | 4/3/2006 | CITI 566 | CITI 593 |
| TX 238 | Email from Rajiv Sennar to Gupta re: Ghazi Abbar Transaction, with attachments | 4/6/2006 | CITI 607 | CITI 610 |
| TX 239 | "Know Your Client" Report on Abdullah Abbar | 4/6/2006 | CITI 005104 | CITI 005110 |
| TX 240 | Email from Parviz to Burns re FW: Ghazi Abbar Transaction | 4/7/2006 | CITI 611 | CITI 612 |
| TX 243 | Email from Sennar to Arnold and others re: RE: Ghazi Trade: CIS and Call | 4/10/2006 | CITI 703 | CITI 705 |
| TX 244 | Email from Jean Lafforgue to Donald Krapp et al., re: FW: Ghazi Trade: CIS and Call | 4/10/2006 | CITI 643 | CITI 644 |
| TX 245 | Draft CMAC Memorandum for Leveraged Option Trades linked to Ajial and Amatra | 4/10/2006 | CITI 000875 | CITI 000886 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 246 | Email with attachment from James Wathan to Donald Krapp et al., re: RE: Ghazi Trade CIS and Call | 4/11/2006 | CITI 703 | CITI 707 |
| TX 247 | Email from Jean Lafforgue to James Wathan re: RE: Ghazi Trade: CIS and Call | 4/11/2006 | CITI 822 | CITI 824 |
| TX 248 | Email and attached transaction pipeline material. | 4/11/2006 | CITI 653 | CITI 679 |
| TX 249 | Email from Wathan to Sennar re Re: Dinner with Ghazi | 4/16/2006 | CITI 10305 | CITI 10307 |
| TX 250 | Email from Rajiv Sennar re: CSIS Due Diligence re: Due Diligence Report | 4/18/2006 | CITI 913 | |
| TX 251 | Email from Rajiv Sennar to Donald Krapp et al. re: Amatra-Ajial DD Meeting with Client w/ Attachment | 4/18/2006 | CITI 914 | CITI 924 |
| TX 252 | Ajial Leveraged Feeder Holdings Limited Account Application | 4/18/2006 | ABBAR 3149 | ABBAR 3205 |
| TX 254 | Email from Sennar to Arnold et al re RE: AmatrAuthenticityAjial DD meeting with Client | 4/20/2006 | CITI 1072 | CITI 1073 |
| TX 255 | Email from Mohanned Noor to Ghazi re: Investments for end of May and June | 4/23/2006 | CITI 1219 | |
| TX 256 | Email from Rajiv Sennar to Donald Krapp, et al., re: RE: Amatra-Ajial CMAC Memo | 4/23/2006 | CITI 10308 | CITI 10309 |
| TX 257 | Email from Rajiv Sennar to Short re: RE: Restructuring of Amatra-Ajial Vehicles | 4/24/2006 | CITI 1324 | CITI 1326 |
| TX 258 | Email from Rajiv Sennar to McCourt re: RE: Amatra Ajial Documents | 4/24/2006 | CITI 1367 | |
| TX 259 | Email from Anthony Tuths to Rajiv Sennar re: RE: Restructuring of Amatra-Ajial Vehicles | 4/24/2006 | CITI 1373 | CITI 1381 |
| TX 260 | Email from James Wathan to Rajiv Sennar re: Summary CGML relationship with Ghazi Abbar | 4/25/2006 | CITI 7992 | CITI 7995 |
| TX 261 | Email from Favaro to Tang re FW: AmatrAuthenticityAjial CMAC Memo | 4/26/2006 | CITI 10003 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 263 | Email from Rajiv Sennar to Abbar re: Changes discussed today | 4/27/2006 | ABBAR 1473 | |
| TX 264 | Email from Wathan to Wan re RE: Compliance docs for Amatra and Ajial Leverage Option | 4/27/2006 | CITI 5117 | CITI 5122 |
| TX 265 | Group of 41 Investment Recommendations sent by Ghazi Abbar to Rajiv Sennar at CGMI | May-06 | ABBAR 2890 | ABBAR 2930 |
| TX 266 | Email from James Wathan to Julie Wan re: Summary of CGML relationship with Ghazi Abbar, attaching summary of relationship | 5/4/2006 | CITI 008589 | CITI 008594 |
| TX 267 | Email from Claude Serfilippi to Carl Jenkins, copying others with no subject indicated, attaching signed copies of the Summary of Leverage Option Transaction | 5/9/2006 | CITI 001852 | CITI 001858 |
| TX 268 | Letter re: Summary of Leverage Option Transaction Amatra with exhibits | 5/9/2006 | | |
| TX 269 | Investment Advisory Agreement between Ajial Holdings Limited and Ghazi Abbar (Conformed Copy) | 5/9/2006 | | |
| TX 270 | Subscription Agreement between Amatra Limited Investments, CGML, and Ghazi Abbar | 5/9/2006 | | |
| TX 271 | Participating Shares Subscription Agreement between Ajial Holdings Limited, CGML, and Ghazi Abbar | 5/9/2006 | | |
| TX 272 | Options Trades Closing Documents - Volume I | 5/9/2006 | ABBAR 461 | ABBAR 728 |
| TX 273 | Options Trades Closing Documents - Volume II | 5/9/2006 | ABBAR 729 | ABBAR 1072 |
| TX 274 | Email from Salley Buckley to Chloe Goubert re Mr Abbar | 4/6/2006 | ABBAR 4995 | |
| TX 277 | Fax from Ghazi Abbar to Rajiv Sennar re: Investment Redemptions | 7/16/2006 | CITI 004840 | CITI 004841 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 278 | Email from Parviz to Burns re: I need your sign-off for an email I would like to send to | 8/8/2006 | CITI 4373 | CITI 4374 |
| TX 279 | Email from Rajiv Sennar to Albin re: Re: Ajial and Amatra | 8/12/2006 | CITI 11635 | |
| TX 281 | Account Opening Forms Ajial Leveraged Feeder Holding Limited | 9/6/2006 | ABBAR 94 | ABBAR 123 |
| TX 282 | Account Opening Forms Amatra Leveraged Feeder Holding Limited and Amatra Articles of Association | 9/6/2006 | ABBAR 1907 | ABBAR 1967 |
| TX 283 | Letter from Deutsche Bank to Ghazi Abbar enclosing copies of account opening forms for Amatra Leveraged Feeder Holdings Limited and Ajial Leveraged Feeder Holdings Limited | 9/19/2006 | ABBAR 3087 | ABBAR 3122 |
| TX 287 | Email from Vishal Mishra to Patrick Chan re: FW: Ghazi Operational Memo, with attachment | 10/31/2006 | CITI 11686 | CITI 11688 |
| TX 288 | Email from Khademi to Vardon and others re: Re: Amatra | 11/2/2006 | CITI 4895 | CITI 4898 |
| TX 289 | Email from Stewart Dixon to Ghazi Abbar and Mohanned Noor, copying Nicola Margetts and John Bertram re: Private Equity/Purpose Trust Structure and attachments | 11/7/2006 | ABBAR 4467 | ABBAR 4470 |
| TX 291 | Email from Paul Fraynt to John Yu, Yontcho Valtchev re: RE: | 12/17/2006 | CITI 8988 | CITI 8989 |
| TX 293 | Citigroup's 2007 Annual Report On Form 10- K | 2007 | CITI 007523 | CITI 007730 |
| TX 294 | LPUT Exculpatory Clauses Notice | 2007 | ABBAR 239 | ABBAR 243 |
| TX 295 | Individual Guarantor Declarations of Abdullah Abbar and Ghazi Abbar | 2007 | ABBAR 5543 | ABBAR 5551 |
| TX 296 | Email to Barge, et al., from Webster re FW: Amatra and Ajial | 1/25/2007 | CITI 10557 | CITI 10558 |
| TX 298 | Email from Beat Glusstein to Deepak Sharma and others attaching Private Equity Loan approval materials | 2/14/2007 | CITI 005718 | CITI 005859 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 299 | Email from Shah to Damian Kozlowski re: CA Package for Prime Saudi Client with attachments | 2/22/2007 | CITI 5987 | CITI 6025 |
| TX 300 | Trustee Services Agreement to Agreed Terms & Conditions between Cititrust (Cayman) Limited, Smith Barney Private Trust Company (Cayman) Limited, and The Investment Director of the Lender Protection Closed-End Unit Trust | 3/23/2007 | ABBAR 3300 | ABBAR 3320 |
| TX 301 | Lender Protection Closed-End Unit Trust between Cititrust (Cayman) Limited, Citibank NA (Geneva Branch), and Smith Barney Private Trust Company (Cayman) Limited | 3/23/2007 | ABBAR 3321 | ABBAR 3393 |
| TX 302 | Amavest Holdings Limited Account Application | 3/23/2007 | | |
| TX 303 | Private Equity Loan closing documents | 3/23/2007 | ABBAR 3298 | ABBAR 3722 |
| TX 304 | Individual Guarantor Declarations signed by Abdullah Mahmoud Abbar and Ghazi Abdullah Mahmoud Abbar | 3/27/2007 | ABBAR 3537 | ABBAR 3542 |
| TX 305 | Amendments to the Ajial & Amatra Confirmation Agreement | 4/20/2007 | | |
| TX 306 | Amendments to the Ajial & Amatra Confirmation Agreement | 4/20/2007 | | |
| TX 307 | Memorandum from London Account Control to James Wathan re: Annual Update of KYC for Amatra Leveraged Feeder Holdings Limited | 5/9/2007 | CITI 10068 | CITI 10076 |
| TX 308 | Email from Rajiv Sennar to Burns re: Ghazi meeting with seniors | 5/14/2007 | CITI 4463 | |
| TX 309 | Email from Fraynt to Bower et al., re Investment guideline template for Amatra and Ajial | 6/14/2007 | ABBAR 9955 | |
| TX 310 | Email from Yu to Bower et al, re Ajial 6-29-07 Subscription | 6/18/2007 | ABBAR 9949 | ABBAR 9953 |
| TX 311 | Email from Yu to Bower et al, re Ajial 6-29-07 Subscription | 6/20/2007 | ABBAR 9938 | ABBAR 9939 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 314 | Email from John Yu to George Bower et al, re: Ajial Monthly Reporting | 7/10/2007 | ABBAR 8570 | ABBAR 8571 |
| TX 315 | Email from Yu to Bower and Sennar re RE: AM and AJ Leverage | 7/10/2007 | ABBAR 9886 | ABBAR 9888 |
| TX 316 | Email from Yu to Bower et al, re Ajial 8-6-07 Redemption | 8/6/2007 | ABBAR 9849 | ABBAR 9853 |
| TX 317 | Email from Yu to Bower at al, re Amatra 8-6-07 | 8/6/2007 | ABBAR 9854 | ABBAR 9856 |
| TX 318 | Email from John Yu to George Bower re: RE: Haircuts | 8/15/2007 | ABBAR 9840 | |
| TX 319 | Example of Investment Recommendation Letter from Ghazi Abbar to CGMI | 8/29/2007 | ABBAR 4617 | |
| TX 324 | Example of Notional Adjustment Request from Ghazi Abbar to Deutsche Bank, from Deutsche Bank to CGMI, and approval by CGMI | 10/23/2007 | ABBAR 1799 | ABBAR 1807 |
| TX 325 | Email from Rajiv Sennar to George Bower re: RE: Client Service Meeting | 10/23/2007 | ABBAR 9675 | ABBAR 9676 |
| TX 326 | Letter from Ghazi Abbar to Deutsche Bank International Trust Co. Ltd., with attachment | 11/1/2007 | ABBAR 1788 | ABBAR 1790 |
| TX 327 | Email from Yu to Bower re Amatra HC break down | 12/7/2007 | ABBAR 9547 | |
| TX 328 | Credit Agreement Third Amendment and Restatement between Vintage Investments Limited, Langton Ltd., and Meltem Ltd. as borrowers, Cititrust (Cayman) Limited as trustees, Abdullah Mahmoud Abbar and Ghazi Abdullah Abbar as individual guarantors, and Citibank NA (Geneva Branch) and Citibank (Switzerland) SA, as lenders | 2008 | ABBAR 3206 | ABBAR 3293 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 329 | Video of Ghazi Abbar Interview | 2008 | ABBAR 5017 | |
| TX 330 | Citigroup's 2008 Annual Report on Form 10- K | 2008 | CITI 007091 | CITI 007342 |
| TX 331 | Multi-Asset and Fund Linked Solutions presentations for Q2 2008 | 2008 | CITI 218 | CITI 231 |
| TX 334 | Email from Yu to Bower et al, re RE: Requests for Information_Aj***, with attached Trail (sic) Balance | 3/19/2008 | ABBAR 1253 | ABBAR 1278 |
| TX 339 | Email chain from Samir Mathur to George Bower Re: Thank you | 4/16/2008 | ABBAR 9332 | ABBAR 9333 |
| TX 340 | Email from Paul Fraynt to George Bower re: RE: Investment guideline template for Amatra and Ajial | 4/21/2008 | ABBAR 9325 | ABBAR 9328 |
| TX 341 | Email from Abbar to Bower re FW: Ajial and Amatra | 4/28/2008 | ABBAR 4548 | |
| TX 342 | Email from Ram Bala Chandran to FI Global Hybrid Funds Trading and others re: FoF Risk Report for 04/29/08, with attachments | 4/30/2008 | CITI 010765 | CITI 010780 |
| TX 344 | Email from Yu to Bower re Haircuts | 5/13/2008 | ABBAR 9289 | ABBAR 9290 |
| TX 345 | Email from Havens to Abbar re: thank you | 5/16/2008 | ABBAR 1511 | |
| TX 346 | Risk Report and cover email. | 5/16/2008 | CITI 10781 | CITI 10796 |
| TX 347 | Email from George Bower to Mohanned Noor, copying Ghazi Abbar re: Meeting with CGML | 5/23/2008 | ABBAR 1467 | |
| TX 348 | Email from Mohanned Noor to George Bower Re: Meeting with CGML | 5/26/2008 | ABBAR 2657 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 355 | Email from Sallie Krawcheck to Ghazi Abbar re: Re: New York visit | 6/6/2008 | ABBAR 33 | |
| TX 356 | Email from Zhenyu "Harry" Peng to Mohanned Noor, Samir Mathur, and Vishal Mishra, copying others re: April IG Breaches for Amatra and Ajial | 6/11/2008 | CITI 004578 | CITI 004582 |
| TX 359 | Email from James Wathan to George Bower, re: Pre-meeting note | 6/20/2008 | ABBAR 4568 | |
| TX 360 | Risk Report and cover email. | 6/30/2008 | CITI 10797 | CITI 10810 |
| TX 361 | Email from John Yu to George Bower et al, re: Amatra 7-7-2008 Redemption | 7/7/2008 | ABBAR 9259 | |
| TX 363 | Email from Michelle Scahill to Ramesh Gupta re: Hybrids Weekly Call | 7/15/2008 | CITI 4691 | CITI 4692 |
| TX 364 | Email from Noor to Toole, re RE: Meltem | 8/28/2008 | ABBAR 4603 | ABBAR 4604 |
| TX 365 | Example of Redemption Request by Ghazi Abbar to CGMI, and CGMI approval of Redemption Recommendation | Oct-08 | ABBAR 2548 | ABBAR 2553 |
| TX 366 | Letter from Richard Burns to Ajial re: Confirmation for leveraged option transaction | 10/17/2008 | ABBAR 2286 | ABBAR 2288 |
| TX 367 | Letter from Richard Burns to Ajial re: Confirmation, Breach Notice, and Current Remedy Notice | 10/24/2008 | ABBAR 2274 | ABBAR 2275 |
| TX 368 | Email from Mohanned Noor to Abbar re: Fw: Tudor and Tewksbury | 10/29/2008 | ABBAR 4777 | ABBAR 4779 |
| TX 369 | Letter from Ajial Holdings Limited to Ghazi Abbar | 10/29/2008 | ABBAR 2538 | |
| TX 370 | Email from Mohanned Noor to George Bower | 11/11/2008 | ABBAR 4711 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 372 | Email from Dominic Notaro to Vishal Mishra and Samir Mathur, copying others re: Ghazi | 2/17/2009 | CITI 004760 | |
| TX 378 | Email from Mohanned Noor to Ghazi Abbar, with no subject indicated | 2/11/2010 | ABBAR 5134 | ABBAR 5136 |
| TX 379 | Email from Abbar to Bower Fw: Re | 2/12/2010 | ABBAR 5128 | ABBAR 5130 |
| TX 380 | Declaration of Jed M. Schwartz, Esq. in Support of Citigroup Global Markets Inc.øs Motion for a Preliminary Injunction | 10/6/2011 | | |
| TX 381 | Defendants' Response to CGMI First Request for Interrogatories | 4/6/2012 | | |
| TX 382 | Letter from Ross B. Intelisano to Daniel M. Perry re: Follow-Up on Interrogatories | 4/27/2012 | | |
| TX 383 | Cover emails from John Yu at CGMI with attached monthly reports of Ajial and Amatra | 2007-2009 | various Bates numbers in the range of ABBAR 7000s-8000s | |
| TX 385 | Copies of Business Card from files of Ghazi Abbar | Undated | ABBAR 4310 | ABBAR 4327 |
| TX 386 | Citibank (Switzerland) Account opening documents for Amatra Leveraged Feeder Holdings Limited | Undated | ABBAR 3089 | ABBAR 3122 |
| TX 388 | Citi Fund Leveraged Products Presentation | Undated | CITI 163 | CITI 188 |
| TX 391 | KYC Individual Report | Undated | CITI 9955 | CITI 9959 |
| TX 392 | Email from Claude Serfilippi to Mohanned Noor, copying Ghazi Abbar re: PE facility sot, with attachments | 1/13/2007 | CITI 2803 | CITI 2809 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 393 | Email from James Wathan to Mohanned Noor, copying Rajiv Sennar RE: Leverage | 1/19/2006 | CITI 000455 | |
| TX 394 | Fax from Tracy Martel to Ned Noor copying Ghazi Abbar containing signed Amendment of a Transaction | 7/11/2008 | ABBAR 2322 | ABBAR 2324 |
| TX 395 | Letter from Ghazi Abbar to Ajial Leveraged Feeder re: Amendment of a Transaction | 7/9/2008 | ABBAR 4279 | ABBAR 4280 |
| TX 396 | Fax from Tracy Martel to Rajiv Sennar copying Ned Noor and Ghazi Abbar containing Amendment of a Transaction signed by Amatra Leveraged Feeder and Ajial Leveraged Feeder | 4/25/2007 | ABBAR 4362 | ABBAR 4366 |
| TX 398 | Fax from Tracy Martel to Ned Noor copying Ghazi Abbar containing Amendment of a Transaction signed by Ajial Leverage Feeder Holdings Limited | 7/11/2008 | ABBAR 9231 | ABBAR 9233 |
| TX 399 | Letter from CGML to Amatra Leveraged Feeder Holdings Limited re: Amendment of a Transaction | 4/20/2007 | ABBAR 3294 | ABBAR 3295 |
| TX 501 | Email from Rajiv Sennar to Ghazi Abbar re: Update | 3/6/2008 | CITI 009330 | CITI 009331 |
| TX 506 | Hybrid Derivatives Organization Chart | Undated | CITI 000006 | |
| TX 507 | Global Hybrids Org Chart Slides | Undated | CITI 000001 | CITI 000004 |
| TX 508 | Global Hybrids Org Chart (High Level) | Undated | CITI 000005 | |
| TX 514 | Client Documentation Checklist - Amatra Leveraged Feeder Holdings Ltd | 7/10/2006 | CITI 009860 | CITI 009920 |
| TX 515 | CMAC Memorandum for Leveraged Option Trades linked to Ajial and Amatra | 4/25/2006 | CITI 1478 | CITI 1496 |
| TX 516 | Email from James Wathan to Rajiv Sennar and others with no subject indicated | 4/26/2006 | CITI 008506 | CITI 008507 |
| TX 517 | Email from Rajiv Sennar to Craig Seledee re: Structuring Fee Letters Final, with attachments | 5/11/2006 | CITI 008596 | CITI 008608 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 518 | Email from James Wathan to Rajiv Sennar re: Summary CGML relationship with Ghazi Abbar, attaching a Summary of the Ghazi-CGML transaction | 5/5/2006 | CITI 001834 | CITI001838 |
| TX 519 | Email from Mohanned Noor to Rajiv Sennar and others re: Amatra Option Confirmation 3-16-2006 | 3/20/2006 | CITI 007833 | CITI 007835 |
| TX 520 | Email from Rajiv Sennar to Richard Burns re: Ghazi PE Portfolio | 1/16/2007 | CITI 004425 | |
| TX 521 | Investment Advisory Agreement between Amatra Investments Limited and Ghazi Abbar (Conformed Copy) | 5/9/2006 | CITI 002149 | CITI 002163 |
| TX 523 | Option Confirmation between Amatra Leveraged Feeder Holdings Limited and CGML (Conformed Copy) | 5/9/2006 | CITI 002370 | CITI 002441 |
| TX 524 | Email from Claude Serfilippi to Rajiv Sennar and others re: Fee Letters | 5/12/2006 | CITI 08609 | CITI 008611 |
| TX 525 | Email from Rajiv Sennar to James Wathan and others re: Ghazi | 3/19/2007 | CITI 009135 | |
| TX 526 | Email from James Wathan to Rajiv Sennar and others re: Ghazi Trade | 3/19/2007 | CITI 009134 | |
| TX 527 | Email from Claude Serfilippi to Rajiv Sennar re: Email, with attachments | 7/7/2006 | CITI 011008 | CITI 011066 |
| TX 528 | Email from Rajiv Sennar to Craig Seledee and Jonathan Asher re: Ghazi Abbar: Restructuring of Invst Management Functions, with attachments | 7/20/2006 | CITI 008697 | CITI 008714 |
| TX 529 | Email from George Bower to Mohanned Noor with no subject indicated | 9/21/2006 | CITI 011070 | |
| TX 530 | Email from George Bower to Mohanned Noor re: Fact finding visit to Geneva | 9/22/2006 | CITI 011071 | CITI 011072 |
| TX 531 | Email from George Bower to Mohanned Noor with no subject indicated | 9/25/2006 | CITI 011067 | |
| TX 532 | Investment Advisory Agreement (Ajial Holdings and Ghazi Abbar) | 5/9/2006 | ABBAR 583 | ABBAR 597 |
| TX 533 | Email from George Bower to Mohanned Noor re: Geneva visit URGENT | 10/31/2006 | CITI 011079 | CITI 011082 |
| TX 534 | Email from Alexandre Sampedro to George Bower re: Visit to Geneva | 11/2/2006 | CITI 011084 | CITI 011086 |
| TX 535 | Email from Alexandre Sampedro to Ghazi Abbar re: copy of statements | 11/8/2006 | CITI 011087 | CITI 011088 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 536 | Email from Tim Doxford to George Bower re: Harbour Holdings Oct 06 performance | 11/14/2006 | CITI 011094 | CITI 011095 |
| TX 537 | Email from George Bower to Ghazi Abbar and Mohanned Noor re: Amatra and Ajial performance monitoring | 11/13/2006 | CITI 011091 | CITI 011092 |
| TX 538 | Email from Ghazi Abbar to Mark Patterson re: Hedge Fund | 11/29/2006 | CITI 011096 | CITI 011099 |
| TX 539 | Email from George Bower to Mohanned Noor with no subject indicated | 1/15/2007 | CITI 011108 | |
| TX 540 | Email from Alexandre Sampedro to George Bower re: HF Portfolio Information, with attachments | 1/25/2007 | CITI 011116 | CITI 011131 |
| TX 541 | Email from Alexandre Sampedro to Mohanned Noor and George Bower re: Radar Capital Authorisations | 2/15/2007 | CITI 011147 | CITI 011150 |
| TX 542 | Email from George Bower to Alexandre Sampedro and Nasrulla Khan re: Hermitage Global | 2/22/2007 | CITI 011154 | CITI 011156 |
| TX 543 | Email from Rajiv Sennar to George Bower re: Re: Visit to CGGM | 6/5/2007 | ABBAR 9957 | ABBAR 9960 |
| TX 544 | Email from Rajiv Sennar to George Bower and James Wathan re: AM and AJ Leverage | 7/3/2007 | ABBAR 7100 | ABBAR 7102 |
| TX 545 | Email from Yontcho Valtchev to George Bower and Mohanned Noor re: Haircuts | 8/16/2007 | ABBAR 7026 | ABBAR 7029 |
| TX 546 | Email from George Bower to James Wathan, Rajiv Sennar, and Mohanned Noor re: Meeting Agenda, with attachments | 8/28/2007 | CITI 011187 | CITI 011189 |
| TX 547 | Email from Yontcho Valtchev to George Bower re: Haircuts, with attachments | 9/7/2007 | ABBAR 6954 | ABBAR 6957 |
| TX 548 | Investment advisory fee payments, in emails and letters from files of Ghazi Abbar, produced in bulk | 2009 | ABBAR 1650 | ABBAR 1658 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 549 | Email from Mike Toole to Paul DeSousa re: Last weeks meeting, with attachments | 4/9/2008 | CITI 011196 | CITI 011263 |
| TX 550 | Email from George Bower to John Yu re: AM and AJ strike numbers Feb-08 | 3/25/2008 | ABBAR 7467 | ABBAR 7468 |
| TX 551 | Email from James Wathan to Mohanned Noor re: CPPI, with attachments | 6/16/2008 | CITI 002970 | CITI 002975 |
| TX 552 | Email from George Bower to Samir Mathur re: Thank you | 4/18/2008 | ABBAR 10278 | ABBAR 10280 |
| TX 557 | Email from Patricia Hogan to Nicola Margetts re: Forbearance Period, with attachments | 10/24/2008 | ABBAR 8889 | ABBAR 8894 |
| TX 558 | Email from George Bower to Samir Mathur re: Private Call | 8/19/2009 | ABBAR 8521 | ABBAR 8523 |
| TX 559 | Email from George Bower to Ghazi Abbar re: NY CMAC Meeting - Thursday April 27 - Ajial Amatra Leverage Options, attaching Amatra-Ajial CMAC Memo dated 4-25-06 | 8/26/2009 | ABBAR 5018 | ABBAR 5019 |
| TX 560 | Notice of Rule 30(b)(6) Deposition of Ajial Leveraged Feeder Holdings Limited | 2/29/2012 | | |
| TX 561 | Option Confirmation between Ajial Leveraged Feeder Holdings Limited and CGML (Conformed Copy) | 5/9/2006 | CITI 002285 | CITI 002356 |
| TX 562 | Notice of Rule 30(b)(6) Deposition of Amatra Leveraged Feeder Holdings Limited | 2/29/2012 | | |
| TX 563 | Email from Rajiv Sennar to Ghazi Abbar re: Amatra Option Confirmation 3-16-06, attaching draft confirmation dated 3-17-06 | 3/17/2006 | CITI 000494 | CITI 000562 |
| TX 567 | Credit Agreement dated March 2007 b/t Langton Limited, Vintage Investments Limited, Cititrust (Cayman) Limited | 3/23/2007 | ABBAR 3472 | ABBAR 3536 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 568 | Email from Mohanned Noor to Ghazi Abbar re: My conference call with you and others from the Citigroup team, attaching diagrams | 10/16/2006 | ABBAR 2674 | ABBAR 2677 |
| TX 570 | Email from Rajiv Sennar to Ghazi Abbar re: Follow Up | 2/6/2006 | CITI 000457 | CITI 000458 |
| TX 571 | Email from Rajiv Sennar to Ghazi Abbar, Chris Owen, and Claude Serfilippi re: Disclosure Letter, attaching draft Summary of Leverage Option Transaction | 5/3/2006 | CITI 003708 | CITI 003717 |
| TX 572 | Letter from CGMI to Ghazi Abbar re: Summary of Leverage Option Transaction | 5/9/2006 | CITI 001853 | CITI 001857 |
| TX 573 | Structuring Services Letter from CGML to Amatra Leveraged Feeder Holdings Limited | 5/11/2006 | CITI 004407 | CITI 004409 |
| TX 574 | Structuring Services Letter from CGML to Ajial Leveraged Feeder Holdings Limited | 5/11/2006 | CITI 002239 | CITI 002241 |
| TX 575 | Email chain from Rajiv Sennar, to James Wathan re: RE: Ghazi | 3/19/2007 | CITI 009135 | |
| TX 577 | Letter from Ghazi Abbar to Deepak Sharma | 11/19/2009 | ABBAR 5178 | ABBAR 5180 |
| TX 578 | Email from Ghazi Abbar to Trevor Houston and others re: Restructuring Proposal | 11/17/2009 | ABBAR 5175 | ABBAR 5177 |
| TX 579 | Client Documentation Checklist - Ajial Leveraged Feeder Holdings Ltd | 10/7/2006 | CITI 010077 | CITI 010129 |
| TX 580 | Client Documentation Checklist - Amatra Leveraged Feeder Holdings Ltd | 10/7/2006 | CITI 009860 | CITI 009920 |
| TX 581 | Letter from Ghazi Abbar to Muwaffak Bibi | 6/18/2009 | ABBAR 5145 | ABBAR 5146 |
| TX 582 | Notice of Rule 30(b)(6) Deposition of Amavest Holdings Limited | 2/29/2012 | | |
| TX 583 | Notice of Rule 30(b)(6) Deposition of Gama Investment Holdings Limited | 2/29/2012 | | |
| TX 586 | Email from Mohanned Noor to Ghazi Abbar re: Private Client Enquiry in Brevan Howard | 3/3/2006 | ABBAR 1086 | ABBAR 1087 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 587 | Email from Mohanned Noor to Ghazi Abbar re: Investments for end of May and June | 4/23/2006 | ABBAR 1101 | |
| TX 588 | Statement of Claim, Abdullah Mahmoud Abbar, Ghazi Abdullah Abbar, Ajial Leveraged Feeder Holdings Limited, et al. vs. Citigroup Global Markets, Inc., FINRA Dispute Resolution Arbitration Number 11-03212 (Aug. 18, 2011) | | | |
| TX 590 | Notice of Subpoena for Videotaped Deposition of Chadbourne & Parke LLP | 2/22/2012 | | |
| TX 595 | Email from Rajiv Sennar to Joanne McCourt, Chris Owen, and Claude Serfilippi re: Amatra/Ajial Documents | 4/27/2006 | CITI 013979 | CITI 013982 |
| TX 596 | Email from James Wathan to Chris Owen re: Ghazi Trade: CIS and Call | 4/13/2006 | CITI 013794 | CITI 013799 |
| TX 597 | Email from Rajiv Sennar to Ghazi Abbar, Chris Owen, and Claude Serfilippi re: Amatra-Ajial: Timeline and Documentation, attaching Amatra-Ajial Trades Timeline | 4/24/2006 | CITI 007981 | CITI 007986 |
| TX 613 | Email from Adrian Chopin to Claude Serfilippi and Chris Owen re: Amatra and Ajial (12230-01899) | 4/27/2006 | CITI 011334 | CITI 011342 |
| TX 619 | Email from George Bower to Claude Serfilippi re: Tudor and Tewksbury | 10/29/2008 | ABBAR 5558 | ABBAR 5561 |
| TX 702 | Email from Rajiv Sennar to to Mohanned Noor,  George Bower and Ghazi Abbar cc: Wathan, Yafaoui re: RE: Amatra Investments Limited - July 2007 NAV | 8/22/2007 | ABBAR 9799 | ABBAR 9801 |
| TX 703 | Email from Rajiv Sennar to Adiran Chopin et al. re: RE: New Numbers | 5/9/2006 | ABBAR 3733 | ABBAR 3734 |
| TX 704 | Email from George Bower to Samir Mathur cc: Ghazi Abbar, Noor re: Discussion | 10/15/2008 | ABBAR 4726 | |
| TX 705 | Email from George Bower to Samir Mathur cc: Ghazi Abbar, Noor re: October Intra Months | 10/15/2008 | ABBAR 4727 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 708 | Email from George Bower to Samir Mathur cc: Ghazi Abbar, Jonsson cc: Without Prejudice - Follow up to Telephone Call 6th October 2009 | 10/7/2009 | ABBAR 10021 | ABBAR 10022 |
| TX 711 | Email from George Bower to Samir Mathur cc: Ghazi Abbar, Hogan re: Without Prejudice - Telephone Call follow up | 10/7/2009 | ABBAR 1612 | ABBAR 1614 |
| TX 714 | Email from Mohanned Noor to Stewart Dixon et al.  Re: RE: LPUT Income Distribution | 1/31/2007 | CITI 004432 | CITI 004437 |
| TX 716 | Email from John Yu to George Bower et al. re: Ajial Monthly Reporting -9/28/07 | 11/27/2007 | ABBAR 7960 | |
| TX 717 | Email from Rajiv Sennar to Alistair Webster et al. cc: Paul Reed et al re: RE: Amatra - Ajial | 1/26/2007 | CITI 010577 | CITI 010579 |
| TX 718 | Email from Rajiv Sennar to James Wathan and Mohanned Noor Re RE: Updated Termsheet | 2/28/2006 | CITI 000473 | CITI 000475 |
| TX 719 | Email from Erwin Parviz to Rajiv Sennar re: RE: Ghazi Abbar Transaction | 4/25/2008 | CITI 001403 | CITI 001405 |
| TX 720 | Email from Simon Vardon to Alexandre Sampedro and Mohanned Noor re: RE: Am*** - Beneficial Ownership | 11/14/2006 | CITI 002640 | CITI 002641 |
| TX 722 | Email from Erwin Parviz to Zahra Khademi re FW: Ghazi Trade Memo | 4/4/2006 | CITI 000595 | CITI 000597 |
| TX 729 | Email from John Yu to Mohanned Noor and Dion Marsden re: Amatra and Ajial Monthly Reporting | 6/15/2006 | CITI 002514 | |
| TX 730 | Email from George Bower to John Yu re: RE: Question on Leverage Statements | 7/17/2007 | ABBAR 10370 | |
| TX 731 | Email from John Yu to George Bower re: Re: AM and AJ Delverage in August | 10/9/2007 | ABBAR 9693 | ABBAR 9694 |
| TX 732 | Email from John Yu to George Bower re: RE: Amatra Investments Limited | 10/24/2007 | ABBAR 9663 | ABBAR 9665 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 733 | Email from George Bower to John Yu et al. cc: Ghazi Abbar, Noor et al. re: Ajial NAV 30 Sept 2007 | 11/23/2007 | ABBAR 10331 | |
| TX 735 | Email from John Yu to Janice Falla et al re: RE: Amatra 12-31-2007 Subscription | 1/3/2008 | ABBAR 9530 | ABBAR 9533 |
| TX 736 | Email from John Yu to George Bower cc Noor re: RE: Strike numbers - 30 Nov 07 | 1/10/2008 | ABBAR 9515 | ABBAR 9517 |
| TX 742 | Email from John Yu to George Bower et al. cc Vardon et al. Re: RE: Scan from a Xerox WorkCentre Pro | 3/10/2008 | ABBAR 9430 | ABBAR 9433 |
| TX 743 | Email from George Bower to John Yu cc Ghazi Abbar et al. re Ajial Target Ratio - Action Plan for correction within 90 days | 3/20/2008 | ABBAR 10297 | ABBAR 10298 |
| TX 744 | Email from John Yu to John Yu et al re: RE: Amatra 3-25-08 Redemption | 3/25/2008 | ABBAR 9384 | |
| TX 745 | Email John Yu to HYB Fund Derivatives Trading et al re: RE: Ajial 3-31-2008 Redemptions | 3/28/2008 | ABBAR 9369 | ABBAR 9371 |
| TX 746 | Email from John Yu to George Bower re: RE: AM and AJ strike numbers Feb-08 | 4/2/2008 | ABBAR 9366 | ABBAR 9368 |
| TX 747 | Email from John Yu to George Bower re RE:Bear Stearns Enhanced HG Fund | 4/11/2008 | ABBAR 4980 | ABBAR 4981 |
| TX 748 | Email from John Yu to George Bower cc Mohanned Noor, James Wathan, Peng re: RE: Haircuts | 5/13/2008 | ABBAR 9289 | |
| TX 749 | Email from John Yu to Mohanned Noor and George Bower cc James Wathan and Peng re: RE: Haircuts | 5/16/2008 | ABBAR 9287 | ABBAR 9288 |
| TX 750 | Email from John Yu to Mohanned Noor et al. re: RE: Ajial 7-7-2009 Redemptions | 7/7/2008 | ABBAR 9254 | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 751 | Email from John Yu to Mohanned Noor et al cc Ghazi Abbar et al re: RE: Information request | 7/15/2008 | ABBAR 9224 | ABBAR 9226 |
| TX 753 | Email from John Yu to George Bower cc Vardon et al re: RE: Revised Redemption Request - Bear Stearns Structured Risk Partners | 7/28/2008 | ABBAR 9210 | ABBAR 9211 |
| TX 754 | Email from George Bower to John Yu re:  RE: Revised Redemption Request - Bear Stearns Structured Risk Partners | 7/28/2008 | ABBAR 10221 | ABBAR 10222 |
| TX 755 | Email from George Bower to John Yu re Re: Amatra & Ajial Margin Call | 9/18/2008 | ABBAR 4642 | ABBAR 4643 |
| TX 758 | Email from George Bower to John Yu and Mohanned Noor cc Ghazi Abbar et al re Re: Summary Plans | 10/8/2008 | ABBAR 4695 | ABBAR 4696 |
| TX 759 | Email from John Yu to George Bower cc Walker, Mathur, Peng re: RE: Plan B-Alt and Plan C | 10/9/2008 | ABBAR 8998 | ABBAR 9000 |
| TX 761 | Email from George Bower to John Yu re Fw: Amatra and Ajial Cure Plan 15 Oct 2008 | 10/15/2008 | ABBAR 4723 | ABBAR 4275 |
| TX 762 | Email from George Bower to Samir Mathur, Hogan, Yu, Walker, Serfilppi, Noor, Ghazi Abbar, Margetts re Conference Call with Citi | 10/20/2008 | ABBAR 4752 | |
| TX 763 | Email from John Yu to Ghazi Abbar re: FW: Follow up to the call discussion Amatra and Ajial | 10/23/2008 | ABBAR 4764 | |
| TX 764 | Email from John Yu to Samir Mathur et al re: Call to discuss Amatra and Ajial | 10/27/2008 | ABBAR 8232 | |
| TX 765 | Email from George Bower to Patricia Hogan, and John Yu cc Burns, Abbar, Mohanned Noor re: Investment Manager role | 11/24/2008 | ABBAR 10083 | |
| TX 766 | CGMI Form X-17A-5 for 2004 | 12/31/2004 | ABBAR 10738 | ABBAR 10759 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 767 | CGMI Form X-17A-5 for 2005 | 12/31/2005 | ABBAR 10760 | ABBAR 10782 |
| TX 768 | CGMI Form X-17A-5 for 2006 | 12/31/2006 | ABBAR 10783 | ABBAR 10806 |
| TX 769 | CGMI Form X-17A-5 for 2007 | 12/31/2007 | ABBAR 10807 | ABBAR 10839 |
| TX 770 | CGMI Form X-17A-5 for 2008 | 12/31/2008 | ABBAR 10840 | ABBAR 10871 |
| TX 771 | CGMI Form X-17A-5 for 2009 | 12/31/2009 | ABBAR 10872 | ABBAR 10911 |
| TX 772 | Citi Annual Report for 2009 | 12/31/2009 | ABBAR 10912 | ABBAR 11193 |
| TX 775 | Citi Private Bank website - Home page | 6/28/2012 | ABBAR 12322 | ABBAR 12322 |
| TX 776 | Citi Private Bank website - "Our Firm" page | 6/28/2012 | ABBAR 12323 | ABBAR 12323 |
| TX 777 | Citi Private Bank website - "Research" page | 6/28/2012 | ABBAR 12324 | ABBAR 12324 |
| TX 778 | Citi Private Bank brochure | 2007 | ABBAR 12325 | ABBAR 12329 |
| TX 780 | Trust Deed for The JT 808 Trust | 6/23/1998 | CITI 003417 | CITI 03445 |
| TX 781 | Trust Deed for The JT647 Trust | 1/31/1998 | CITI 03446 | CITI 003474 |
| TX 782 | Declarations of Trust (Amavest Holdings Ltd.) | 5/4/06 and 8/19/98 | CITI 009921 | CITI 009923 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 783 | Letter from Ghazi Abbar to Rajiv Sennar | 8/29/2007 | ABBAR 4617 | |
| TX 784 | Email from John Yu et al to HYB Fund Derivatives Trading, et al. (Example of Trade Redemption Documents and Notional Adjustment Request Notice) | 10/23/2007 | ABBAR 1799 | ABBAR 1807 |
| TX 785 | Examples of Investment Recommendations by Ghazi Abbar to Rajiv Sennar | 5/18/2006 | ABBAR 2890 | ABBAR 2930 |
| TX 786 | Email from Paola Lazzarotta to John Yu et al. re: Ajial 10-13-2008 Deleverage Redemptions | 10/13/2008 | ABBAR 2548 | ABBAR 2553 |
| TX 790 | Certified translation of power of attorney | [] | ABBAR 12330 | ABBAR 12334 |
| TX 791 | Certified translation of power of attorney | [] | ABBAR 12335 | ABBAR 12339 |
| TX 792 | Certified translation of power of attorney | [] | ABBAR 12340 | ABBAR 12345 |
| TX 793 | Certified translation of power of attorney | 3/7/2011 | ABBAR 12346 | ABBAR 12347 |
| TX 794 | Cover letter and Letter of Principles re: JT647 Trust | 10/3/00 and 7/10/00 | ABBAR 12348 | ABBAR 12353 |
| TX 795 | Cover letter and Letter of Principles re: JT647 2006 Trust | 12/17/07 and 12/3/07 | ABBAR 12354 | ABBAR 12359 |
| TX 799 | Email from James Wathan to Mohanned Noor, cc Rajiv Sennar, re: RE: Leverage | 1/19/2006 | CITI 455 | CITI 455 |
| TX 800 | Citi ̶Strategic Funding Solutions for Hedge Funds, Global Hybrid Solutions Group ó July 2007ø | July 2007 | CITI 189 | CITI 217 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 801 | Compendium of emails from Patricia Hogan and John Yu attaching monthly statements; monthly statements; letter from CGML re Notional Removal Adjustment | 2007 2008 2009 | ABBAR 1624 - 1645, 1289, 1692, 2289 - 2292 | |
| TX 805 | Email from Rajiv Sennar to multiple parties re: Ghazi Trade | 4/10/2006 | CITI 822 | CITI 824 |
| TX 806 | Letter to John Rich from Milbank re: production | 6/7/2012 | | |
| TX 807 | Email from Lafforgue to Gupta re: FW: Amatra Portfolio | 4/27/2006 | CITI 015348 | CITI 015355 |
| TX 808 | Email from Glusstein to Tse re: Amendment to Approved PE facility | 3/15/2007 | CITI 015284 | CITI 015318 |
| TX 809 | Email from Weir to Haider re: Ghazi Abbar | 7/16/2008 | CITI 015319 | CITI 015344 |
| TX 814 | FINRA Uniform Submission Agreement signed by Defendant | 8/10/2011 | | |
| TX 816 | Citi Private Bank At a Glance | | ABBAR 203 | ABBAR 204 |
| TX 817 | Example of Trade Redemption Document and Notional Adjustment Request Notice | 11/5/2007 11/1/2007 11/1/2007 11/1/2007 | CITI 005010 | CITI 005015 |
| TX 818 | Email from Sennar to Burns RE: NY CMAC Meeting - Thursday April 27 - Ajial Amtra Leverage Options | 4/26/2006 | CITI 001524 | CITI 001529 |
| TX 819 | Email from Burns to Mathur RE: Ghazi Abbar Transaction | 4/11/2006 | CITI 00680 | CITI 00681 |
| TX 820 | Email from Mathur to Burns RE: Ghazi Abbar Transaction | 4/10/2006 | CITI 000622 | CITI 000625 |
| TX 821 | Email from Wathan to Sennar RE: Leverage | 1/19/2006 | CITI 000453 | CITI 000454 |
| TX 822 | Request for Subscription for Shares of Amatra Investments Limited from CGMI to Amatra Investments Limited | 5/9/2006 | | |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number |
|---|---|---|---|---|
| TX 824 | Letters to Ajial Feeder and Amatra Feeder from CGML | 11/18/2009 | ABBAR 4358 | ABBAR 4361 |
| TX 826 | Email from Rajiv Sennar to James Wathan re FW: Amatra-Ajial New Investments for May month end | 5/16/2006 | CITI 001994 | CITI 001998 |
| TX 827 | Citigroup Private Bank monthly statements for the Feeder Funds | | ABBAR 012366 | ABBAR 012583 |
| TX 828 | Draft Side letter relating to certain transfers of value in connection with the Option Transaction | 4/21/2006 | CITI 013925 | CITI 013928 |
| TX 829 | CONFIDENTIAL: Separation Agreement | 6/22/2012 | CITI 015376-C | CITI 015387-C |

## SCHEDULE 2

### EXHIBITS PLAINTIFF INTENDS TO OFFER TO WHICH DEFENDANTS OBJECT

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 16 | Citigroup Corporate and Investment Bank Global Master Service Contract | 12/14/2001 | | | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 17 | Appendix A to the Citigroup Corporate and Investment Bank Global Master Service Contract | 12/15/2005 | | | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 45 | Intra-Citi Service Agreement | 1/1/2008 | CITI 015258 | CITI 015283 | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 200 | Abdullah Mahmoud Abbar Account Application | 1/19/1994 | | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 201 | Gama Investment Holdings Limited Account Application | 4/28/1996 | | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 202 | Letter from Ghazi Abbar to Patrick J. Pico re Ghazi Abdullah Abbar Account Application | 10/30/1996 | ABBAR 3059 | ABBAR 3084 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 207 | Signature Page to Transaction with Non-party | 9/1/2005 | CITI 12128 | CITI 12129 | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 225 | Email from Beat Glusstein to Clark Kall and others re: LPUT income distribution | 1/25/2006 | CITI 004430 | CITI 004431 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 242 | Email from Richard Burns to Peter Jackson re: Saudi Business | 4/7/2006 | CITI 010353 | CITI 010354 | Defendant objects on the grounds of: completeness (Fed. R. Evid. 106). Defendants have requested an *in camera* review of TX 242. |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 275 | Application Concerning the Formation of Mosaic Investment Management | 6/8/2006 | ABBAR 4961 | ABBAR 4965 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 286 | Email from Ghazi Abbar to Mohanned Noor re: Term Sheet, attaching Ghazi Abbar's comments to a private equity facility term sheet | 10/30/2006 | CITI 004410 | CITI 004412 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 322 | Annual Suitability Confirmation Letter from the Private Bank to Ghazi Abbar | 10/12/2007 | ABBAR 181 | ABBAR 182 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 323 | Termination Agreement for trade with Non-party. | 10/19/2007 | CITI 012123 | CITI 012127 | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 336 | Annual Suitability Confirmation Letter from Private Bank to Abdullah Abbar | 3/27/2008 | ABBAR 153 | ABBAR 154 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 373 | Email from Ghazi Abbar to Private Bank regarding attached Annual Suitability Confirmation Letter | 9/1/2009 | ABBAR 4818 | ABBAR 4820 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 384 | Swiss Federal Penal Code Art. 271 (Translation) | Undated | | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 397 | Email from Ned Noor to Ghazi Abbar copying George Bower RE: Ajial and Amatra Leveraged Feeder companies | 4/27/2007 | ABBAR 4474 | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 500 | Email from Rajiv Sennar to Ghazi Abbar re: Home email and number | 3/4/2008 | CITI 010342 | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 502 | Email from Rajiv Sennar to Ghazi Abbar re: DB MENA Equity Conferences and attachments | 2/16/2009 | ABBAR 1584 | ABBAR 1592 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 503 | Email from Rajiv Sennar to James Wathan re: FW Plantation Update | 9/17/2007 | CITI 004492 | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 504 | Email from Rajiv Sennar to James Wathan re: hi | 7/24/2007 | CITI 004483 | CITI 004484 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 505 | Email from Rajiv Sennar to Ghazi Abbar re: Plantation Memo Oct 18, 2007, attaching Project Plantation Description dated Oct 18, 2007 | 10/18/2007 | CITI 004558 | CITI 004564 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 509 | Email from James Wathan to Rajiv Sennar re: Mnemonics, attaching account opening documents of Ajial, Ajial Leveraged, Amatra, and Amatra Leveraged | 5/11/2006 | CITI 010310 | CITI 010310 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 510 | Email from Nelson Libby to James Wathan and Robert Moore re: Account AJIALLEV Approval Status Change Notification | 5/9/2006 | CITI 010311 | CITI 010311 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 511 | Email from Nelson Libby to James Wathan and Robert Moore re: Account AJIAL Approval Status Change Notification | 5/9/2006 | CITI 010312 | CITI 010312 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 512 | Email from Nelson Libby to James Wathan and Robert Moore re: Account AMATRLEV Approval Status Change Notification | 5/9/2006 | CITI 010313 | CITI 010313 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 513 | Email from Nelson Libby to James Wathan and Robert Moore re: Account AMATRA Approval Status Change Notification | 5/9/2006 | CITI 010314 | CITI 010314 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 522 | Email from Craig Seledee to Rajiv Sennar re: CBNA, CGMI and CGML Signatories | 12/20/2007 | CITI 009321 | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 564 | Letter from Ghazi Abbar to Patrick J. Pico, attaching Private Bank Account Applications. | 10/30/1996 | ABBAR 162 | ABBAR 180 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 565 | Annual Suitability Confirmation Letters from the Private Bank | 2006-2010 | ABBAR 4225 | ABBAR 4239 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 576 | Stephen Schurr, *You have met the cowboys, now meet hedge fund organisation man*, Financial Times | 4/17/2006 | | | Defendant objects on the grounds of: relevance (Fed. R. Evid. 401) |
| TX 591 | Claude Serfilippi Curriculum Vitae (Chadbourne & Parke website) | 3/14/2012 | CITI 013782 | CITI 013785 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 592 | Press release: Chadbourne Names Claude S. Serfilippi Managing Partner of London Office (Chadbourne & Parke website) | 2/16/2004 | CITI 013790 | | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 593 | Email from Rajiv Sennar to Ghazi Abbar re: Amatra Option Confirmation 3-16-06, attaching draft Amatra - Leverage Option Confirm | 3/17/2006 | CITI 000494 | CITI 000562 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 594 | Email from William Greason to Claude Serfilippi, Denis Petkovic, and Robin Mizrahi re: Amatra's agreements, attaching Deutsche Bank loan agreement and draft Confirmation | 4/4/2006 | ABBAR 5238 | ABBAR 5323 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 598 | Email from Adrian Chopin to Chris Owen re: (12230-01899) | 4/18/2006 | CITI 013800 | CITI 013802 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 599 | Email from Adrian Chopin to Chris Owen and Claude Serfilippi re: Amatra documents (12230-01899), with attachments | 4/22/2006 | CITI 013929 | CITI 013945 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 600 | Email from Kevin O'Sullivan to Rajiv Sennar, Jonathan Asher, and Craig Seledee re: Comments from Chadbourne Parke (12230-01899), with attachments | 5/3/2006 | CITI 013992 | CITI 014025 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 601 | Email from Carl Jenkins to Chris Owen and Claude Serfilippi re: Amatra/Ajial IAA (blacklined) (12230-01899), with attachments | 5/5/2006 | CITI 003718 | CITI 003735 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 602 | Email from Claude Serfilippi to Rajiv Sennar, Kevin O'Sullivan, Raphael Lebrun, and Craig Seledee re: Amatra documents (12230-01899), with attachments | 5/7/2006 | CITI 014261 | CITI 014278 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 603 | Email from Kevin O'Sullivan to Claude Serfilippi and Rajiv Sennar re: Revised IAA (12230-01899), with attachments | 5/7/2006 | CITI 014279 | CITI 014294 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 604 | Email from Claude Serfilippi to Kevin O'Sullivan and Rajiv Sennar re: Revised IAA (12230-01899), with attachments | 5/8/2006 | CITI 014323 | CITI 014338 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 605 | Email from Adrian Chopin to Claude Serfilippi, Kevin O'Sullivan, and Rajiv Sennar re: Revised IAA (12230-01899), with attachments | 5/8/2006 | CITI 014306 | CITI 014322 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 606 | Email from Kevin O'Sullivan to Chris Owen and Claude Serfilippi re: Option and IAA (12230-01899), with attachments | 5/9/2006 | CITI 014347 | CITI 014435 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 608 | Email from Claude Serfilippi to Rajiv Sennar, Christopher Owen, and Ghazi Abbar re: Disclosure Letter | 5/7/2008 | CITI 014295 | CITI 014298 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 609 | Email from Rajiv Sennar to Sandeep Kumar Singh re: Structuring Fee Letters, with attachments | 5/11/2006 | CITI 001919; CITI 004349A | CITI 001920; CITI 004351A | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 610 | Email from Kevin O'Sullivan to Rajiv Sennar re: Option Agreement/AMATRA (12230-01899), attaching Option Agreement | 5/4/2006 | CITI 014026 | CITI 014064 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 614 | Email from Mohanned Noor to Claude Serfilippi and Ghazi Abbar re: Private Equity Financing, with attachments | 1/9/2007 | CITI 002782 | CITI 002788 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| TX 615 | Email from Claude Serfilippi to Sandra Forbes re: Exculpatory Letter, with attachments | 2/15/2007 | CITI 014600 | CITI 014603 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 616 | Email from John Barnett to Claude Serfilippi and Ghazi Abbar re: Exculpatory Clauses Notice; Agreed Terms and Conditions; TSA, with attachments | 3/5/2007 | CITI 006380 CITI 012507 | CITI 006385 CITI 012548 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 617 | Email from Mohanned Noor to Claude Serfilippi and Ariel Ezrahi re: Credit Agreement - Version 21 | 3/22/2007 | CITI 014704 | CITI 014706 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 618 | Email from Claude Serfilippi to Will Whitt re: LPUT - Credit Agreement amendments, with attachments | 5/3/2007 | CITI 014859 | CITI 014869 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) |
| TX 823 | CGML Spreadsheet | | CITI 010609 | CITI 010624 | Defendant objects on the ground of: relevance (Fed. R. Evid. 401) Foundation (Fed. R. Evid. 602) |

## SCHEDULE 3

## EXHIBITS DEFENDANTS INTEND TO OFFER TO WHICH PLAINTIFF OBJECTS

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 6** | Email from Rajiv Sennar to Stephen Hsu and others re: Reminder - Global Hybrids CMAC Pipeline Meeting | 2/8/2006 | CITI 000461 | CITI 000463 | Relevance |
| **TX 11** | Broker Check Report for Richard Burns | Undated | ABBAR 10691 | ABBAR 10698 | Hearsay |
| **TX 14** | Email from Samir Mathur to Richard Burns re: Hybrids Key Policy Compliance Procedures, with attachments | 1/25/2006 | CITI 007785 | CITI 007794 | Relevance |
| **TX 20** | Email from Erwin Parviz to Richard Burns with no subject indicated | 10/31/2006 | CITI 004415 | CITI 004417 | Relevance |
| **TX 21** | Email from Richard Burns to Richard Moore re: As promised, with attachments | 11/9/2006 | CITI 012137 | CITI 012145 | Relevance |
| **TX 27** | Hybrids Compensation Spreadsheet 2006 | Undated | CITI 012146 | CITI 012147 | Relevance |
| **TX 28** | Email from Rajiv Sennar to Mark Overley re: P&L Estimates for 2007 | 10/25/2007 | CITI 012223 | CITI 012224 | Relevance |
| **TX 29** | Hybrids Compensation Spreadsheet | Undated | CITI 012146 | CITI 012147 | Relevance |
| **TX 32** | Email from James Forese to Richard Burns re: Blackstone IPO Allocation for Ghazi | 6/20/2007 | CITI 004477 | | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 33** | Email from Rajiv Sennar to Richard Burns re: Urgent - Ghazi Abbar | 6/22/2007 | CITI 001221 | CITI 001222 | Relevance |
| **TX 223** | Email from Wathan to Sennar re leverage | 1/19/2006 | CITI 453 | | Relevance |
| **TX 234** | Email from Sennar to Noor et al., re FW: PV on Amatra's loan | 3/30/2006 | ABBAR 1091 | | Relevance |
| **TX 241** | Email from Sennar to Ghazi re DB Loan Mark to Market | 4/7/2006 | ABBAR 1095 | | Relevance |
| **TX 253** | Email from Abbar to Kveim re | 4/19/2006 | ABBAR 4996 | ABBAR 4997 | Completeness |
| **TX 262** | Email from Sennar to Abbar re Physical Settlement | 4/27/2006 | ABBAR 1108 | | Relevance |
| **TX 276** | Email from Noor to Yu re Re: Amatra Cash Movement for 5mm | 7/13/2006 | CITI 2539 | CITI 2540 | Relevance |
| **TX 280** | Email from Albin to Sennar re RE: Ajial and Amatra | 8/14/2006 | CITI 5252 | | Relevance |
| **TX 284** | Email from Abbar to Kozlowski re: thanks letter | 9/28/2006 | ABBAR 1143 | | Relevance |
| **TX 285** | Letter from Kozlowski to Abbar | 9/29/2006 | ABBAR 10500 | | Relevance |
| **TX 290** | Email from Parviz to Sennar re RE: Resume for client | 12/6/2006 | CITI 5425 | | Relevance |
| **TX 292** | Letter from Abbar to Noor Re: Radar Capital Ltd | 12/27/2006 | ABBAR 1444 | | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 297** | Email from Sennar to Lawlor re Karim Job | 1/30/2007 | CITI 5583 | | Relevance |
| **TX 312** | Email from Noor to Abbar re Fw: Bear Stearns High Grade Update | 6/28/2007 | ABBAR 4975 | ABBAR 4976 | Relevance |
| **TX 313** | Intentionally left blank | | | | |
| **TX 320** | Email from Bower to Yu re RE: Amatra Investment Limited | 9/18/2007 | ABBAR 10347 | ABBAR 10348 | Relevance |
| **TX 321** | Email from Sennar to Fraynt re: Ajial and Amatra IG Monitoring July | 9/21/2007 | CITI 2957 | CITI 2958 | Relevance |
| **TX 332** | Email from Abbar to Noor Re: Fwd: Mr. Sharma's Jeddah Visit | 1/14/2008 | ABBAR 1506 | | Relevance |
| **TX 333** | Email from Noor to Abbar re FW: ***COLLECTING ORDERS: PI 8316 5 indices auto-call, 1 year 60% KI, 12.50% pa | 1/18/2008 | ABBAR 4536 | ABBAR 4541 | Relevance |
| **TX 335** | Email from Abbar to "SALLIE CITI" Re: India visit | 3/19/2008 | ABBAR 1507 | | Relevance |
| **TX 337** | Email from Yu to Bower re Ajial and Amatra | 4/9/2008 | ABBAR 9345 | | Relevance |
| **TX 338** | Letter from Abbar to Krawcheck | 4/12/2008 | ABBAR 1509 | | Relevance |
| **TX 343** | Letter from Krawcheck to Abbar | 5/9/2008 | ABBAR 1510 | | Relevance |
| **TX 349** | Email from Abbar to Krawcheck re: New York visit | 6/2/2008 | ABBAR 32 | | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 350** | Email from Abbar to Wilson-Perez re: New York visit | 6/2/2008 | ABBAR 1514 | | Relevance |
| **TX 351** | Email from Abbar to Nolte re: New York visit | 6/2/2008 | ABBAR 1518 | | Relevance |
| **TX 352** | Email from Abbar to Pandit re: New York visit | 6/3/2008 | ABBAR 1519 | | Relevance |
| **TX 353** | Email from Abbar to Barber re: New York visit | 6/3/2008 | ABBAR 1520 | | Relevance |
| **TX 354** | Letter from Abbar to Krawcheck | 6/5/2008 | ABBAR 31 | | Relevance |
| **TX 357** | Email from Yu to Bower re Meeting with Florina | 6/11/2008 | ABBAR 9274 | | Relevance |
| **TX 358** | Email from Yu to Bower re RE: Meeting with Florina | 6/16/2008 | ABBAR 9271 | | Relevance |
| **TX 362** | Email from Bower to Noor re Investment advice letter | 7/15/2008 | ABBAR 2958 | ABBAR 2959 | Relevance |
| **TX 371** | Letter to G. Abbar from Lazzarotto re Notice of Termination of Investment Advisory Agreement | 1/29/2009 | ABBAR 1235 | ABBAR 2553 | Relevance |
| **TX 374** | Email from Hogan to Ghazi & Bower re Amatra/Ajial ASCO transactions | 9/22/2009 | ABBAR 8498 | ABBAR 4779 | RULE 408 |
| **TX 375** | Email from O'Connell to Bower re RE: Citigroup's restructuring proposal | 11/5/2009 | ABBAR 5163 | | RULE 408 |
| **TX 376** | Email from O'Connell to Ghazi re Citigroup's updated restructuring | 11/16/2009 | ABBAR 8257 | | RULE 408 |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
|  | proposal |  |  |  |  |
| TX 377 | Email from Bower to Houston re: Hedge Fund Information | 1/18/2010 | ABBAR 5187 |  | Relevance |
| TX 387 | Indicative Summary of Proposed Restructuring | Undated | ABBAR 5113 |  | RULE 408 |
| TX 389 | Email from Haider to Tse and others Re: Gos New York Schedule for June 3-9, with attachments | Undated | CITI 6925 | CITI 6948 | Relevance |
| TX 390 | Intentionally left blank |  |  |  |  |
| TX 553 | Email from Bower to Yu Subject: Ajial Target Ratio - Action Plan for Correction within 90 Days | 4/10/2008 | ABBAR 4545 | ABBAR 4552 | Relevance, Completeness |
| TX 700 | Email from Paul Fraynt to George Bower cc: Yu, Mathur, Hogan, Kim, Albin re: RE: Investment Guideline Template for Amatra and Ajial | 4/16/2008 | ABBAR 9334 | ABBAR 9335 | Relevance |
| TX 701 | Email from John Yu to Mohanned Noor and George Bower cc: Albin, Mishra, Klingbaum, Valtchev, Fraynt, Mathur re Ajial and Amatra The Bear Stearns High Grade Structured Credit Fund | 6/15/2007 | ABBAR 9954 |  | Relevance |
| TX 706 | Email from George Bower to Samir Mathur re: RE: Catch up | 10/7/2008 | ABBAR 4693 |  | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 707** | Email from George Bower to Samir Mathur cc: Ghazi Abbar, Maroun, Liz Bower re: August Hedge Fund report | 10/7/2009 | ABBAR 4824 | | Relevance |
| **TX 709** | Email from George Bower to Samir Mathur et al.  Re: Conference Call with Citi | 10/20/2008 | ABBAR 1685 | | Relevance |
| **TX 710** | Email from George Bower to Samir Mathur re: RE: Ajial Leveraged Feeder Holdings Limited; Amatra Leveraged Feeder Holdings Limited | 10/18/2008 | ABBAR 4744 | ABBAR 4747 | Relevance |
| **TX 712** | Email from George Bower to John Yu, Samir Mathur cc: Wathan, Noor, Bouafsoun, Ghazi Abbar, Walker re: RE: A**** Portfolios - Deleverage planning | 9/29/2008 | ABBAR 4687 | ABBAR 4688 | Relevance |
| **TX 713** | Email from George Bower to John Yu, Samir Mathur cc: Wathan, Noor, Bouafsoun, Ghazi Abbar, Walker re: RE: A**** Portfolios - Deleverage planning | 9/29/2008 | ABBAR 4685 | | Relevance |
| **TX 715** | Email from John Yu to Rajiv Sennar et al. re: RE: Amatra 12-31-2007 Subscription | 1/3/2008 | CITI 005033 | CITI 005036 | Relevance |
| **TX 721** | Email from Samir Mathur to Rajiv Sennar re: RE: Ghazi Abbar Transaction | 4/7/2006 | CITI 000617 | | Relevance |
| **TX 723** | Email from James Wathan to Rajiv Sennar re:  Re: Ghazi Trade: CIS and Call | 4/13/2006 | CITI 000894 | CITI 000898 | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 724** | Email from James Wathan to Rajiv Sennar re: Fw: Ghazi Trade: CIS and Call | 4/13/2006 | CITI 000899 | CITI 000902 | Relevance |
| **TX 725** | Email from James Wathan to Rajiv Sennar re: Re: Ghazi Trade: CIS and Call | 4/13/2006 | CITI 000903 | CITI 000907 | Relevance |
| **TX 726** | Email from James Wathan to Rajiv Sennar re: Re: Ghazi Trade: CIS and Call | 4/13/2006 | CITI 000908 | CITI 000912 | Relevance |
| **TX 727** | Email from Rajiv Sennar to Mohanned Noor and James Wathan re: RE: Ghazi Trade: CIS and Call | 10/20/2006 | CITI 002573 | CITI 002576 | Relevance |
| **TX 734** | Email from John Yu to George Bower cc: Sennar, Noor, Ghazi Abbar and Valtchev re: RE: AM Haircut | 11/24/2007 | ABBAR 9575 | | Relevance |
| **TX 737** | Email from John Yu to George Bower re RE: Ajial Leverage costs accrued | 2/21/2008 | ABBAR 9478 | ABBAR 9479 | Relevance |
| **TX 738** | Email from John Yu to George Bower re RE: Leveraged Swap Statement | 2/25/2008 | ABBAR 9463 | ABBAR 9464 | Relevance |
| **TX 739** | Email from George Bower to John Yu re RE: deleverage | 2/27/2008 | ABBAR 10308 | | Relevance |
| **TX 740** | Email from George Bower to John Yu re RE: deleverage | 2/27/2008 | ABBAR 10306 | ABBAR 10307 | Relevance |
| **TX 741** | Email from John Yu to George Bower re RE: Amatra and Ajial Interest Accrual | 3/4/2008 | ABBAR 9446 | ABBAR 9448 | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 752** | Email from George Bower to John Yu cc Vardon, Pinkerton, Noor re RE: Amatra 7-16-2008 Redemption | 7/16/2008 | ABBAR 10224 | ABBAR 10226 | Relevance |
| **TX 756** | Email from John Yu to George Bower and Samir Mathur cc  Wathan, Noor, Bouafsoun, Ghazi Abbar, and Walker re RE: A**** Portfolios - Delverage planning | 9/29/2008 | ABBAR 9058 | ABBAR 9059 | Relevance |
| **TX 757** | Email from John Yu to George Bower re RE: Strike Numbers | 10/2/2008 | ABBAR 9044 | ABBAR 9048 | Relevance |
| **TX 760** | Email from George Bower to John Yu cc Mathur, Walker, Albin re RE: Plan B-Alt and Plan C | 10/10/2008 | ABBAR 10146 | ABBAR 10149 | Relevance |
| **TX 773** | FINRA BrokerCheck - Firm Search Results for "Smith Barney" | 6/21/2012 | ABBAR 11194 | ABBAR 11197 | Hearsay, Relevance, 403 |
| **TX 774** | FINRA BrokerCheck Report for CGMI | 6/21/2012 | ABBAR 11198 | ABBAR 12321 | Hearsay, Relevance, 403 |
| **TX 788** | Emails sent and received by Rajiv Sennar | various | various | various | Authenticity, Completeness |
| **TX 789** | Emails sent and received by Samir Mathur | various | various | various | Authenticity, Completeness |
| **TX 796** | Letter from Ghazi Abbar and Abdullar Abbar re JT647 Trust and JT647 2006 Trust | 5/5/2012 | ABBAR 12360 | | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| **TX 797** | Letter from Ghazi Abbar re JT808 Trust and JT808 2006 Trust | 5/5/2012 | ABBAR 12361 | | Relevance |
| **TX 798** | Deed of Assignment | 5/5/2012 | ABBAR 12362 | ABBAR 12365 | Relevance |
| **TX 802** | Email from Paul Fraynt re: Investment Guidelines. | 4/16/2008 | ABBAR 9325 | ABBAR 9327 | Relevance |
| **TX 803** | Email from O'Connell to Bower re: Citigroups Restructuring Proposal | 11/9/2009 | ABBAR 8258 | ABBAR 8258 | Rule 408 |
| **TX 804** | Compendium of Emails between George Bower, Ghazi Abbar, O'Connell and/or Houston | various | ABBAR 5191 ABBAR 5193 ABBAR 5195 ABBAR 5222 | ABBAR 5192 ABBAR 5194 ABBAR 5195 ABBAR 5222 | Rule 408, Completeness, Foundation, Authenticity |
| **TX 810** | Email from Burns to Sennar FW: Urgent - Ghazi Abbar | 6/22/2007 | CITI 012215 | CITI 012216 | Relevance |
| **TX 811** | Email from Forese to Noor FW: Urgent - Ghazi Abbar | 6/22/2007 | CITI 012217 | CITI 012218 | Relevance |
| **TX 812** | Email from Sennar to Burns RE: Urgent - Ghazi Abbar | 6/22/2007 | CITI 012219 | CITI 012220 | Relevance |
| **TX 813** | Email from Sennar to Burns RE: Urgent - Ghazi Abbar | 6/22/2007 | CITI 012221 | CITI 012222 | Relevance |
| **TX 815** | Compendium of FINRA Broker Check Reports for CGMI Registered Representatives | | | | Foundation, Authenticity, Hearsay |
| **TX 825** | Email from Rajiv Sennar to James Wathan re FW: Wednesday, 24th May | 5/19/2006 | CITI 002244 | CITI 002246 | Relevance |

| Trial Exhibit Number | Exhibit Description | Date | Begin Bates Number | End Bates Number | Objection |
|---|---|---|---|---|---|
| | @ 10 am | | | | |