USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/2/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - X

CITIGROUP GLOBAL MARKETS, INC.

                                           Plaintiff,

                               11 Civ. 6993 (LLS)

                 -against-

                                             OPINION

GHAZI ABBAR (as an individual and as
temporary administrator of the estate of
Abdullah Mahmoud Abbar), AJIAL LEVERAGED
FEEDER HOLDINGS, LTD., AMATRA LEVERAGED
FEEDER HOLDINGS, LTD., AMAVEST HOLDINGS,
LTD. GAMA INVESTMENT HOLDINGS, LTD., and
CHRISTINE WOODHOUSE (as temporary
administrator of the estate of Abdullah
Mahmoud Abbar)

                                           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - X

    Defendant Ghazi Abbar arranged the investment of his family's wealth with affiliates of Citigroup, Inc. ("Citigroup"), a large multinational financial services provider with numerous business divisions and offices worldwide. The investments performed poorly, and Sheikh Abbar, whom I shall call Mr. Abbar in accordance with American usage, asserts that Citigroup is responsible. It is not the function of this proceeding to adjudicate those claims, but simply to determine whether he can compel arbitration of them here.

    Mr. Abbar claims a right to arbitrate his dispute against a separately incorporated component of Citigroup, Citigroup Global Markets, Inc. ("CGMI"). CGMI has brought this proceeding to

enjoin his doing so. So far, that issue has given rise to a year and a half of litigation with depositions, discovery, travel, and extensive preparations for the trial which we are now completing on its ninth day.

Rule 12200 of the Code of Arbitration Procedure of the Financial Industry Regulatory Authority (known as FINRA) requires FINRA members (including CGMI) to arbitrate disputes at the request of their customer. The defendants led by Mr. Abbar filed a claim with FINRA seeking its arbitration over CGMI's claimed mishandling of the investments. CGMI denies the defendants were its customers. It says they were customers of a different Citigroup business entity called Citigroup Global Markets, Ltd. ("CGML") located in London. CGMI filed this suit and moved to preliminarily enjoin the arbitration of this dispute before FINRA. The hearing on that motion was consolidated with this trial on the merits under Fed. R. Civ. P. 65(a)(2).

For the reasons which follow, the injunction is granted.

## BACKGROUND

In late 2005 to early 2006, Ghazi Abbar's private banker Mohanned Noor changed employment from Deutsche Bank to Citigroup Private Bank in Geneva, and sought to bring the Abbar family's business with him. In the following months, Abbar family trusts

(through defendant investment vehicles Amatra Leveraged Feeder Holdings, Ltd. and Ajial Leveraged Feeder Holdings, Ltd.) purchased option agreements in London from Citigroup Global Markets, Ltd. ("CGML"), in a transaction which provided the Abbars with "leverage" substantially increasing the size of their hedge fund investments, and included forum selection and choice-of-law clauses directing the resolution of disputes in the courts of England and under English law.

Under the structure of the options transaction, "reference funds" owned by CGML, controlled by CGMI, and managed by Ghazi Abbar held the Abbars' hedge fund investments, which were increased by "leverage" funds extended by CGML in exchange for a form of interest payment. CGML owned the economic interest in the reference funds, and CGMI the voting interest. The funds hired Ghazi Abbar as their "Investment Advisor," establishing a mechanism for him to select the funds' investments, subject to CGMI's approval.

The options entitled the Abbar trusts to the value of the assets held in the reference funds, less the leverage funds and accumulated interest, and CGML extended the leverage on a non-recourse basis. CGML's ownership of the reference funds secured its position in the transaction: it would only lose money if the

value of the reference funds' hedge fund holdings fell enough to impair the then value of the leverage funds (the "gap risk").

The process of structuring and negotiating the options required substantial work by CGMI personnel and frequent communications between them and Mr. Abbar. After closing, CGMI employees continued to monitor the risk to CGML and helped prepare monthly reports on the status of the funds. As owner of the voting shares of the reference funds, CGMI reviewed and approved the investment recommendations submitted by Ghazi Abbar as the funds' Investment Advisor, and assisted Mr. Abbar and his agents in completing the submission procedures.

CGMI personnel devised the structure of the options transaction because such "fund derivatives" were within their specialty, whereas CGML's London traders typically arranged investments in different financial products. CGMI personnel were familiar with working with colleagues employed by other business divisions, and regarded that as part of their service of CGMI.

That arrangement was understood and in fact desired by Mr. Abbar. He paid little attention to which Citigroup legal entity happened to employ the bankers working with him. He wanted his Swiss banker Noor "to be able to walk the corridors of the entire Citigroup," and to "have access to the entirety of

4

Citigroup through" Noor "wherever the best people were." Mr. Abbar himself interacted with employees of numerous Citigroup divisions and offices located in Geneva and London, as well as in New York.

That practice was documented internally, albeit episodically, in intra-Citigroup business arrangements, was formalized on significant occasions in powers of attorney (including one which granted a CGMI managing director authority to sign the transaction confirmations on CGML's behalf), and given economic effect by systems for accounting adjustments to reflect the value of services performed by Citigroup affiliates for other Citigroup affiliates.

That is consistent with CGMI's involvement in the transaction after closing. In assisting with the preparation of monthly reports, CGMI employees helped satisfy CGML's contractual obligation to provide such reports. They performed due diligence on hedge fund assets to determine the appropriate amount of leverage CGML should extend on the investments, in light of the risk to CGML's funds. With its power as the voting shareholder, CGMI exercised control over the reference funds' investment decisions to protect CGML's economic interest, more than to provide Mr. Abbar with beneficial services, overriding his own wishes as Investment Advisor.

When the transaction came under stress, CGMI removed Mr. Abbar as Investment Advisor, and its employees participated in efforts to "work out" the transaction with Mr. Abbar. Those efforts failed, the Abbar family lost a considerable amount of money, and Mr. Abbar filed a statement of claim with FINRA on behalf of himself, his father, and their investment vehicles.

The statement of claim includes allegations concerning a failed private equity loan facility completed with Citibank (Switzerland) SA, a Swiss commercial bank, and Citibank, NA (Geneva Branch). CGMI personnel played no role in negotiating the private equity loan facility. They participated in approvals and in the "work out" process, and spoke generally to Mr. Abbar about private equity investing. Mr. Abbar asserts some relationship between the loan facility and the options transaction in that he considered the two a "package deal," that leverage from the options transaction was at times extended to assets collateralizing the loan facility, and that "work out" discussions proposed consolidation of the two transactions.

## DISCUSSION

Under FINRA Rule 12200,

Parties must arbitrate a dispute under the Code if:

- Arbitration under the Code is either:
    (1) Required by a written agreement, or

    (2)   Requested by the customer;

- The dispute is between a customer and a member or associated person of a member; and

- The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

1.

When arbitration is resisted, Article 9 of the United States Code, Section 4 provides that "The court shall hear the parties" and if "the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." "Summarily" means "without delay or formality," Webster's Third New International Dictionary 2289 (3rd ed. 1981), as compared to "plenary."

That is because the decision is not like one of tort liability, part of the trial, but one that precedes and settles the nature of the trial itself.

Because of the method of determining the application of the word "customer," this proceeding has not been summary but plenary. The statement of claim was filed twenty months ago, and the complaint in this case was filed nineteen months ago. The Amended Joint Pretrial Order was 130 pages long: plaintiff proposed 363 findings of fact, defendants 397. There were nine

albums containing scores of exhibits. We are concluding on the ninth day of trial.

That is because the question whether Mr. Abbar was a "customer" of CGMI was seen to require examining and evaluating the substance, nature, and frequency of each interaction and task performed by the various persons who dealt with Mr. Abbar, their contemporaneous understandings of whose behalf the person was acting, and the extent to which the person's activities shaped or caused the transaction, in the hope that such facts would coalesce into a functional concept of the customer relationship capable of supporting a judicial determination.

Upon my appraisal of the documentary evidence as a whole, and the credible and germane testimony, I would rule that Mr. Ghazi Abbar and the other defendants were not customers of CGMI, primarily because of the overwhelming significance of the execution of the transactions with CGML and the Swiss banks, and that the planning, structuring, and other services performed by CGMI in New York were ancillary and collateral to those central core transactions.

However, I do not rest that decision on those grounds which require, as they have in this case, such an expenditure of time, expense and effort to establish as to make a mockery of the statutory concept that whether there is an agreement to

8

arbitrate be decided by the court at the outset, and promptly. There is a better way.

2.

The more direct, available, reliable, and predictable ground for decision is the one increasingly adopted by the courts and by FINRA. That is, the investor is the customer of the party with which he has the account and consummates the transaction.

The entity in which the investor has his account, and from whom the investor purchases his desired product, defines the legal and business locus of his status as a customer, and is the core of the relationship as a customer.

An account is the necessary proof of a legal and business relationship with the broker. One cannot transact this business without it. As Richard Burns, head of the Citigroup business unit which conducted the options transaction testified:

> A:   In order to transact with a U.K. broker-dealer, you have to set the account up, you have to have opened it, you have to have gone through the formal regulatory requirements for money laundering, suitability, appropriateness, background checks in order to be able to execute and contract with a counter party under – in the U.K.
>
> *       *       *
>
> Q:   In this case with your work at CGML, do you know whether CGML has any internal requirements before it does a transaction with a customer?

> A: Yes. It has fairly proscriptive policies around opening procedures, suitability procedures, compliance around KYC and AML procedures, very extensive internal policy documents.
>
> \* \* \*
>
> Q: You said before that these trades were booked at CGML, is that correct?
>
> A: Yes.
>
> Q: How do you know that?
>
> A: The contract entered into between the client and the CGML is referenced and is contracted with CGML, the finance is provided, the funding is providing of CGML's bank sheet, its books. The risk is borne by CGML, the approval process specifies which entity books the transaction, CGML. The reporting, monthly reporting is all CGML for risk.

Burns Direct, Trial Tr. vol. 2, 159:20-161:5, Apr. 22, 2013.

The purchase or account agreement is also relied upon as proof of the customer relationship by courts in the increasingly commonplace litigation over FINRA arbitrability. With the execution of the transaction, these two are the touchstones of status as a customer. None of the defendants purchased a product from or opened an account with CGMI.

The Second Circuit stated in UBS Financial Services v. West Virginia University, 660 F.3d 643, 650 (2d Cir. 2011):

> UBS asserts, and the parties conceded at oral argument, that "customer" means "someone who buys goods or services." Appellant's Br. at 18 (internal quotation marks omitted). See Webster's Third New International Dictionary 559 (3d ed. 2002) (defining

10

> "customer" as "one that purchases some commodity or service" (def. 2a)); id. at 1844 (defining "purchase" as "buy for a price" (def. 1d)); American Heritage Dictionary of the English Language 450 (4th ed. 2000) (defining customer as "[o]ne that buys goods and services" (def. 1)). Because the term is unambiguous with respect to this core definition, we need not here provide a comprehensive definition of the term under Rule 12200. The term "customer" includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member.

Accordingly, the court held for the investor, "because WVUH purchased a service, specifically auction services, from UBS," id.

The Second Circuit enjoined an arbitration in Wachovia Bank v. VCG Special Opportunities Fund, 661 F.3d 164, 173 (2d Cir. 2011), because, among other reasons, there was "no claim that VCG had a brokerage agreement" with Wachovia's FINRA-registered broker-dealer.

The Fourth Circuit concluded in UBS Financial Services, Inc. v. Carilion Clinic, 706 F.3d 319, 327 (4th Cir. 2013)

> that "customer," as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA – namely investment banking and securities business activities.

In Morgan Keegan & Co., Inc. v. Silverman, 706 F.3d 562, 567-68 (4th Cir. 2013), the court stated:

11

> Accordingly, we hold that, under the facts presented, the defendants were not "customers" of Morgan Keegan as contemplated by Rule 12200, because the defendants did not purchase commodities or services from Morgan Keegan in the course of its business activities regulated by FINRA.

In Raymond James Financial Services, Inc. v. Cary, 709 F.3d 382, 388 (4th Cir. 2013) (emphasis in original), the court stated:

> That Keough and Affeldt shared commissions and both recruited investors on behalf of Inofin does not save appellants' argument in light of our conclusion that a customer is one "who purchases commodities or services from a FINRA member."

I do not suggest that those cases are on all fours with this one, or cannot be distinguished on one ground or another, or that they control the decision here. Their value lies in the fact that in one case after another in this field of experience, the courts have taken a purchase transaction as the defining proof.

FINRA itself has provided that a recommendation of an investment does not establish a customer relationship; a brokerage account does, unless the broker receives a commission for recommending the purchase of a security directly from the issuer. Thus, its suitability rules apply

> when a broker-dealer or registered representative makes a recommendation to a potential investor who then becomes a customer. Where, for example, a registered representative makes a recommendation to purchase a security to a potential investor, the

12

> suitability rule would apply to the recommendation if that individual executes the transaction through the broker-dealer with which the registered representative is associated or the broker-dealer receives or will receive, directly or indirectly, compensation as a result of the recommended transaction.

FINRA Regulatory Notice No. 12-55, at Q&A 6(b) (Dec. 2012) (footnotes omitted).

The elements of an account and a purchase are visible to all at the outset of the dispute resolution process. Their use as a rule of decision allows ready determination of the arbitrability of disputes, and avoids the need for lengthy proceedings over whether arbitration is available. It gives the financial community reasonable expectations with respect to the rule that will apply. That is the ground of decision in this case, and it should be applied in other such cases, with appropriate exceptions to avoid injustice.

## CONCLUSION

The evidence establishes that defendants had no agreement to arbitrate their disputes before FINRA. The motion for an injunction (Dkt. No. 3) is therefore granted, and the plaintiff shall, on consent if possible, within the next 10 days, submit a form of judgment permanently enjoining the arbitration. In case of disagreement, defendants may respond within a week.

So ordered.

13

DATED:    New York, New York
          May 2, 2013

                              _____
                                   LOUIS L. STANTON
                                      U. S. D. J.